1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | JULIE L. GARLAND
Senior Assistant Attorney General
4 | ANYA M. BINSACCA
Supervising Deputy Attorney General
5 | BRIAN C. KINNEY, State Bar No. 245344
Deputy Attorney General
6 |   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7 |   Telephone:  (415) 703-5255
   Fax:  (415) 703-5843
8 |   Email:  Brian.Kinney@doj.ca.gov

9 | Attorneys for Respondent Ben Curry, Warden
at the Correctional Training Facility

10 |

11 | IN THE UNITED STATES DISTRICT COURT

12 | FOR THE NORTHERN DISTRICT OF CALIFORNIA

13 | SAN FRANCISCO DIVISION

14 |

| | |
|---|---|
| **Darryl Dawson,** | C07-4821 WHA |
| Petitioner, | |
| v. | **ANSWER TO THE ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| **Ben Curry, Warden,** | |
| Respondent. | Judge:  The Honorable William Alsup |

1

**TABLE OF CONTENTS**

2                                                                          **Page**

3   ANSWER TO THE ORDER TO SHOW CAUSE                                       2

4   MEMORANDUM OF POINTS AND AUTHORITIES                                   10

5   ARGUMENT                                                               10

6        I.    THE STATE COURT'S DENIAL OF DAWSON'S HABEAS CLAIM
               WAS NEITHER CONTRARY TO, OR AN UNREASONABLE
7              APPLICATION OF, CLEARLY ESTABLISHED FEDERAL LAW,
               NOR BASED ON AN UNREASONABLE DETERMINATION OF THE
8              FACTS.                                                      10

9
               A.   The California Supreme Court's Decision Was Not Contrary to
10                  Clearly Established Federal Law.                       11

11                  1.   Dawson received all process due under the only United States
                         Supreme Court law addressing due process in the parole
12                       context.                                         11

13                  2.   The Ninth Circuit's some-evidence standard is not clearly
                         established federal law and, therefore, Dawson is only entitled
14                       to the process established in *Greenholtz* — not some-evidence
                         federal review.                                  12
15
                    3.   Even if the some-evidence standard were clearly established
16                       federal law, the California Supreme Court's decision did not
                         violate this standard.                           14
17
                    4.   The some-evidence standard only requires some evidence to
18                       support the Board's decision to deny parole — not evidence
                         indicating that the inmate presented a current risk to society
19                       if released.                                     17

20                  5.   The Board may rely on static factors to deny parole.    17

21                  6.   Dawson's claim regarding California's sentencing matrices
                         does not implicate a question of federal law.    18
22
               B.   The California Supreme Court's Decision Upholding the Board's
23                  Parole Denial Reasonably Determined the Facts.        19

24  CONCLUSION                                                            21

25

26

27

28

1

# TABLE OF AUTHORITIES

2

Page

3
**Cases**

*Biggs v. Terhune*
4
    334 F.3d 910 (9th Cir. 2003)     8, 17

5
*Carey v. Musladin*
    ___ U.S. ___, 127 S.Ct. 649, 653     12, 13
6

*Estelle v. McGuire*
7
    502 U.S. 62, 67 (1991)     19

8
*Foote v. Del Papa*
    492 F.3d 1026, 1029 (9th Cir. 2007)     13
9

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*
10
    442 U.S. 1, 12 (1979)     7, 11-13, 21

11
*Hicks v. Feiock*
    485 U.S. 624, 629 (1998)     19
12

*Himes v. Thompson*
13
    336 F.3d 848, 853 (9th Cir. 2003)     10, 14

14
*In re Dannenburg*
    34 Cal. 4th 1061, 1087 (2005)     7, 9, 18, 19
15

*In re Rosenkrantz*
16
    29 Cal. 4th 616, 658 (2002)     12, 14, 17

17
*Irons v. Carey*
    __ F.3d __ 2007 WL 2027359 (9th Cir. July 13, 2007)     13, 14, 17
18

*Nguyen v. Garcia*
19
    477 F.3d 716 (9th Cir. 2007)     13

20
*Sandin v. Connor*
    515 U.S. 472, 484 (1995)     7
21

*Sass v. Cal. Bd. of Prison Terms*
22
    461 F.3d 1123, 1128 (9th Cir. 2006)     7, 8, 13, 14

23
*Schriro v. Landrigan*, __ U.S. __
    127 S. Ct. 1933, 1942 (2007)     13
24

*Superintendent v. Hill*
25
    472 U.S. 445 (1985)     13, 14

26
*Wainwright v. Greenfield*
    474 U.S. 284 (1986)     13
27

*Williams v. Taylor*
28
    529 U.S. 362, 412 (2000)     10

Answer to Order to Show Cause; Memorandum of Points and Authorities

*Dawson v. Curry*
C07-4821 WHA

## TABLE OF AUTHORITIES  (continued)

| | Page |
|---|---|
| **Statutes** | |
| 28 United States Code | |
| § 2244(d)(1) | 9 |
| § 2254(d)(1-2) | 10 |
| § 2254(d)(2) | 19 |
| | |
| California Code of Regulations, Title15 | |
| § 2282 | 9, 19 |
| § 2402, subd. (b) | 18 |
| § 2402, subd. (c)(1)(A) | 15 |
| § 2402, subd. (c)(1)(B) | 15 |
| § 2402, subd. (c)(1)(C) | 15 |
| § 2402, subd. (c)(1)(D) | 15 |
| | |
| California Penal Code | |
| § 3041, subdivision (b) | 18 |
| | |
| | |
| **Other Authorities** | |
| Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) | 7, 8, 10-14, 16-19, 21 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  BRIAN C. KINNEY, State Bar No. 245344
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5255
    Fax:  (415) 703-5843
8   Email:  Brian.Kinney@doj.ca.gov

9  Attorneys for Respondent Ben Curry, Warden
   at the Correctional Training Facility

10

11                   IN THE UNITED STATES DISTRICT COURT

12               FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                          SAN FRANCISCO DIVISION

14

| | |
|---|---|
| 15  **Darryl Dawson,** | C07-4821 WHA |
| 16                            Petitioner, | **ANSWER TO THE ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 17         **v.** | |
| 18  **Ben Curry, Warden,** | |
| 19                            Respondent. | Judge:  The Honorable William Alsup |

20

21        Petitioner Darryl Dawson, an inmate at the Correctional Training Facility and serving an

22  indeterminate sentence for first-degree murder, represents himself in this habeas action.

23  Petitioner alleges that the Board of Parole Hearings unconstitutionally denied him parole at his

24  October 5, 2006 first-subsequent-parole-consideration hearing.  Specifically, Dawson argues that

25  the Board violated his due process rights because sufficient evidence did not support the Board's

26  denial.  The Court summarily dismissed Dawson's second claim — challenging the Board's

27  failure to provide reasons for the two-year denial — because it is not a cognizable claim for

28  federal habeas relief.

Answer to Order to Show Cause; Memorandum of Points and Authorities        *Dawson v. Curry*
                                                                            C07-4821 WHA

1    The Court issued a September 25, 2007 Order to Show Cause why Dawson's petition

2    should not be granted.  Respondent Warden Ben Curry answers as follows:

3                    **ANSWER TO THE ORDER TO SHOW CAUSE**

4    In response to the Petition for Writ of Habeas Corpus filed on September 19, 2007,

5    Respondent hereby admits, denies, and alleges the follows:

6    1.    Dawson is lawfully in the custody of the California Department of Corrections and

7    Rehabilitation (CDCR) following his 1981 conviction for first-degree murder, with an

8    enhancement for being armed with a firearm, and thirteen counts of robbery with the use of a

9    firearm. (Ex. A, Judgement.)  Dawson received a twelve-year sentence for the 13 robbery counts,

10   and in 1987 he began serving twenty-five years to life for the first-degree murder. (*Id.*; Ex. B,

11   2003 Life Prisoner Evaluation Report, at p. 1.)  Dawson does not challenge his underlying

12   convictions in the current proceeding.

13   2.    Respondent affirmatively alleges that in 1980 Dawson committed a string of armed

14   robberies with his crime partner, Kenneth Lamart Jordan. (Ex. B, at pp. 1-3; Ex. C, Appellate

15   Court Opinion, at pp. 3-5, 11-20; Ex. D, Probation Officer's Report, at pp. 6-8; Ex. E,

16   Supplemental Probation Officer's Report, at pp. 2-4.)  Dawson received his first-degree murder

17   conviction for his participation in the last robbery the two committed before apprehension,

18   wherein Dawson's crime partner shot a market security guard trying to use a phone. (Ex. C, at

19   pp. 16-17.)  After his partner shot the security guard, Dawson directed the store's assistant

20   manager at gunpoint down three check stands, and demanded money from each grocery checker.

21   (*Id.* at pp. 17-18.)  The security guard later died from blood loss. (*Id.* at p. 17; Ex. E, at p. 4.)  A

22   month before this murder-robbery, evidence links Dawson to another murder-robbery, which the

23   State convicted Jordan of, but not Dawson. (Ex. C, at pp. 14-15.)  The various robberies

24   transpired on two nights, January 30, 1980, and February 29, 1980. (*Id.* at pp. 11-20.)

25   More specifically, on January 30, 1980, Jordan, Dawson's crime partner, robbed people at a

26   Safeway at approximately 7:30 p.m., at an Alpha Beta Market at 10:30 p.m., at a Jack-in-the-Box

27   Restaurant at approximately 10:40 p.m., and at Norm's Restaurant at approximately 10:50 p.m.

28   — where Jordan shot and killed a patron. (Ex. C, at pp. 11-14; Ex. E, at p. 3.)  Dawson was only

Answer to Order to Show Cause; Memorandum of Points and Authorities          *Dawson v. Curry*
                                                                              C07-4821 WHA

1  convicted for the armed robberies occurring at the Jack-in-the-Box Restaurant. (Ex. C, at p. 3.)

2  However, a witness identified Dawson as Jordan's accomplice during the Norm's Restaurant

3  robberies, and other witnesses also identified Dawson's involvement in the Safeway and Alpha

4  Beta Market robberies. (*Id.* at pp. 11-15.)  Jordan received a first-degree murder conviction for

5  the Norm's Restaurant killing. (*Id.* at p. 4.)

6      On February 29, 1980, Dawson and Jordan committed five armed robberies at McCoy's

7  Market at approximately 8:00 p.m., and six armed robberies at Boy's Market at approximately

8  9:00 p.m. — where Jordan shot and killed a uniformed security guard. (*Id.* at pp. 3-4, 15-18.)

9  Jordan also received a first-degree murder conviction for this shooting, as did Dawson. (*Id.* at

10  pp. 3-4.)

11      During the Jack-in-the-Box Restaurant robberies, Dawson pointed a handgun at the assistant

12  manager while at the drive-up window. (Ex. B, at p. 1; Ex. C, at p. 13.)  The assistant manager

13  ducked behind the grill, and Jordan told the assistant manager to come out or there would be

14  shooting. (*Id.*)  At gunpoint, Jordan ordered the assistant manager to have another employee

15  admit Dawson through the back door. (*Id.*)  Dawson entered and walked the assistant manager to

16  the front of the restaurant. (*Id.*)  Jordan ordered the assistant manager to open the safe. (*Id.*)  As

17  the assistant manager reached for his wallet to obtain the safe combination, Jordan cocked his

18  handgun, which he was aiming at the man. (*Id.*)  The assistant manager explained his purpose

19  and was allowed to remove his wallet. (*Id.*)  Dawson took the wallet, and removed the

20  combination. (*Id.*)  Dawson then gave back the combination to the assistant manager so he could

21  open the safe, and Dawson kept the wallet. (*Id.*)  In addition to the wallet, Dawson and Jordan

22  left with all the coins from the safe, the money from the cash register, and the cashier's wallet at

23  the drive-up window. (*Id.*)  In total, the crime duo stole $170. (Ex. B, at p. 1.)

24      On February 29, 1980 at approximately 8:00 p.m., Jordan entered McCoy's Market, and

25  asked a checker the whereabouts of the security guard, mentioning him by name. (Ex. B, at p. 1;

26  Ex. C, at p. 15.)  Some minutes later, Jordan approached the checker from behind and ordered

27  him to remain at his check stand, remove the cash from the register, and place it in a paper bag.

28  (*Id.*)  The checker complied and then turned around to see that Jordan was holding a gun. (*Id.*)

1  Dawson pointed his gun at the floor and ordered a second checker to empty her register. (*Id.*)

2  Dawson also directed this checker to empty the till from two closed check stands. (*Id.*)  A third,

3  unidentified accomplice joined Jordan and Dawson during this robbery. (*Id.*)  Dawson

4  approached the snack-bar operator while he was attempting to call the sheriff's department on a

5  telephone outside the store. (Ex. C, at p. 16.)  Dawson asked him if he was notifying the police.

6  (*Id.*)  The snack-bar operator claimed he was not, and Dawson ordered him to hang up the phone

7  and to return to the store. (*Id.*)  In addition to the clerks, the assailants robbed the liquor clerk,

8  the snack bar operator, and his wife. (Ex. B, at p. 1.)  Before the three robbers left the store,

9  Jordan placed a gun in the side of the uniformed but unarmed security guard and ordered him to

10  the rear of the store. (*Id.* at pp. 1-2.)  Dawson and the other two carried off $2,000. (*Id.* at p. 2.)

11     Approximately an hour later, Jordan entered Boy's Market. (Ex. B, at p. 2; Ex. C, at p. 16.)

12  Jordan immediately came back outside and walked around the corner toward the telephones.

13  Shortly before, a uniformed security guard, Dwight Cousins, armed with a fake gun, had walked

14  to the telephones. (Ex. C, at p. 17; Ex. E, at p. 3.)  At point-blank range and without any warning,

15  Jordan shot the security guard, who was clutching the telephone receiver in his hand. (*Id.*)

16  Jordan demanded the guard's gun, and then took it. (Ex. C, at p. 17.)  Jordan reentered the store,

17  where Jordan and Dawson proceeded to rob all the cashiers in the store at gunpoint. (Ex. E, at

18  pp. 3-4.)  Dawson approached the assistant manager, pointed a gun at him, and told him that he

19  would be shot if he did not do as he was told. (Ex. C, at p. 17-18.)  Dawson then marched the

20  assistant manager to check stands 6, 5, and 2 in succession (number 3 and 4 were closed), and

21  demanded money from each of the checkers. (*Id.* at 18.)  Jordan demanded food stamps and

22  change from the checker at check stand 8. (*Id.*)  Thereafter, Jordan called across the room to

23  Dawson and proceeded to the next check stand. (*Id.*)  A box boy attempted to call for help, and

24  Jordan said, "I've already killed one person, do you want to be next?" (*Id.*)  Dawson and Jordan

25  left the store with $1,200. (Ex. B, at 2.)  The security guard later died due to blood loss. (Ex. E,

26  at p. 4; Ex. C, at p. 17.)

27     3.    Respondent affirmatively alleges that prior to his commitment offense, the Los

28  Angeles Police Department arrested Dawson for assault with a deadly weapon, and possession of

1  marijuana. (Ex. D, at p. 5; Ex. B, at p. 4; Ex. F, Parole Hearing Transcript, at pp. 7-9.) He was

2  not convicted on either charge. (*Id.*) Dawson was arrested and convicted for driving under the

3  influence of alcohol in 1979. (*Id.*)

4      4.  . Respondent affirmatively alleges that prior to the commitment offense, Dawson

5  struggled with alcohol use, and smoked marijuana. (Ex. D, at p. 4; Ex. F, at pp. 14-16.) In

6  addition, Dawson had a PCP problem in high school, which he smoked for several years. (*Id.*;

7  Ex. F, at p. 36; Ex. G, Psychological Evaluation Report, dated March 21, 2003, at p. 2.)

8  Dawson's parents convinced him to live with his relatives in Texas to avoid the influence of

9  drugs in the neighborhood. (Ex. D, at p. 4; Ex. F, at p. 15.) However, Dawson's drug-use

10  continued, and from age twenty-one until his incarceration he used cocaine. (*Id.*)

11      5.  Respondent affirmatively alleges that during incarceration, Dawson has received two

12  disciplinary violations. (Ex. B, at p. 6.; Ex. F, at p. 23; Ex. H, 2006 Life Prisoner Evaluation

13  Report, at p. 2.) Dawson fought his cell mate in 1982, and, in 2002, he engaged in inappropriate

14  sexual behavior with his wife in the prison's visiting room. (*Id.*; Ex. F, at p. 24.)

15      6.  Respondent affirmatively alleges that in prison Dawson does not regularly attend

16  meetings for Alcoholics Anonymous and/or Narcotics Anonymous. (Ex. F, at p. 37.) During his

17  parole hearing, Dawson indicated that he had not attended a single meeting in about a year. (*Id.*

18  at p. 38.)

19      7.  Respondent affirmatively alleges that the Los Angeles County District Attorney's

20  Office opposed Dawson's parole. (*Id.* at pp. 59-60.) Deputy District Attorney Bashing attended

21  the parole hearing and commented that Dawson's discussion of his remorse for the crimes

22  centered more on himself than the victims involved. (*Id.* at p. 60.)

23      8.  Respondent affirmatively alleges that the Board denied Dawson parole at his October

24  6, 2006 first-subsequent-parole-consideration hearing. (*Id.* at pp. 67-78.) In denying parole, the

25  Board based its decision on several factors. (*Id.*)

26      First, the Board relied on the gravity of the commitment offense, noting that multiple

27  victims were attacked, and one was killed during the course of three separate acts of violence.

28  (*Id.* at p. 69.) Also, Dawson and his crime partner carried out these violent acts in a

Answer to Order to Show Cause; Memorandum of Points and Authorities

*Dawson v. Curry*
C07-4821 WHA

1   dispassionate and calculated manner. (*Id.*) The Board further noted that the offense was carried

2   out in a manner which demonstrates an exceptionally callous disregard for human suffering. (*Id.*)

3   The Board also touched upon the very trivial motive for the murder-robbery, commenting that

4   Dawson's half of all the stolen money from the various robberies was between $1,600 and

5   $1,700. (*Id.*)

6       Second, the Board relied on Dawson's lack of remorse and insight into the crime. (*Id.* at pp.

7   68, 75-76.) The Board addressed that Dawson could not identify the number of victims he

8   affected in the various robberies, and commented that he displayed a lack of remorse for those he

9   impacted. (*Id.* at p. 68.) The Board further commented that Dawson should participate in self-

10  help programs to help develop remorse for his victims. (*Id.* at 69.) The Board also denied parole

11  because Dawson needs to develop insight into the commitment offense. (*Id.* at pp. 75, 76.) Even

12  though Dawson refused to discuss the offense, he periodically discounted the severity of his

13  conduct during the parole hearing. (*Id.* at pp. 20, 21, 51, 65, 75.) For instance, on three separate

14  instances Dawson stated that the reason he committed the crime was because he was "out of [his]

15  character." (*Id.* at p. 21, 51, 65, 75.) Also, Dawson refused to appreciate and acknowledge his

16  responsibility for the victim's death stating, "my crime partner decided to take it upon his self

17  [sic] to shoot and kill the security guard." (*Id.* at p. 20.) The Board recommended that self-help

18  programs could assist Dawson in developing the insight he lacks. (*Id.* at p. 76).

19      Third, the Board denied parole because Dawson requires more programming to assist in the

20  transition to life outside of prison. (*Id.* at pp. 70, 76-77.) As noted by the Board, Dawson

21  received his GED and a vocation early during his incarceration, but lacks current growth. (*Id.* at

22  p. 70.) The Board recommended a variety of self-help programs to address Dawson's

23  shortcomings. (*Id.* at p. 70, 76-77.) Specifically, the Board observed that Dawson requires

24  consistent participation in Alcoholics Anonymous, or substance abuse programming because of

25  his prior drug-use problems. (*Id.* at p. 71, 72, 77.) The Board also recommended that Dawson

26  focus on attending classes and/or reading books specific to helping with relationships. (*Id.* at p.

27  76-77.) The Board explained that such activities would be especially helpful for Dawson once he

28  is paroled and begins living with his wife. (*Id.*) The Board acknowledged that Dawson's parole

Answer to Order to Show Cause; Memorandum of Points and Authorities            *Dawson v. Curry*
                                                                              C07-4821 WHA

1   plans were "pretty good," but recognized that Dawson needed to create a resume and further

2   develop his support systems outside of prison. (*Id.* at pp. 71-72, 77; see also *id.* at pp. 54-56

3   [discussion of supporting influences if paroled].)

4       9.   Respondent admits that Dawson filed a habeas petition in the California Supreme

5   Court alleging the same causes of action that he alleges here. (Ex. I, Supreme Court Petition.)

6   Respondent further admits that the court denied the petition. Hence, Dawson exhausted his state

7   court remedies in regard to the issues currently before this Court. However, Respondent denies

8   that Dawson exhausted his claims to the extent that they are more broadly interpreted to

9   encompass any systematic issues beyond this particular review of the October 2006 parole denial.

10      10.  Respondent preserves the argument that Dawson does not have a federally protected

11  liberty interest in parole. *See Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1,

12  12 (1979) (liberty interest in conditional parole-release date created by unique structure and

13  language of state parole statute); *Sandin v. Connor*, 515 U.S. 472, 484 (1995) (no federal liberty

14  interest in parole because serving a contemplated sentence does not create an atypical or

15  significant hardship compared with ordinary prison life); and *In re Dannenburg*, 34 Cal. 4th

16  1061, 1087 (2005) (California's parole scheme is a two-step process that does not impose a

17  mandatory duty to grant life inmates parole before a suitability finding); *contra Sass v. Cal. Bd.*

18  *of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006) (holding that California inmates have a

19  federally protected liberty interest in parole date).

20      11.  Respondent denies that the state court's denial of habeas corpus relief was contrary to,

21  or involved an unreasonable application of, clearly established United States Supreme Court law,

22  or that the denial was based on an unreasonable interpretation of facts in light of the evidence

23  presented. Dawson therefore fails to make a case for relief under the Anti-Terrorism and

24  Effective Death Penalty Act of 1996 (AEDPA).

25      12.  Respondent affirmatively alleges that Dawson received an opportunity to present his

26  case to the Board, and the Board provided him with a detailed explanation for its parole denial.

27  (Ex. F.) Thus, Dawson received all process due under *Greenholtz*, the only clearly established

28  federal law regarding due process rights of inmates at parole consideration hearings.

Answer to Order to Show Cause; Memorandum of Points and Authorities          *Dawson v. Curry*
                                                                              C07-4821 WHA

13.   Respondent affirmatively alleges that the Board considered all relevant and reliable evidence before it, and that some evidence supports its decision.  However, Respondent further affirmatively alleges that the some-evidence standard does not apply in federal habeas proceedings challenging parole denials, and that the some-evidence standard is only clearly established federal law in the prison *disciplinary* context.

14.   Respondent denies that  clearly established federal requires this Court to determine whether some evidence supports a finding that Dawson currently poses an unreasonable risk of danger to society.

15.   Respondent denies that the Board improperly relied on Dawson's commitment offense, or relied solely on Dawson's commitment offense.  Respondent affirmatively alleges that the Board also relied on other factors in determining parole suitability, such as Dawson's lack of insight into the nature of the commitment offense, his lack of remorse for the victims of his crimes, and his lack of self-help programming.  (Ex. F, at pp. 67-78.)  Respondent denies that the Board's 2003 decision to deny Dawson parole relied solely on Dawson's commitment offense.  (Petn. at Ex. D.)  However, Respondent affirmatively alleges that federal due process does not preclude the Board from relying on immutable factors to deny parole. *Sass*, 461 at 1129. Respondent further affirmatively alleges that the argument that the Board may not continue to rely on the circumstances of Dawson's commitment offense to deny parole is not cognizable under AEDPA because it relies on circuit court dicta in *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003), rather than clearly established United States Supreme Court precedent.

16.   Respondent affirmatively alleges that the Board reviewed and discussed Dr. Gamard's 2003 Psychological Evaluation Report of Dawson.  (Ex. F, at pp. 39-40.)  Respondent denies that the Board disregarded the report.  Respondent further denies that Dawson maintains a clearly established federal right to have the Board rely on his psychological evaluation report when conducting his parole consideration hearing.

17.   Respondent denies that the Board ignored or failed to consider evidence tending to show Dawson's parole suitability.  Respondent denies that Dawson maintains a clearly established federal right to have the Board consider or acknowledge all factors indicative of his

1   suitability for parole.

2       18.  Respondent denies that the Board failed to consider Correctional Counselor Peabody's

3   2003 Life Prisoner Evaluation Report.  Respondent denies that Dawson maintains a clearly

4   established federal right to have the Board consider his Life Prisoner Evaluation Report.

5       19.  Respondent denies that, based on Dawson's housing classification, CDCR determined

6   that he is not a threat to society.  Respondent denies that the Board ignored his classification

7   level and custody status.  (See Ex. F at p. 22.)  Respondent denies that Dawson maintains a

8   clearly established federal right to have the Board review his classification level or custody status

9   at his parole hearing.

10       20.  Respondent admits that California's parole regulations contain a matrix of suggested

11   base terms that prisoners with life sentences should serve before released on parole.  See Cal.

12   Code Regs. tit. 15, § 2282.  However, under California law, an inmate's base term can be set

13   only after the Board finds the inmate suitable for parole, because the statutory scheme places

14   individual suitability for parole above a prisoner's expectancy in an early setting of a fixed date

15   designed to ensure term uniformity.  *Dannenberg*, 34 Cal. 4th at 1070-71.  Accordingly,

16   Respondent denies that the Board violated California law concerning the matrix of suggested

17   base terms.  Respondent denies that California law requires the Board to compare Dawson's

18   crimes to other instances of the same crime when deciding whether to grant parole.  Additionally,

19   Respondent denies that Dawson maintains a clearly established federal right to have the Board

20   apply California's matrix of suggested base terms.  Respondent further denies that Dawson

21   maintains a clearly established federal right based upon the frequency in which the Board sets

22   parole dates for other inmates.

23       21.  Respondent admits that Dawson's claims are timely under 28 U.S.C. § 2244(d)(1), and

24   are not barred by any other procedural defense.

25       22.  Respondent denies that an evidentiary hearing is necessary in this matter.

26       23.  Respondent affirmatively alleges that Dawson fails to establish any grounds for habeas

27   corpus relief.

28       24.  Except as expressly admitted above, Respondent denies, generally and specifically,

Answer to Order to Show Cause; Memorandum of Points and Authorities        *Dawson v. Curry*
C07-4821 WHA

1   suitability for parole.

2       18.    Respondent denies that the Board failed to consider Correctional Counselor Peabody's

3   2003 Life Prisoner Evaluation Report.  Respondent denies that Dawson maintains a clearly

4   established federal right to have the Board consider his Life Prisoner Evaluation Report.

5       19.    Respondent denies that, based on Dawson's housing classification, CDCR determined

6   that he is not a threat to society.  Respondent denies that the Board ignored his classification

7   level and custody status.  (See Ex. F at p. 22.)  Respondent denies that Dawson maintains a

8   clearly established federal right to have the Board review his classification level or custody status

9   at his parole hearing.

10      20.    Respondent admits that California's parole regulations contain a matrix of suggested

11  base terms that prisoners with life sentences should serve before released on parole.  See Cal.

12  Code Regs. tit. 15, § 2282.  However, under California law, an inmate's base term can be set

13  only after the Board finds the inmate suitable for parole, because the statutory scheme places

14  individual suitability for parole above a prisoner's expectancy in an early setting of a fixed date

15  designed to ensure term uniformity.  *Dannenberg*, 34 Cal. 4th at 1070-71.  Accordingly,

16  Respondent denies that the Board violated California law concerning the matrix of suggested

17  base terms.  Respondent denies that California law requires the Board to compare Dawson's

18  crimes to other instances of the same crime when deciding whether to grant parole.  Additionally,

19  Respondent denies that Dawson maintains a clearly established federal right to have the Board

20  apply California's matrix of suggested base terms.  Respondent further denies that Dawson

21  maintains a clearly established federal right based upon the frequency in which the Board sets

22  parole dates for other inmates.

23      21.    Respondent admits that Dawson's claims are timely under 28 U.S.C. § 2244(d)(1)

24  (2000), and are not barred by any other procedural defense.

25      22.    Respondent denies that an evidentiary hearing is necessary in this matter.

26      23.    Respondent affirmatively alleges that Dawson fails to establish any grounds for habeas

27  corpus relief.

28      24.    Except as expressly admitted above, Respondent denies, generally and specifically,

Answer to Order to Show Cause; Memorandum of Points and Authorities                  *Dawson v. Curry*
                                                                                      C07-4821 WHA

1   each allegation of the petition, and specifically denies that Dawson's administrative, statutory, or

2   constitutional rights have been violated in any way.

3       Accordingly, Respondent respectfully requests that the Court deny the Petition for writ of

4   corpus and dismiss these proceedings.

5

6                       **MEMORANDUM OF POINTS AND AUTHORITIES**

7                                   **ARGUMENT**

8                                        **I.**

9       **THE STATE COURT'S DENIAL OF DAWSON'S HABEAS CLAIM WAS
        NEITHER CONTRARY TO, OR AN UNREASONABLE APPLICATION**
10      **OF, CLEARLY ESTABLISHED FEDERAL LAW, NOR BASED ON AN
        UNREASONABLE DETERMINATION OF THE FACTS.**

11

12      The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) modified "the role

13  of federal habeas courts in reviewing petitions filed by state prisoners by placing a new constraint

14  on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas

15  corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529

16  U.S. 362, 412 (2000) (O'Connor, J., concurring [speaking for a majority of the Court]).  Under

17  AEDPA, a federal court may grant a writ of habeas corpus on a claim that a state court already

18  adjudicated on the merits *only if* the state court's adjudication was either: (1) "contrary to, or

19  involved an unreasonable application of, clearly established Federal law, as determined by the

20  Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts

21  in light of the evidence presented at the State Court proceeding."  28 U.S.C. § 2254(d)(1-2).

22      Here, the California Supreme Court decision[1] denying Dawson's  claim for habeas relief

23  was neither contrary to, or an unreasonable application of, federal law, nor was it based on an

24  unreasonable determination of the facts in light of the evidence presented.  First, Dawson

25

26      _____

27      1.  When, as here, the state court's holding does not provide a reasoned explanation, the
    reviewing court must independently review the record to determine whether the state court decision
    was a reasonable application of clearly established federal law. *Himes v. Thompson*, 336 F.3d 848,
28  853 (9th Cir. 2003).

1  received all process required under *Greenholtz*, the only clearly established federal law

2  specifically addressing the due process rights of inmates in a parole-consideration hearing.

3  Second, the state court decision was not based on an unreasonable determination of the facts;

4  rather, the evidence presented supports the state court's holding.  Thus, Dawson fails to establish

5  a violation of AEDPA standards, and the state court's decision denying habeas relief must stand.

6

**A.  The California Supreme Court's Decision Was Not Contrary to Clearly
    Established Federal Law.**

7

8  Under the first AEDPA standard, a federal court may grant habeas relief if the state court

9  decision was contrary to, or an unreasonable interpretation of, clearly established federal law as

10  determined by the Supreme Court of the United States.  Here, Dawson received all process due

11  under *Greenholtz*, the only clearly established federal law regarding the due process rights of

12  inmates at a parole-consideration hearing.

13

**1.  Dawson received all process due under the only United States
    Supreme Court law addressing due process in the parole context.**

14

15  In *Greenholtz*, the United States Supreme Court established the due process protections

16  required in a state parole system.  The Court held that the only process due at a parole consideration

17  hearing is an opportunity for the inmate to present his case, and an explanation for a parole denial.

18  *Greenholtz*, 442 U.S. at 16.  Dawson's claim fails because he received both of these protections at

19  his October 2006 hearing.

20  First, the Board provided Dawson the opportunity to fully present his case.  (See generally Ex.

21  F; see also Ex F, at p. 3 [Board explaining Dawson's right to heard and present documents].)

22  Dawson opted to not discuss the commitment offense, but he fully discussed other aspects of his life

23  and incarceration.  (Ex. E.)  Dawson discussed his prior criminal history (*id.* at pp. 7-9), his prior

24  drug abuse (*id.* at pp. 14-16), his social history (*id.* at pp. 16-20), his disciplinary history while

25  incarcerated, (*id.* at pp. 22-25), his programming while incarcerated (*id.* at pp. 30-31, 37-38), his

26  vocational achievements (*id.* at pp. 28-29, 32-34), his plans for employment if paroled (*id.* at pp. 34-

27  36, 42-43), and his insight and remorse for the crimes (*id.* at pp. 41, 47-48, 50).  Also, even though

28  he choose not to discuss the specifics of the murder and robberies, Dawson did occasionally discuss

1    aspects of his commitment offense. (*Id.* at p. 20.)

2    Second, Dawson received a thorough explanation as to why the Board denied parole. (*Id.* at

3    pp. 67-78.) The Board explained that several factors required the denial, including the gravity of the

4    commitment offense, Dawson's lack of insight into the nature of the commitment offense,

5    Dawson's lack of remorse for the various victims he affected, and Dawson's insufficient

6    participation in institutional programming, such as self-help classes and substance-abuse programs.

7    (*Id.*)

8    Therefore, Dawson presented his case to the Board and received an explanation as to why the

9    Board denied him parole. Because Dawson received all process due under *Greenholtz*, the state

10   court's adjudication of his habeas claim did not violate clearly established Supreme Court

11   precedent. Accordingly, Dawson's claim fails under AEDPA.

12           **2.    The Ninth Circuit's some-evidence standard is not clearly established**
                     **federal law and, therefore, Dawson is only entitled to the process**
13                   **established in *Greenholtz* — not some-evidence federal review.**

14   Dawson challenges the sufficiency of the evidence the Board relied on in its decision. (Petn. at

15   p. 11.) While California law requires a reviewing court to apply the some-evidence standard of

16   review, *In re Rosenkrantz*, 29 Cal. 4th 616, 658 (2002), it should not apply to a federal habeas

17   proceeding challenging a parole denial.

18   The United States Supreme Court recently reiterated that for AEDPA purposes, "clearly

19   established federal law" refers only to the holdings of the nation's highest court on the specific issue

20   presented. *Carey v. Musladin*, __ U.S. __, 127 S. Ct. 649, 653 (2006). In *Musladin*, the Ninth

21   Circuit held that under clearly established federal law courtroom spectators who wore buttons

22   depicting the victim in a murder trial inherently prejudiced the defendant and denied him a fair trial.

23   *Id.* at 652. In vacating the Ninth Circuit's decision, the Supreme Court explained that the two

24   Supreme Court cases that the Ninth Circuit relied on — one involving a defendant who was

25   required to wear prison clothing during trial and the other concerning a defendant who had four

26   uniformed troopers placed behind him at trial — involved state-sponsored courtroom practices that

27   were unlike the private conduct of the victim's family. *Id.* at 653-54. As a result, the Court held

28   that "given the lack of applicable holdings from [the Supreme Court], it could not be said that the

Answer to Order to Show Cause; Memorandum of Points and Authorities                    *Dawson v. Curry*
                                                                                       C07-4821 WHA

1    state court 'unreasonably appl[ied] . . . clearly established Federal law.'" *Id.* at 653-54.

2        Similarly, the Supreme Court found in *Schriro v. Landrigan*, __ U.S. __, 127 S. Ct. 1933, 1942

3    (2007) that a federal habeas petitioner maintained no claim under AEDPA because Supreme Court

4    precedent finding ineffective assistance of counsel when an attorney fails to adequately investigate

5    mitigating evidence is factually distinct from a defense attorney failing to investigate mitigating

6    evidence after the client demonstrates a reluctance to assist the investigation, as were the facts in

7    *Landrigan*. Consequently, the Supreme Court has clearly indicated that circuit courts may not

8    import — under the guise of "clearly established federal law" — a federal standard used in one

9    context for a different factual circumstance. *See e.g. id.*; and *Musladin*, S. Ct. at 653 - 654.[2]

10       Despite the Supreme Court's guidance in this area, the Ninth Circuit continues to extend the

11    *Hill* some-evidence standard of review — a Supreme Court holding applicable to prison disciplinary

12    hearings — to habeas petitions challenging denials of parole. *Sass v. Cal. Bd. of Prison Terms*, 461

13    F.3d 1123 (9th Cir. 2006) (referencing *Superintendent v. Hill*, 472 U.S. 445 (1985) — a prison

14    disciplinary case — for proposition that Board's denial of parole requires some evidence); *Irons v.*

15    *Carey*, __ F.3d __, 2007 WL 2027359 (9th Cir. July 13, 2007).

16       Furthermore, *Greenholtz*, the only Supreme Court decision concerning the due process rights

17    of an inmate in the parole context, specifically recognized the procedural distinction between the

18    government denying an inmate parole and the government determining guilt by way of an

19    adversarial proceeding. *Greenholtz*, 442 U.S. at 15-16. Based of this distinction, the Supreme

20    Court determined that a denial of parole only requires the state to provide an opportunity for the

21    inmate to present his case and an explanation for the parole denial — not additional protections,

22    such as those in an adversarial proceeding. *Id.* (reasoning that "to require the parole authority to

23

24        2. Likewise, the Ninth Circuit has recently affirmed this principle in a number of cases. *See*

25    *e.g.*, *Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007) (affirming district court's denial of
     habeas claim alleging ineffective assistance of appellate counsel based on an alleged conflict of

26    interest because the Supreme Court has never held — even though the Ninth Circuit has — that such
     an irreconcilable conflict violates the Sixth Amendment); and *Nguyen v. Garcia*, 477 F.3d 716 (9th

27    Cir. 2007) (holding that because the Supreme Court had not extended a defendant's right to counsel
     — established in *Wainwright v. Greenfield*, 474 U.S. 284 (1986) — to a competency hearing, federal

28    law was not clearly established for AEDPA purposes).

Answer to Order to Show Cause; Memorandum of Points and Authorities                    *Dawson v. Curry*
                                                                                        C07-4821 WHA

13

1   provide a summary of the evidence would convert the [parole-consideration] process into an

2   adversary proceeding and to equate the Board's parole release determination with a guilt

3   determination").

4        As a result, for AEDPA purposes, the *Hill* some-evidence standard of review required for

5   prison *disciplinary* hearings should not apply to a federal-habeas-proceeding challenging a parole

6   denial.  However, Respondent recognizes that the Ninth Circuit has held otherwise, most recently in

7   *Irons v. Carey*, 2007 WL 2027359, and will argue this case accordingly.

8        **3.    Even if the some-evidence standard were clearly established
               federal law, the California Supreme Court's decision did not
9               violate this standard.**

10       Assuming the some-evidence test is clearly established Supreme Court law for parole denials,

11  Dawson's claim fails under AEDPA because the state court's decision was not contrary to, and did

12  not involve an unreasonable application of, the some-evidence requirement.

13       California law requires that some evidence supports the parole authority's underlying factual

14  findings made in support of this determination. *Rosenkrantz*, 29 Cal. 4th at 616.  The California

15  Supreme Court presumably applied this standard of review here.  And, therefore, the state court's

16  decision was not contrary to clearly established federal law.  However, when, as here, the state court

17  holding fails to provide a reasoned explanation, the reviewing court must independently review the

18  record to determine whether the state court's decision was a reasonable application of federal law.

19  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

20       Assuming the some-evidence standard applies, this standard of review "does not require

21  examination of the entire record, independent assessment of the credibility of the witnesses, or

22  weighing of the evidence;" rather, it is satisfied if there is "any evidence in the record that could

23  support the conclusion reached by the [Board]." *Hill*, 472 U.S. at 455-56; *see also Sass*, 461 F.3d at

24  1129 (stating that "*Hill's* some evidence standard is minimal.")

25       Here, some evidence supports the Board's decision.  The Board based its denial on several

26  factors, each containing evidentiary support.

27       First, the Board relied on the gravity of the commitment offense. (*Id.* at p. 69).  The Board

28  noted that Dawson's crimes involved attacks on multiple victims, one of whom was killed, during

1    the course of three separate acts of violence. (*Id.* [relying on Cal. Code Regs. tit. 15, 2402, subd.

2    (c)(1)(A)].) Also, the Board explained that Dawson and his crime partner carried out these violent

3    acts in a dispassionate and calculated manner. (*Id.* [relying on Cal. Code Regs. tit. 15, 2402, subd.

4    (c)(1)(B)].) This finding also contains significant evidentiary support. As addressed in the

5    California Court of Appeals decision upholding Dawson's felony-murder conviction, the court

6    stated, "it appears clear that an integral part of [Dawson and Jordan's] robbery scheme was to

7    neutralize security guards and to prevent the raising of any alarm until they completed their crimes.

8    Further, it is readily inferable that both [Dawson and Jordan] were prepared to kill in the face of

9    non-cooperation or any threat to the smooth completion of their aims." (Ex. C, at p. 42, see also Ex.

10    C, at pp. 41-43 [detailing evidentiary support for court's findings].)

11       The Board further noted that the offense was carried out in a manner which demonstrates an

12    exceptionally callous disregard for human suffering. (*Id.* [relying on Cal. Code Regs. tit. 15, 2402,

13    subd. (c)(1)(C)].) Indeed, Dawson proceeded to methodically rob every cashier in Boy's Market at

14    gunpoint, while the security guard lay bleeding to death outside the store. (Ex. D, at pp. 3-4.) In

15    addition, Dawson frightened several victims with a loaded handgun on several occasions, including

16    when he pointed his loaded gun at an assistant manager and told him that he would be shot if he did

17    not do as he was told. (*Id.*; Ex. C, at p. 17.) And finally the Board touched upon the very trivial

18    motive for the crime, commenting that Dawson's half of all the stolen money from the several

19    robberies was between $1,600 and $1,700. (Ex. F, at p. 69 [relying on Cal. Code Regs. tit. 15,

20    2402, subd. (c)(1)(D)].)

21       Second, the Board relied on Dawson's lack of remorse and insight into the crimes. (*Id.* at pp.

22    68, 75-76.) The Board identified that Dawson failed to even grasp the number of victims he

23    affected in the various robberies he committed. (*Id.* at p. 68.) The Board suggested that Dawson

24    participate in self-help programs in order to better appreciate how his conduct deeply impacted his

25    victims. (*Id.* at p. 69.) The Board also denied parole because Dawson needs to develop insight into

26    the nature and magnitude of the commitment offense. (*Id.* at pp. 75, 76.) Again, the record

27    supports the Board's finding. Dawson periodically discounted the severity of his conduct during the

28    parole hearing. (*Id.* at pp. 20, 21, 51, 75.) For instance, on three separate instances Dawson's

Answer to Order to Show Cause; Memorandum of Points and Authorities       *Dawson v. Curry*
C07-4821 WHA

1    explanation for why he committed the crime was because he was "out of [his] character." (*Id.* at pp.

2    21, 51, 65, 75.)  Also, Dawson refused to appreciate and acknowledge his responsibility for the

3    victim's death stating, "my crime partner decided to take it upon his self [sic] to shoot and kill the

4    security guard." (*Id.* at p. 20.)  The Board recommended that institutional self-help programs could

5    assist Dawson in developing insight regarding the magnitude of his criminal conduct. (*Id.* at p. 76.)

6          Third, the Board denied parole because Dawson requires more programming to assist in the

7    transition from prison life to living in a less-restrictive environment. (*Id.* at pp. 70, 76-77.)  As

8    noted by the Board, Dawson received his GED and a vocation early during his incarceration, but

9    lacks current growth. (*Id.* at p. 70.)  The Board recommended a variety of self-help programs to

10   address Dawson's shortcomings. (*Id.* at p. 70, 76-77.)  Specifically, the Board observed that

11   Dawson requires consistent participation in Alcoholics Anonymous, or substance abuse

12   programming because of his prior drug-use problems. (*Id.* at pp. 71, 72, 77.)  Indeed, this

13   conclusion is also supported by the record.  Dawson acknowledged that he did not regularly attend

14   Alcoholics Anonymous or Narcotics Anonymous. (*Id.* at p. 37.)  Dawson also indicated that he had

15   not attended a class in about a year. (*Id.* at p. 38.)  The Board's recommendation in this regard is

16   particularly relevant because the Probation Officer's Report notes that Jordan, Dawson's crime

17   partner, may have influenced Dawson to participate in the robberies by supplying drugs to him.

18   (Ex. D, at p. 10.)    The Board also recommended that Dawson focus on attending classes and/or

19   reading books specific to helping with relationships. (Ex. F, at pp. 76-77.)  The Board explained

20   that such activities would be especially helpful for Dawson once he is paroled and begins living

21   with his wife. (*Id.*)  The Board acknowledged that Dawson's parole plans were "pretty good," but

22   recognized that Dawson needed to create a resume and further develop his support systems outside

23   of prison. (*Id.* at pp. 71-72, 77; see also *id.* at pp. 54-56 [discussion of supporting influences if

24   paroled].)

25          In summary, the Board identified several reasons why the state should not parole Dawson.

26   Every reason contained factual support within the record.  As a result, some evidence supports the

27   Board's decision to deny parole.  Therefore, the state court's decision did not involve an

28   unreasonable application of the some-evidence standard, and Dawson's claim fails under AEDPA.

Answer to Order to Show Cause; Memorandum of Points and Authorities          *Dawson v. Curry*
                                                                              C07-4821 WHA

1    **4.  The some-evidence standard only requires some evidence to support**
       **the Board's decision to deny parole — not evidence indicating that the**
2       **inmate presented a current risk to society if released.**

3        Dawson suggests that the Board violated his due process rights because it presented no

4   evidence to support a finding that he posed a current risk to society if released from prison. (Petn.

5   at p. 9.) *At most*, clearly established federal law requires that some evidence support the Board's

6   decision to deny parole. (*See* supra Part A.2-3.) Neither clearly established Ninth Circuit

7   precedence, *Biggs v. Terhune*, 334 F.3d 910, 915, nor clearly established California law, *In re*

8   *Rosenkrantz*, 29 Cal. 4th 616, 658, imposes a judicial review requiring some evidence to support a

9   finding that the inmate poses a current risk to society if released. As a result, the California

10  Supreme Court's decision denying Dawson's petition was not an unreasonable application of clearly

11  established federal law. Therefore, Dawson's claim fails under AEDPA.

12       **5.  The Board may rely on static factors to deny parole.**

13       Dawson argues that the Board violated his due process rights because it based its decision on

14  the commitment offense. (Petn. at p. 9.) Dawson's argument fails for several reasons.

15       First, there exists no "clearly established federal law" that prohibits the Board's ability to rely

16  on static factors, such as Dawson's commitment offense, to deny parole. The Ninth Circuit has

17  stated in dicta that the Board's continued reliance on *one* unchanging factor to deny parole "could

18  result in a due process violation." *Biggs v. Terhune*, 334 F.3d 910, 917 (9th Cir. 2003). However,

19  the *Biggs* court did not definitively indicate that reliance on an unchanging factor necessarily

20  violates due process, only that it possible could. *Id.* In *Biggs*, the court praised Biggs for being "a

21  model inmate," and found that the record was "replete with the gains Biggs has made," including a

22  master's degree in business administration. *Id.* at 919. Nonetheless, the court denied habeas relief

23  because the Board's decision to deny parole, which relied solely on the commitment offense, was

24  supported by some evidence.

25       Although the Ninth Circuit recently revisited this issue again in *Irons* in dicta, it held there that

26  despite "substantial" evidence of the inmate's rehabilitation in the case, the Board acted properly

27  within its discretion in continuing to rely on the circumstances of the inmate's offense to deny

28  parole. *Irons v. Carey*, 2007 WL at 2027359 at 6. Accordingly, the Ninth Circuit has never held

Answer to Order to Show Cause; Memorandum of Points and Authorities                    *Dawson v. Curry*
                                                                                        C07-4821 WHA

1    that a Board's reliance on a static factor to deny parole violates due process. Thus, a Board's mere

2    consideration of a static factor is not contrary to clearly established United States Supreme Court

3    jurisprudence.

4        Second, California Penal Code section 3041, subdivision (b), requires that the Board examine

5    the commitment offense, as the Board "shall set a release date unless it determines that the gravity

6    of the current offense or offenses, is such that consideration of the public safety requires a more

7    lengthy period of incarceration." Indeed, the California Supreme Court held in *Dannenberg*, 34

8    Cal. 4th at 1094, that the Board may rely *solely* on the circumstances of the commitment offense.

9    Furthermore, California Code of Regulations, title 15, section 2402(b), requires the Board to

10   consider "[a]ll relevant, reliable information" which includes the base and other commitment

11   offenses. Therefore, California law not only permits the Board's reliance on the commitment

12   offense, it mandates that the Board examine it.

13       Lastly, the Board, in denying parole, did not rely solely on Dawson's commitment offense.

14   The Board's denial also incorporated Dawson's lack of insight into the severity of the crime, his

15   lack of remorse for the victims involved, and his insufficient participation in self-help programs,

16   such as Narcotics Anonymous. (Ex. F, at pp. 69-78.) Therefore, the Board did not base its decision

17   merely on the commitment offense, but rather relied on behavioral and competency issues that

18   Dawson may remedy before his next parole-consideration hearing.

19       Consequently, Dawson's argument that the Board violated his due process rights by using his

20   commitment offense to support the parole denial is without merit. Neither federal law nor

21   California law dictates that the Board cannot rely on the commitment offense. Regardless, the

22   Board's decision did not rely solely on the commitment offense. Accordingly, Dawson's claim fails

23   under AEDPA.

24       **6.    Dawson's claim regarding California's sentencing matrices does not
              implicate a question of federal law.**

25

26       Dawson alleges that the Board failed to set a uniform parole date in accordance with

27   California's sentencing matrices. (Petn. at p. 9.) Dawson's argument again fails to implicate

28   federal habeas relief.

Answer to Order to Show Cause; Memorandum of Points and Authorities                    *Dawson v. Curry*
                                                                                        C07-4821 WHA

1    First, assuming the Board misapplied California law, mere violations of state law are not

2  cognizable under federal habeas law. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

3    Second, the Board did not violate California law. California's parole regulations contain a

4  matrix of suggested base terms that prisoners with life sentences should serve before they are

5  released on parole. See Cal. Code Regs. tit. 15, § 2282. However, in *Dannenberg*, 34 Cal. 4th at

6  1070-71, the California Supreme Court held that an inmate's base term can be set only after he has

7  been found suitable for parole, because the statutory scheme places individual suitability for parole

8  above a prisoner's expectancy in an early setting of a fixed date designed to ensure term uniformity.

9  As a result, "the Board, exercising its traditional broad discretion, may protect public safety in each

10  discrete case by considering the dangerous implications of a life-maximum prisoner's crime

11  individually." *Id.* at 1071. As this Court is bound by a state court's interpretation of state law,

12  Dawson's claim that California's parole regulations require the setting of a uniform parole date does

13  not state a colorable federal claim. *Hicks v. Feiock*, 485 U.S. 624, 629 (1998). Accordingly, the

14  state court decision denying Dawson's habeas petition was not contrary to, or an unreasonable

15  application of, clearly established federal law.

16

17  **B.    The California Supreme Court's Decision Upholding the Board's Parole
         Denial Reasonably Determined the Facts.**

18    Under the second AEDPA standard, a federal court may grant habeas relief if the state court

19  decision was based on an unreasonable determination of the facts in light of the evidence presented

20  at the State Court proceeding. 28 U.S.C. § 2254(d)(2).

21    Here, the evidence presented to the California Supreme Court is identical to the evidence

22  presented to this Court. (Compare Ex. I, at Ex. A-D; with Petn. at Ex. A-D.) The state court failed

23  to render a reasoned decision addressing its factual findings. Nonetheless, an independent review of

24  the record demonstrates that the Board relied on accurate documentation of Dawson's history and

25  the commitment offense.

26    With regard to the commitment offense, the Board relied on the summaries of the crime from

27  the 2003 Life Prisoner Evaluation Report, which relied on the Probation Officer's Report and the

28  California Court of Appeals Opinion upholding Dawson's convictions. (See Ex. F, at p. 6.) With

1    regard to Dawson's institutional and pre-commitment history, the Board relied on the 2003 Life

2    Prisoner Evaluation Report, the 2006 Life Prisoner Evaluation Report, the 2003 Psychological

3    Evaluation, and Dawson's own testimony. (*Id.* at pp. 6, 22, 38.) Dawson does not allege nor

4    provide any evidence to suggest that these documents contained inaccurate information.

5        Accordingly, the record indicates that the Board relied on accurate information. And, as

6    addressed earlier, the Board's findings, based on this accurate factual information, is supported by

7    some evidence.

8    / / /

9    / / /

10   / / /

11   / / /

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1                                    **CONCLUSION**

2          Dawson fails to demonstrate a basis for relief under AEDPA's two standards permitting a

3    habeas remedy after a state court has already adjudicated the same issue.  Under the first standard,

4    the California Supreme Court's adjudication of Dawson's claim was not contrary to, or an

5    unreasonable application of, clearly established federal law, as determined by the United States

6    Supreme Court.  Dawson received all process entitled under *Greenholtz*, and — although not clearly

7    established federal law — some evidence supports the Board's decision.  Under the second

8    AEDPA standard, the record reflects that the evidence presented at the parole hearing, such as

9    Dawson's testimony, the 2003 and 2006 Life Prisoner Evaluation Reports, and the 2003

10   Psychological Evaluation Report, accurately reflected the facts concerning Dawson.  Thus,

11   Respondent respectfully requests that the petition be denied.

12

13          Dated:  December 26, 2007

14

15                                    Respectfully submitted,

16                                    EDMUND G. BROWN JR.
                                      Attorney General of the State of California
17
                                      DANE R. GILLETTE
18                                    Chief Assistant Attorney General

19                                    JULIE L. GARLAND
                                      Senior Assistant Attorney General
20
                                      ANYA M. BINSACCA
                                      Supervising Deputy Attorney General
21

22

23                                    /S/ BRIAN C. KINNEY
                                      BRIAN C. KINNEY
24                                    Deputy Attorney General
                                      Attorneys for Respondent
25

26   DawsonAnswer.wpd

27   SF2007200806

28

Answer to Order to Show Cause; Memorandum of Points and Authorities                *Dawson v. Curry*
                                                                                   C07-4821 WHA

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Darryl Dawson v. Ben Curry**, Warden

Case No.:    **C07-4821 WHA**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **December 26, 2007**, I served the attached

**ANSWER TO THE ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Darryl Dawson  (C-30679)
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 26, 2007, at San Francisco, California.

| R. Panganiban | Signature |
|---|---|
| Declarant | |

40200644.wpd