# EXHIBIT C (PART 1)

NOT TO BE PUBLISHED

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | | |
|---|---|---|
| THE PEOPLE, | ) | 2d Crim. No. 40162 |
|     Plaintiff and<br>    Respondent, | )<br>)<br>) | (Super. Ct. Nos.<br>A 357550, A 617792) |
|     v. | ) | COURT OF APPEAL • SECOND DIST. |
| DARRYL LEROY DAWSON and<br>KENNETH LAMART JORDAN, | )<br>) | F I L E D<br>APR 2 5 1983 |
|     Defendants and<br>    Appellants. | )<br>)<br>) | CLAY ROBBINS, JR.  Clerk<br>Deputy Clerk |
| THE PEOPLE, | ) | 2d Crim. No. 40599 |
|     Plaintiff and<br>    Appellant, | )<br>) | (Super.Ct.No. A 357550) |
|     v. | ) | |
| DARRYL LEROY DAWSON, | ) | |
|     Defendant and<br>    Respondent. | )<br>)<br>) | |

APPEAL from judgments and an order of the Superior Court of Los Angeles County.  James M. Ideman, Judge.  Judgment affirmed; judgment affirmed in part and reversed in part with directions; order reversed.

Baird A. Brown, under appointment by the Court of Appeal, for Defendant and Appellant Darryl Leroy Dawson.

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant Kenneth Lamart Jordan.

John K. Van De Kamp and Robert H. Philibosian, District Attorneys of Los Angeles County; Harry B. Sondheim, Head, Appellate Division; and Maurice H. Oppenheim, Deputy District Attorney, for Plaintiff and Respondent.

---

John K. Van De Kamp and Robert H. Philibosian, District Attorneys of Los Angeles County; Harry B. Sondheim, Head, Appellate Division; and Maurice H. Oppenheim, Deputy District Attorney, for Plaintiff and Appellant.

Baird A. Brown, under appointment by the Court of Appeal, for Defendant and Respondent Darryl Leroy Dawson.

---

3

## INTRODUCTION

Defendants Darryl Leroy Dawson (Dawson) and Kenneth Lamart Jordan (Jordan) appeal from judgments of conviction entered after a jury trial.  Prior to trial, defendants' motions to suppress evidence pursuant to Penal Code section 1538.5 were denied.  Defendants' motions to exclude as impermissibly suggestive evidence of photographic lineup identifications and in-court identifications based thereon were also denied.

The jury found both defendants guilty of 13 counts of robbery (Pen. Code, § 211) [a January 30, 1980 Jack-in-the-Box robbery in which property was taken from two victims; a February 29, 1980 McCoy's Market robbery in which property was taken from five victims; a February 29, 1980 Boy's Market robbery in which property was taken from six victims], in the course of which each defendant personally used a firearm (Pen. Code, § 12022.5); and one count of first degree murder (Pen. Code, §§ 187/189) [stemming from the February 29, 1980 Boy's Market incident], in the course of which Jordan personally used a firearm (Pen. Code, § 12022.5; § 12022, subd. (a)) and inflicted great bodily injury upon the victim (Pen. Code, § 12022.7).  The jury further found Jordan guilty of 10

4

additional counts of robbery (Pen. Code, § 211), in the course of which he personally used a firearm (Pen. Code, § 12022.5); and one additional count of first degree murder (Pen. Code, § 187/189), in the course of which he personally used a firearm (Pen. Code, § 12022.5) and inflicted great bodily injury upon the victim (Pen. Code, § 12022.7). The jury also found to be true allegations that the murders occurred while defendant/ defendants were committing or accomplices in the commission of a robbery/robberies (Pen. Code, § 190.2, subds. (a)(17)(i) and (b)).

It having previously been agreed that the sentence for Dawson upon a murder conviction in which the special allegation pursuant to Penal Code section 190.2 was found to be true would be life imprisonment without possibility of parole, trial proceeded upon the penalty phase of Jordan's murder convictions. After two mistrials, the People declined to proceed with a third trial, after which the penalties were fixed at life imprisonment without possibility of parole. Dawson's motion for a new trial was denied, but the trial court granted his motion to strike the special circumstance pursuant to Penal Code section 190.2. Thereafter, each defendant was sentenced to state prison for the terms prescribed by law.

The People appeal from the trial court's order striking the special circumstance pursuant to Penal Code section 190.2, as to Dawson.

STATEMENT OF FACTS

Penal Code section 1538.5 Hearing

On February 29, 1980, at approximately 8:00 p.m., Los Angeles County Deputy Sheriffs John Rodriguez and Susan Beck investigated a report of a robbery at McCoy's Market in Lynwood.  The deputies interviewed eight or nine witnesses to the incident, from which they compiled a composite description of the robbery suspects.  One suspect was described as a mixed oriental-black male with "Samoan" features and a thin moustache, age 20 to 25 years, 5'6" to 5'7" tall, weighing approximately 140 pounds, wearing brown trousers and a red and gray jacket.  The other suspect was described as a black male, age 20 to 25 years, approximately 5' 11" tall, weighing approximately 160 pounds, and wearing a black leather jacket. Deputy Rodriguez further learned that the suspects were armed with two handguns--respectively, a two-inch and a four-inch .38 caliber weapon.

At approximately 11:00 p.m. on the same evening, Deputies Rodriguez and Beck were traveling westbound on Imperial Highway

in Lynwood, approaching State Street--approximately three to three and one-half miles from the scene of the McCoy's Market robbery.  They observed a Chevrolet Vega hatchback traveling in the same direction proceed through the red traffic signal at State Street.  Utilizing red lights and siren, the deputies attempted to intercept the Vega, which continued traveling one and one-half blocks before stopping, weaving from lane to lane.  The occupants--Dawson, the driver, and Jordan, the passenger--emerged from the automobile.  As Deputy Rogdriguez approached the automobile, he observed the resemblance of the occupants to the descriptions of the McCoy's Market robbery suspects--noting particularly Jordan's oriental features and brown trousers.

As Deputy Rodriguez conducted a pat-down search of the driver (Dawson), he observed in plain view on the automobile's passenger seat a black leather pouch from which protruded the butt of a handgun.  As a consequence of this observation, Deputy Rodriguez concluded the automobile's occupants were, indeed, the McCoy's Market robbery suspects.  Accordingly, he handcuffed Dawson and escorted him to the sheriff's vehicle, placing him in Deputy Beck's custody, then returned to handcuff and to conduct a pat-down search of Jordan.  In the course of that search, Deputy Rodriguez found a substantial sum of money in Jordan's back trousers pockets.  Meanwhile, Deputy Beck

7

conducted a second pat-down search of Dawson, during which she found two rolls of currency, one in each of Dawson's socks.

After escorting Jordan to the patrol vehicle, Deputy Rodriguez retrieved the black leather pouch containing the handgun.  Thereafter, he searched the open passenger and hatchback compartments of the Vega.  The search yielded a red and gray plaid jacket, a black leather jacket, an army field jacket, a raincoat and an open bag of miscellaneous coin.

In the course of investigating a robbery/homicide at a Boy's Market in Los Angeles, which occurred on February 29, 1980, approximately one hour after the McCoy's Market robbery, Los Angeles Police Officer Bird initiated a teletype message which recited details of the crime, specific descriptions of the suspects (including the mixed oriental-black features of one suspect), and the make of the automobile utilized therein. After perusing the teletype, Los Angeles County Sheriff's Sergeant Hubaud of the Lynwood Station telephoned Officer Bird.  In response, on March 5, 1980, Officer Bird visited the Lynwood Station, where he spoke with Sergeant Hubaud and examined the .38 caliber handgun and black leather pouch retrieved at the time of Dawson's and Jordan's arrests and booked as evidence.

8

In the course of his examination, Officer Bird found in the zippered pocket of the leather pouch a piece of paper bearing the name "Ken," followed by the word "key" and the number "6373532." Officer Bird knew "key" to be an alias of Jordan; consequently, he ran the number through the police department's reverse telephone directory and found it to be a published number listed to Kenneth Jordan at 5248 Pendleton Avenue, apartment K40, South Gate. This contrasted with the address Jordan had provided upon his arrest; that address proved to be his mother's residence, from which he had long been absent.

Thereafter, photographic lineups including pictures of Dawson and Jordan were shown to at least one witness of the Boy's Market robbery/homicide, which resulted in positive identifications. As a result, on the evening of March 5, 1980, Officer Bird visited Jordan's South Gate residence in the company of two other officers. In back of the apartment, Officer Bird observed a red 1969 Volkswagen with primer paint on the fenders; this matched the description of the vehicle used in the Boy's Market crimes then under investigation. Through the window of the automobile, Officer Bird saw a gasoline receipt indicating a purchase made by Kenneth Jordan on February 29, 1980. A license plate number check confirmed that the automobile was registered to a Kenneth Jordan with a listed address in Compton.

From information reported by an anonymous caller, Officer Bird had reason to believe that an unapprehended third individual had driven the Volkswagen during the commission of the Boy's Market crimes. Conversations with the landlord and residents of the apartment building revealed that a second man occupied the apartment with Jordan and utilized the Volkswagen; since March 1, only one individual had been going to and from the apartment. Inasmuch as Jordan and Dawson had been in custody continuously since February 29, Officer Bird believed it possible that the third suspect was living in the apartment.

In pursuit of confirmatory information, Officer Bird knocked on the door of apartment K40; he was accompanied by Detectives Watson and Hefferman. An individual later identified as Joseph Michael Elgin (Elgin) opened the door. Officer Bird explained that they were investigating a robbery and murder, after which Elgin invited the officers to enter, stating that he lived there with Jordan. Once inside the apartment, Detective Watson conducted a pat-down search of Elgin, in the course of which a roll of currency in the approximate sum of $1,700 fell out of Elgin's left sock. Since Elgin was becoming "quite fidgety" and would not remain still, he was handcuffed to preserve the officers' safety. It was

10

Detective Watson's recollection that Elgin was told he was under arrest at this time. Elgin was advised of his constitutional rights, which he then waived.

Officer Bird asked permission to search the apartment, indicating that if Elgin did not consent, the officers would procure a search warrant. While the officers were discussing the subject of a search, Elgin stated that he knew what they were looking for and escorted the officers to a linen closet where he directed their attention to a plastic bag. Officer Bird found inside the bag a .38 caliber revolver and a .25 caliber automatic, as well as toiletries Elgin identified as his and two wallets, one of which also belonged to Elgin. It was Officer Bird's recollection that after finding the guns he informed Elgin he was under arrest for murder.

Elgin felt no compulsion or pressure to consent to a search; he led the officers to the guns because he considered their discovery inevitable. After Elgin led the officers to the guns, they made no further effort to search the premises per Elgin's consent, but instead obtained and executed a search warrant.

## Additional Facts Adduced at Trial

On January 13, 1980, a man later identified as Jordan approached Wayne Potter (Potter), the night manager of a Safeway Market in Compton and demanded at gunpoint the money which Potter was then removing from a cash register at the liquor counter. Potter acceded to the demand, after which Jordan ordered him to proceed to the front register. With Potter's assistance, the cashier, Tammy Sallis, first gave Jordan the money from the upper part of the cash register, then at Jordan's further command, relinquished the 20 dollar bills from the bottom.

Jordan ordered Potter to move to the next cash register, manned by Mike Dorgan. Potter removed the money from this register and handed it to Jordan. Potter, Sallis and Dorgan all positively identified Jordan as the perpetrator, as did a box boy, Michael Frazier.

At approximately 7:30 p.m. on January 30, 1980, Ketron Grady (Grady), a checker at a Safeway Market in Los Angeles, observed two men loitering in the store lobby. One of the men, later identified as Jordan, came to Grady's cash register and purchased a package of ham. As she placed the ham in a bag, Jordan displayed a handgun and told Grady to put the register

12

money in the bag.  After Grady complied, Jordan told her not to move until he left the store.  The second man, whom she identified as Dawson, stood in the lobby throughout the incident, "watching the front end"; he was wearing a plaid pea coat similar to People's exhibit 3.  Prior to trial, Grady made a tentative photographic identification of Dawson.

At approximately 10:30 p.m. on January 30, John Cody (Cody), the uniformed and armed security guard on duty at an Alpha Beta Market in Inglewood, observed two men in the store near his location at checkstand number 3.  The person he identified as Jordan was behind Cody, while the person he identified as Dawson stood behind the checker, Randall Pratt (Pratt).  Jordan and Dawson aimed handguns at Cody and Pratt, respectively, whereupon Cody told Pratt to give Dawson the cash register money.  Pratt apparently moved too slowly, for Dawson began helping him to put the money in a bag.  Dawson then asked Jordan whether he had taken Cody's "Roscoe" (meaning gun), whereupon Jordan did so.  The defendants left, with Dawson carrying the bag of money.

When Cody described the perpetrators to police officers, the height he ascribed to the man he later identified as Dawson was at considerable variance from Dawson's actual height.

13

Cody's photographic identification of Dawson was tentative; he was fifty percent certain.  Pratt identified Jordan, but was unable to identify the second individual; this individual was wearing the plaid jacket which was People's exhibit 3.

At approximately 10:40 p.m. on January 30, Tyrone Jackson (Jackson), the assistant manager of the Jack-in-the-Box Restaurant on Century Boulevard in Inglewood, noticed the cashier, Darryl Waters (Waters), hand something through the drive-up window to a man he later identified as Dawson.  When Jackson complained, Dawson pointed a handgun at him.  Jackson ducked behind the grill, whereupon a man later identified as Jordan told Jackson to come out or there would be shooting.

At gunpoint, Jordan ordered Jackson to have another employee, Lorrie Patno (Patno) admit Dawson through the back door.  Patno did so, after which Dawson walked Jackson to the front of the restaurant.  Jordan ordered Jackson to open the safe; as Jackson reached for his wallet to obtain the safe combination, Jordan cocked the handgun he was aiming at Jackson.  Jackson explained his purpose and was allowed to remove his wallet, whereupon Dawson took possession and removed the combination for Jackson; Dawson retained the wallet.  In addition, the defendants took all the coins from the safe, the money from the cash register and Waters' wallet.

14

Jackson positively identified both defendants, as did Patno. Fourteen-year-old Willie Pogues saw the perpetrators flee in a black Cadillac Eldorado.

At approximately 10:50 p.m. on January 30, Bertha Shelley (Shelley), the cashier at Norm's Restaurant on La Cienega Boulevard in Culver City, looked up from operating the cash register to see a gun in her face. Shelley screamed and fled to the kitchen; subsequently, she heard gunshots. Billie Love (Love), a restaurant customer, was talking to the victim, John Martin (Martin), when a man Love later identified as Jordan approached and asked Martin for his wallet. Martin replied that he did not have one, whereupon Jordan pulled out a gun and shot Martin in the left side inflicting an injury which caused Martin's death. Love observed a second man standing near the cash register who subsequently left with Jordan.

Norbert Grant (Grant) was seated at the restaurant counter, when he observed Jordan approach Martin and demand his wallet. When Martin hesitated, Jordan shot him; Jordan then bent over Martin and removed his wallet. Grant observed another man, whom he identified as Dawson, removing money from the cash register. Although Grant was adamant in his identifications, he had not provided the police with descriptions of the perpetrators.

15

Waitress Vernell Winchester also saw the shooting and identified Jordan; after the shot was fired, she ran to the back of the restaurant.  Customer Lewis McGlaughlin looked up from his meal at the sound of a shot and saw two black men running out of the restaurant door.  He could not identify either individual, but one was wearing a plaid jacket similar to People's exhibit 3.

On February 29, 1980 at approximately 8:00 p.m., a man later identified as Jordan approached Robert Johnson (Johnson), a checker at McCoy's Market in Lynwood, and asked the whereabouts of the security guard, mentioning him by name. Some minutes later, from behind Johnson, Jordan ordered him to remain at his checkstand, to remove the money from the cash register and to place it in a paper bag.  Johnson complied, then turned around, whereupon he observed a gun in Jordan's hand.  Jordan told Johnson to put the coins in the bag also; Johnson did so and handed the bag to Jordan.

Johnson saw a second individual, holding a gun pointed at the floor, talking to checker Linda Lovey (Lovey), who was removing money from her cash register.  Lovey identified Dawson as the individual who ordered her to empty her register, as well as those at two closed checkstands.  Although Lovey did

16

not see a gun in Dawson's possession, she was frightened in
that she observed a gun in Jordan's hand.

Laura Riley, the liquor clerk, saw two men approach
Johnson's and Lovey's checkstands, then was accosted at
gunpoint by a third individual who demanded the money from her
cash register.  She never looked at this individual's
face--just at his gun.  Dwight Linger (Linger), the snack bar
operator, was walking from the snack bar when a woman told him
a robbery was taking place.  He went outside to telephone the
sheriff's department.  As Linger was reporting the robbery,
Dawson approached and asked whether Linger was telephoning the
sheriff's department.  Upon Linger's denial, Dawson ordered him
to hang up the telephone and return to the store.  After Linger
complied, Dawson took his wallet, while Jordan took property
from Mrs. Linger.  Before the three perpetrators left the
market, Jordan placed a gun in the side of Jerry Hanson, the
uniformed unarmed security guard, and ordered him to the rear
of the store.

At approximately 9:00 p.m. on February 29, Vincent Osby
(Osby), box boy at a Boy's Market in Los Angeles, was standing
outside the market when he saw a man later identified as Jordan
enter the store.  As Jordan did so, he passed Manuel Talley

(Talley) who was circulating a petition at the entrance.
Jordan immediately came back outside and walked around the
corner toward the telphones.  Shortly before, Dwight Cousins
(Cousins), the uniformed and armed security guard, had passed
Osby, walking in the same direction.  Osby heard a shot, after
which he looked in the direction of the telephones in time to
see the security guard falling.  Talley heard Cousins cry out,
"Oh my God, I've been hit"; Cousins was clutching a telephone
receiver as he fell.  Osby heard Jordan, who had a gun in his
hand, say to the security guard, "Give me your gun," after
which Jordan took the guard's gun.  Jordan then walked past
Osby and Talley and reentered the store.  Cousins bled to
death.

In the store, two men approached Stacy Tucker (Tucker) at
the express checkstand, number 11, and demanded the money from
the cash register.  Tucker identified Jordan as one of the men,
but could not identify the individual who displayed a gun.  She
gave the money to the man with the gun, after which the pair
walked away.

A man later identified as Dawson approached Edward Smith
(Smith), the assistant manager, pointed a gun at him and told
Smith he would be shot if he did not do as he was told.  Dawson

then marched Smith to checkstands numbers 6, 5 and 2 in
succession (numbers 3 and 4 were closed); where he demanded
money from each of the checkers, Maritza Lima (Lima), Neil
Murakami and Nicholas Asamoa (Asamoa), respectively.  Lima and
Asamoa identified Dawson, as did Andrew Wallace, a customer at
Asamoa's checkstand, and Sidney Pharris, the liquor clerk.

Jordan approached Jennifer de Jesus, the checker at
checkstand number 8, and demanded food stamps and change; he
helped her to empty the cash register.  Thereafter, Jordan
called across the room to his companion and proceeded to the
next checkstand.  He then approached Lima at checkstand number
6, who told Jordan his friend already had been there.  As one
of the box boys was calling for security, Francis Walker, the
box girl at checkstand number 5, heard Jordan say to the box
boy, "I've already killed one person, do you want to be next?"
After Jordan learned that Dawson had visited checkstand number
6, he called, "Let's go," and the pair left the store.  As
Talley was reporting the shooting of Cousins by telephone, he
saw Jordan run out of the store, past him, and toward an
alley.

On the preceding night, February 28, at approximately 8:00
or 8:15 p.m., another of the market's uniformed security guards

19

observed a red Volkswagen with primer-painted fenders parked at the store with the lights off.  The automobile remained parked for approximately 15 to 20 minutes; it contained three occupants.  Thereafter, the automobile moved to an area in front of the market's liquor department, where it remained approximately five mintues; it then moved to a third location. When the guard approached the vehicle, it swerved away and headed toward the parking lot.  At no time were the headlights illuminated.  The Volkswagen looked like the one pictured in People's exhibits 44 and 45, which depict a vehicle registered to Jordan and observed at his residence subsequent to the events of February 29.

On March 1, 1980, Jordan telephoned Elgin from jail and told him to take money from the dresser drawer to pay the rent on their mutually-shared apartment and to sell or "pass off" the food stamps.  Jordan further directed Elgin to count the money in the black leather jacket; upon doing so, Elgin found $1,600 or $1,700.  Jordan telephoned again on March 4; he told Elgin to take "Sally and Mary" from the side of the toilet stool and to take the money to Jordan's mother's house.  Elgin found two handguns beside the toilet, which he placed in a plastic bag with his personal toiletries; he returned the money to the leather jacket.

On the following day, Jordan asked whether "Mary" and
"Sally" and the money had been taken to his mother's.  Elgin
replied affirmatively, although all of the items were still in
the apartment.  The police arrived during the conversation.

A search of the apartment shared by Jordan and Dawson, made
pursuant to a search warrant, yielded .38 caliber ammunition, a
Boy's Market grocery bag and food stamps from Boy's Market and
McCoy's Market.  The .38 caliber Taurus revolver, taken from
Cody during the January 30 Alpha Beta Market robbery and
recovered from the apartment, was the weapon with which Martin
and Cousins were shot.

## DEFENSE

Jordan testified in his own behalf that he was arrested
while a passenger in Dawson's automobile; the handgun was found
under the bottom panel of the hatchback in the spare tire
compartment.  Of the clothing found in the automobile, only the
leather jacket belonged to him.  He had in his possession only
$81 in single dollar bills, which he won gambling.  He
telephoned Elgin to request that Elgin pick up Jordan's
Cadillac Eldorado from a repair shop.  He denied ever
mentioning guns or the rent in his conversations with Elgin.

21

Jordan further testified that he had seen the leather pouch containing the handgun on previous occasions; the pouch did have his telephone number in it; he denied keeping guns in his apartment or owning a gun.  The $1,950 in the pocket of the black leather jacket hanging in his apartment came from work, gambling and selling drugs.

<u>CONTENTIONS</u>

I

<u>Defendants' Appeals</u>

Both defendants contend that the trial court erred in denying their motions to suppress evidence pursuant to Penal Code section 1538.5 for the following reasons:

A.  Deputy Rodriguez lacked probable cause to arrest defendants;

B.  Deputy Rodriguez lacked probable cause and the requisite exigent circumstances to conduct a warrantless search of the Chevrolet Vega;

C.  The subsequent warrantless search of the black leather pouch containing a handgun was unjustified;

D.  The pat-down search of Elgin was unjustified; accordingly, the police lacked probable cause to arrest Elgin;

22

E.   Further, Elgin's warrantless arrest was per se unreasonable; and

F.   Elgin's consent to search the apartment was not freely and voluntarily given.

II

Jordan contends that the trial court erroneously failed to instruct the jury <u>sua</u> <u>sponte</u> on murder in the second degree.

III

Jordan avers that the trial court erred in denying his motion to exclude evidence of witnesses' photographic lineup identifications and in-court identifications based thereon, in that the photographic lineup was impermissibly suggestive.

IV

Jordan asserts that the trial court failed to articulate adequate reasons for imposing consecutive sentences.

V

Jordan further asserts that the sentences imposed on counts I, II and III constitute multiple punishment in violation of Penal Code section 654.

## VI

Jordan also avers that he is entitled to good time/work time credits.

## VII

Finally, Jordan contends that the trial court failed to properly instruct the jury on the intent required to sustain the special circumstances alleged pursuant to Penal Code section 190.2.

## VIII

Dawson contends there is no substantial evidence to sustain his conviction of the robbery of the security guard, Cousins, or of Cousins' murder under the felony-murder doctrine.

## IX

Both defendants aver that the felony-murder doctrine is no longer an accurate statement of the law.

24

The People's Appeal

The People contend that the trial court erred in striking the special circumstance as to Dawson for the following reasons:

A.   An intent to aid in the killing is not an element required of a special circumstance enumerated in Penal Code section 190.2, subdivision (a)(17), as applied by subdivision (b);

B.   Assuming that intent is required, there is substantial evidence that Dawson possessed the requisite intent.


DISCUSSION

I

Defendants' Appeals

Both defendants contend the trial court erred in denying their motions to suppress evidence pursuant to Penal Code section 1538.5.  We disagree.

Probable Cause to Arrest

Relying upon People v. Harris (1975) 15 Cal.3d 384, People v. Curtis (1969) 70 Cal.2d 347 and People v. Mickelson (1963) 59 Cal.2d 448, defendants argue that the identification data furnished Deputies Rodriguez and Beck following the robbery of

McCoy's Market was insufficient to establish probable cause for their arrests, in that the data did not describe singularly unique individuals.  We find each of the above cases distinguishable with respect to the nature and extent of the identification data furnished.  In Harris, the data deemed insufficient recited a description of a male Caucasian, 5' 8" in height, weighing 150 pounds, with dark hair and moustache, wearing a light cardigan sweater and dark trousers--a generalized description with no distinctive features.  In Curtis, the sole description was quite general and vague, solely that of a black man in a white shirt and tan trousers. The Mickelson description was little better:  a tall white man with dark hair, wearing a red sweater.

In contrast to the foregoing, Deputies Rodriguez and Beck had particulars as to the height and weight of two male individuals, as well as the information that the shorter male was of mixed oriental and black or "Samoan" heritage and clad in brown trousers and a red and gray plaid jacket.  Moreover, the deputies had ample cause to effect a traffic stop, in the course of which the defendants behaved suspiciously and Deputy Rodriguez observed in plain view a leather pouch from which protruded the butt of a handgun; the deputies knew both robbers had been armed with .38 caliber handguns.

26

It was the combination of these factors--traffic offenders behaving suspiciously, who in tandem so closely resembled fresh robbery suspects, coupled with the presence of a handgun--which reasonably caused Deputy Rodriguez "to believe and conscientiously entertain an honest and strong suspicion" that defendants were guilty of the robbery.  (People v. Superior Court (Wells) (1980) 27 Cal.3d 670, 674.)  As In re Louis F. (1978) 85 Cal.App.3d 611, 616 noted:  "Curtis and Mickelson should not be understood as standing for the proposition identification data furnished to a police officer can never alone be sufficient to justify a warrantless arrest unless there could not have been anyone other than the person arrested who could have fit the description.  Rather, the question is one of degree.  And when identification information of the kind here present is buttressed by additional probative evidence of complicity, it cannot be maintained probable cause was lacking."  (Emphasis original.)[1]

---

[1]
Inasmuch as the arrests were supported by probable cause, the searches of defendants' persons which yielded the rolls of currency were valid as incident to the arrests.  (Chimel v. California (1969) 395 U.S. 752, 763.)

27

## Warrantless Automobile Search

Defendants next challenge the warrantless search of the
Vega's open passenger and hatchback compartment.  As noted
previously, Deputy Rodriguez observed in plain view the leather
pouch containing the handgun; hence, it was not seized pursuant
to a search.  (Harris v. United States (1967) 390 U.S. 234;
Jackson v. Superior Court (1977) 74 Cal.App.3d 361.)  As to the
other items seized, there were ample exigencies present to
justify a warrantless search.  Deputy Rodriguez knew two
handguns had been used in the McCoy's Market robbery; only one
was observed in plain view in the automobile.  In such
circumstances, "concern for the safety of the general public
who might be endangered if an intruder removed a revolver from
. . . the vehicle" justifies a warrantless search of the
automobile passenger compartment.  (Cady v. Dombrowski (1973)
413 U.S. 433, 447; see also People v. Johnson (1981) 30 Cal.3d
444, 450 and People v. Martinez (1981) 118 Cal.App.3d 624,
635.)

## Warrantless Search of Leather Pouch

Absent exigent circumstances, a warrant is generally
required to search those closed containers commonly or
invariably associated with a reasonable expectation of

28

privacy.  (<u>Arkansas</u> v. <u>Sanders</u> (1979) 442 U.S. 753, 765;
<u>Chadwick</u> v. <u>United States</u> (1977) 433 U.S. 1.)  Defendants argue
that the leather pouch at issue herein, with its closed,
zippered pockets, is a container so associated with an
expectation of privacy.

We note, however, that the trial court specifically found
that the pouch was intended and utilized solely as a gun case
or holster.  Inasmuch as this finding is supported by
substantial evidence, we are bound by it.  (<u>People</u> v. <u>Superior</u>
<u>Court (Keithley)</u> (1975) 13 Cal.3d 406, 410.)  As <u>Arkansas</u> v.
<u>Sanders</u>, <u>supra</u>, recognized, "Not all containers . . . will
deserve the full protection of the Fourth Amendment.  Thus,
some containers (for example a kit of burglar tools or a gun
case) by their very nature cannot support any reasonable
expectation of privacy because their contents can be inferred
from their outward appearance."  (442 U.S. at p. 764, fn. 13.)
The instant leather pouch falls squarely within the above
category.  That a container such as a holster or gun case
possesses separate zippered compartments does not create an
aura of privacy where none otherwise exists.  Since defendants
had no reasonable expectation of privacy associated with the
pouch, Officer Bird's examination of the zippered compartment
did not constitute an unreasonable search within the meaning of
the Fourth Amendment.

Probable Cause to Arrest Elgin

Relying in part on People v. Lieb (1976) 16 Cal.3d 869,
Cunha v. Superior Court (1970) 2 Cal.3d 352, Remers v. Superior
Court (1970) 2 Cal.3d 659 and People v. Shelton (1964) 60
Cal.2d 740, defendants argue that Elgin's arrest was not
supported by probable cause since the police officers'
suspicions were grounded on facts amounting to nothing more
than "guilt by association." Were the facts available to
Officer Bird solely Elgin's co-residence in Jordan's apartment
and access to Jordan's Volkswagen, we would perforce agree; but
such is not the case.

Officer Bird had specific information that a third suspect
had driven the Volkswagen as the "getaway car" following the
Boy's Market robbery/homicide. Since Jordan and Dawson had, at
that point, been identified as the perpetrators inside the
store and the Volkswagen was registered to Jordan, the
information gathered by Officer Bird with respect to the access
to and ready use of the Volkswagen by Jordan's roommate had a
more substantial character than simply to suggest guilt by
association; that information reasonably raised a suspicion
sufficient to justify further investigation. In pursuit
thereof, Officer Bird approached the apartment to interview