# EXHIBIT C (PART 2)

Elgin; a pat-down search accidentally yielded a roll of
currency in excess of $1,700.[2]   The discovery of such a
large sum of money unusually secreted about Elgin's person was
sufficient to elevate Officer Bird's original suspicions to a
reasonable and conscientiously entertained belief that Elgin
was the third robbery participant; i.e., it provided probable
cause for Elgin's arrest.  (People v. Superior Court (Wells),
supra, 27 Cal.3d 670.)

    Defendants also characterize Elgin's arrest as
unreasonable, in that it was made without a warrant after the
officers' entry into the apartment.  People v. Ramey (1976) 16
Cal.3d 263, 275 does hold that warrantless arrests within the
home are per se constitutionally invalid in the absence of

---

[2]   Detective Watson's testimony was that the roll of currency
fell out of Elgin's sock during the pat-down--not that it was
removed therefrom.  Contrary to defendant's assertion, a
pat-down search was justifiable.  The record clearly
establishes the vicious nature of the Boy's Market crimes, as
well as Officer Bird's knowledge that both in-store robbers
were armed with handguns only one of which had been recovered
at the time of the defendants' arrests.  A pat-down search will
be upheld where the record reveals specific "factors creating a
potential for danger to the officers . . . ."  (People v.
Superior Court (Brown) (1980) 111 Cal.App.3d 948, 956; see also
People v. May (1973) 33 Cal.App.3d 888, 891-892.)  Such factors
are present here; from the totality of the circumstances, the
officers had every reason to believe another handgun, with
which Elgin might have armed himself, was in the apartment.

exigent circumstances or consent to enter. (See also Payton v. New York (1980) 445 U.S. 573.)  But in the instant case, Elgin did consent to the officers' entry.  Moreover, the officers did not seek entry for the purpose of arresting the occupant; probable cause to arrest Elgin arose after the entry.  There is nothing in the record to indicate their lack of receptiveness to any explanations Elgin might have offered to negate his criminal involvement.  Hence, nothing in the officers' intent vitiated the consensual nature of the entry.  (People v. Patterson (1979) 94 Cal.App.3d 456, 463.)

Consent to Search

Inasmuch as Elgin's consent to search was not tainted by the illegality of his arrest (Burrows v. Superior Court (1974) 13 Cal.3d 238, 251), we proceed to examine whether consent was freely and voluntarily given.  Elgin himself testified that he felt no compulsion to consent; Officer Bird informed him that he could refuse and the police would obtain a warrant. Notwithstanding Elgin's restraint in handcuffs, the foregoing constitutes substantial evidence to support the trial court's finding that Elgin's consent was voluntary.  (People v. Reyes (1974) 12 Cal.3d 486, 501; see also People v. Mayberry (1982) 31 Cal.3d 335, 343.)

In any event, the handguns discovered in the course of the consensual search were admissible evidence under the doctrine of inevitable discovery.  As enunciated in People v. Superior Court (Tunch) (1978) 80 Cal.App.3d 665, 673, this doctrine permits the admission of evidence which would have been secured eventually without regard to alleged improper police conduct; it has developed to prevent criminals unjustly from escaping prosecution.  (See also Lockridge v. Superior Court (1970) 3 Cal.3d 166, 170.)  In the course of normal events and proper police activity, the handguns inevitably would have been discovered.

Due to the dual occupancy of the apartment, Officer Bird was prepared to obtain a search warrant whether or not Elgin consented to a search; without reference to the handguns to which Elgin led the officers, Officer Bird had available ample facts to support such a warrant (which he subsequently obtained).[3]  During the search made pursuant to that warrant, the handguns would have come to light.

---

[3]
Defendants presumably recognize this, for they did not attack the validity of the subsequently-obtained warrant in the court below.

33

## II

There is no merit to Jordan's contention that the trial
court erroneously failed to instruct the jury <u>sua</u> <u>sponte</u> on
second degree murder.  The trial court must give instructions,
even in the absence of a request, on all general principles of
law "closely and openly connected with the facts before the
court, and which are necessary for the jury's understanding of
the case."  (<u>People</u> v. <u>St. Martin</u> (1970) 1 Cal.3d 524, 531.)
The obligation extends to instructions regarding lesser
included offenses "when the evidence raises a question as to
whether all of the elements of the charged offense were present
. . . , but not when there is no evidence that the offense was
less than that charged.  [Citations omitted.]"  (<u>People</u> v.
<u>Wickersham</u> (1982) 32 Cal.3d 307, 323-324.)

In the instant matter, quite apart from reference to the
felony-murder doctrine, the evidence as to the killing of
Martin and Cousins bespeaks nothing other than calculated,
deliberate, premeditated murder.  In the course of the Norm's
Restaurant robbery, Jordan demanded Martin's wallet; when
Martin hesitated, Jordan pulled out a gun and shot him.  One
may not reasonably infer a "panic" killing, an accidental
killing or a defensive reaction from such a scenario; the only

reasonable inference to be drawn is that Jordan decided to kill Martin in retribution for Martin's hesitancy in surrendering his property.  Although circumstantial in nature, the evidence relating to the killing of Cousins equally lends itself to only one reasonable set of inferences.  When Jordan shot Cousins, Cousins was standing at the Boy's Market telephones with a telephone receiver in his hand; his gun was holstered.  Later, in the store, Jordan threatened a box boy, calling for security, with death, stating, "I've already killed one person."  Moreover, Jordan walked away, leaving Cousins to bleed to death.  It is clear that when he perceived himself "crossed," Jordan once again killed with deliberation and malice.  There simply was no evidence before the trial court supportive of a second degree murder theory.  Accordingly, there was no error in the court's failure to instruct thereon.

## III

Jordan avers that the trial court erred in denying his motion to exclude evidence of witnesses' photographic lineup identifications and in-court identifications based thereon, in that the photographic lineup was impermissibly suggestive.  We cannot agree.

An in-court eyewitness identification which follows a pretrial photographic identification is grounds for the

reversal of a conviction only if the photographic identifica-
tion procedure was "so impermissibly suggestive as to give rise
to a very substantial likelihood of irreparable misidentifica-
tion." (Simmons v. United States (1968) 390 U.S. 377, 384.)
Whether the photographic identification was unduly suggestive
turns on the facts of each case. (People v. Guillebeau (1980)
107 Cal.App.3d 531, 556.)

Jordan argues that the photographic lineup procedure
utilized was unduly suggestive because he alone among the six
individuals depicted possesses the distinctive characteristic
of oriental-appearing eyes or "Samoan" features. (See Neil v.
Biggers (1972) 409 U.S. 188; People v. Smith (1980) 109
Cal.App.3d 476.) We have examined the photograph of Jordan, as
well as the photographs of the five other individuals, utilized
in the lineup procedure. As a result of our examination, we
conclude that Jordan's personal characteristics are not as
distinctive as he may wish; he is neither the only individual
depicted with a somewhat "Oriental" cast to his eyes nor the
only one with arguably "Samoan" features.

It is apparent that the police took great pains to produce
a fair cross-section of photographs for identification; in our
view, they succeeded. We find nothing unduly suggestive in the
lineup procedure thus followed.

36

IV

Jordan asserts that the trial court failed to articulate
adequate reasons for imposing consecutive sentences.  We
disagree.

Penal Code section 1170, subdivision (c) provides:  "The
court shall state the reasons for its sentence choice on the
record at the time of sentencing . . . ."  The selection of
consecutive sentences is a sentence choice within the meaning
of subdivision (c).  (People v. Walker (1978) 83 Cal.App.3d
619, 622.)  However, the failure to specifically articulate
reasons for the imposition of consecutive sentences is harmless
error if the reason for the court's choice is apparent from the
record.  (People v. Blessing (1979) 94 Cal.App.3d 835,
838-839.)

California Rules of Court, rule 425(a) provides criteria
relating to the imposition of consecutive sentences.  The court
may consider:  "Facts relating to the crimes, including . . .:
[¶] (1) The crimes and their objectives were predominantly
independent of each other.  [¶] (2) The crimes involved
separate acts of violence or threats of violence.  [¶] (3) The
crimes were committed at different times or separate places,

rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] (4) Any of the crimes involved multiple victims. [¶] (5) The convictions for which sentences are to be imposed are numerous." It is abundantly clear from the record that each and every one of the enumerated criteria applies to Jordan's crimes. Accordingly, there is no reasonable purpose to be served in remanding the matter for resentencing.[4]

V

Jordan's further assertion that the sentences imposed on counts I, II and III constitute multiple punishment in violation of Penal Code section 654 lacks merit. Penal Code section 654 provides in pertinent part: "An act or omission which is made punishable in different parts of this Code may be punished under either of such provisions, but in no case can it be punished under more than one; . . . ." In general, a defendant may be punished for each crime of violence against a

---

4

The People urge us to do so, in that the trial court mistakenly entertained the belief it could not impose consecutive sentences in certain instances. However, the issue is not reviewable in this court, for the People have no standing to appeal the trial court's exercise of or failure to exercise sentencing discretion. (Pen. Code, § 1238.)

different victim, even though he entertains but one principal
criminal objective during an indivisible course of conduct.
(People v. Ramos (1982) 30 Cal.3d 553, 587.)

Robbery is a crime of violence against the person; the
central element of the crime is the force or fear exerted
against the victim in order to deprive him of his property.
(Id., at p. 589.)  Counts I, II and III stem from the January
30 Safeway Market robbery, in which Jordan first approached
Potter at the liquor counter and demanded at gunpoint the money
Potter was removing from the cash register.  Jordan then
ordered Potter to proceed to Sallis' checkstand; Potter told
Sallis to give Jordan the money, but when she was slow in doing
so, Potter assisted her.  After moving at Jordan's command to
Dorgan's checkstand, Potter removed the money from that
register.

Both Sallis and Dorgan knew Jordan had a gun; they were
frightened and nervous.  Hence, it is readily inferable that
Jordan exerted force and fear against each in order to take
property in their safekeeping, even though he utilized Potter
as the actual instrument of removal at Dorgan's cash register.
Accordingly, Jordan was properly punished for the robbery of
each of the three victims.

VI

Jordan also avers that he is entitled to good time/work
time credits per People v. Sage (1980) 26 Cal.3d 498.  In that
Jordan was sentenced to life imprisonment without possibility
of parole, we consider this court's holding in People v. Garcia
(1981) 115 Cal.App.3d 85 at pages 112-114 dispositive of the
issue.  The sentence imposed herein is equally indeterminate in
nature as a sentence of straight life imprisonment imposed
pursuant to former Penal Code section 190 (repealed by section
1 of Initiative Measure approved November 7, 1978).  Moreover,
as was the case with respect to a sentence of straight life
imprisonment under former section 190, the present version
thereof makes no provision for the application of conduct
credits to a sentence of life imprisonment without possibility
of parole.  Hence, under the analysis set forth in Garcia,
Jordan is not entitled to such credits.

VII

Finally, Jordan contends that the trial court failed to
properly instruct the jury on the intent required to sustain
the special circumstances alleged pursuant to the Penal Code
section 190.2, subdivision (a)(17).  The issue of whether the

40

killer must have intended the death of the victim in order to sustain a special circumstance alleged under subdivision (a)(17) of section 190.2 is presently pending before the California Supreme Court.[5]   Under the factual circumstances of this case, the error (if any) in the trial court's failure to instruct on intent must be deemed harmless; given the strong evidence that the killings were deliberate, premeditated and malicious there is no reasonable probability that Jordan would have obtained a more favorable result had the jury been instructed as he proposes.  (People v. Watson (1956) 46 Cal.2d 818, 836.)  Accordingly, we consider the instant matter an inappropriate vehicle to decide this issue on an interim basis and rely instead on the doctrine of harmless error to affirm the special circumstance findings.

VIII

Dawson contends there is no substantial evidence to sustain his conviction of the robbery or of Cousins' murder under the felony-murder doctrine.  We disagree.

---

[5]

People v. Kelly, Crim. No. 22137.

In assessing whether a conviction is supported by substantial evidence of each element of the crime, we must view the entire record in the light most favorable to the judgment, presuming the existence of every fact which reasonably could be deduced from the evidence. (People v. Johnson (1980) 26 Cal.3d 557, 576.) Substantial evidence is that which is "reasonable in nature, credible, and of solid value" as opposed to conjecture or speculation. (Ibid.)

Dawson argues that there is no evidence he was aware of the shooting of Cousins outside Boy's Market. Concededly, there is no direct evidence of such awareness; however, that is not dispositive of the issue. The robberies within the market followed a discernible pattern, in that the checkstands were approached in descending numerical order. Thus, it may reasonably be inferred that Jordan and Dawson initially approached Tucker at checkstand 11, demanding the money from the cash register, after which Jordan hurried outside in pursuit of the armed security guard, Cousins, who had just walked past Osby in the direction of the telephones. Meanwhile, Dawson commandeered the assistant manager, Smith, to approach and empty the registers at checkstands 6, 5 and 2. Thereafter, Jordan returned and visited checkstands 8 and 7,

42

then proceeded to checkstand 6, unaware that Dawson had begun
his predations there.

From reference to the circumstances of the McCoy's Market
robbery earlier the same evening, further significant patterns
of conduct reasonably may be inferred. At McCoy's, Jordan
attempted to ascertain the whereabouts of the security guard,
Hanson, after which he was able to take Hanson (who was not
armed with a gun) by surprise and effectively neutralize him.
In the meantime, Dawson retrieved Linger, who had gone outside
to the telephones, but assured Dawson he was not telephoning
the sheriff's department. Hence, it appears clear that an
integral part of defendants' robbery scheme was to neutralize
security guards and to prevent the raising of any alarm until
they completed their crimes.

Further, it is readily inferable that both defendants were
prepared to kill in the face of noncooperation or any threat to
the smooth completion of their aims. During the Jack-in-the-
Box robbery, in which Dawson participated, Jordan threatened to
shoot when Jackson attempted to hide and cocked his handgun,
aimed at Jackson, when Jackson reached for his wallet. In the
course of the Boy's Market robbery, Dawson threatened Smith
with death if he did not do as he was told. Defendants'

43

conduct overall therefore supports the inference that Linger
did not meet with death because he managed to convince Dawson
he had not raised an alarm.

The ultimate inferences which legitimately may be drawn
from the foregoing evidentiary and reasonably deduced facts
are:  (1) Dawson knew Jordan left the store in pursuit of the
armed security guard, Cousins, intending to neutralize him as a
threat to the success of the criminal enterprise; (2) Dawson
knew that would entail the forcible disarming of the guard
(i.e., a robbery); (3) Dawson knew from the McCoy's Market
experience that the guard might be going to the telephones;
and, most importantly, (4) Dawson knew Jordan was prepared to
kill the guard if necessary to neutralize the threat he posed.

Clearly, Dawson aided and abetted Jordan in the achievement
of the criminal ends directed against Cousins.  The guilty
intent necessary for aiding and abetting is not the shared
specific intent to commit a particular offense, but is that
manifested by knowledge that the particular criminal enterprise
is planned and that one's actions facilitate its commission.
(People v. Tewksbury (1978) 15 Cal.3d 953, 960.)  The ultimate
inferences delineated above establish Dawson's knowledge, thus
meeting Tewksbury's first prong.  A defendant with the

44

requisite knowledge is an aider and abettor when he acts in a
manner which either directly or indirectly increases the
probability the crime will be completed successfully.  (People
v. Markus (1978) 82 Cal.App.3d 477, 481.)  Dawson's continuing
armed presence inside the store while Jordan pursued Cousins
did just that--at least indirectly--by reducing the likelihood
of any person's interference with Jordan.  Accordingly, whether
by reference to the felony-murder doctrine or without reference
thereto, there is substantial evidence that Dawson aided and
abetted in the murder as well as the robbery of Cousins.

IX

Although raising no constitutional challenge thereto, both
defendants aver that the felony-murder doctrine is no longer an
accurate statement of the law.  In support thereof, defendants
rely on the holding in People v. Aaron (1980) 409 Mich.672 [299
N.W.2d 304].

In Aaron, the Michigan Supreme Court noted that Michigan
decisional law consistently construed the state's first degree
murder statute as having the purpose of graduating punishment
rather than establishing a separate offense; accordingly, the
court determined that Michigan's felony-murder rule was of
common law rather than statutory origin, thus permitting the

court to abrogate the rule.  In direct contrast, California decisional law has consistently recognized the felony-murder provision in Penal Code section 189 as establishing a substantive offense, rather than limited to delineating a graduation in punishment.  (See, e.g., People v. Burton (1971) 6 Cal.3d 375, 387-388; People v. Washington (1965) 62 Cal.2d 777, 781.)  Inasmuch as California's felony-murder rule is firmly established by decisional law which we are bound to follow (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450) and is statutory in origin, we must defer to the wisdom of the Legislature and may not abrogate the rule.

## The People's Appeal

The People contend the trial court erred in striking the special circumstance as to Dawson for the following reasons:

A.  An intent to aid in the killing of the victim is not an element required of a special circumstance enumerated in Penal Code section 190.2, subdivision (a)(17), as applied by subdivision (b);

B.  Assuming that intent is required, there is substantial evidence that Dawson possessed the requisite intent.  Although we disagree as to the intent required under Penal Code section 190.2, subdivision (b), we do agree that the jury's special circumstance finding was supported by substantial evidence of

the requisite intent.[6]

Initially, we note our construction of section 190.2, subdivision (a)(17)[7] as applicable solely to the actual killer.  To construe subdivision (a) broadly to encompass any defendant found guilty of first degree murder whether or not the literal slayer is possible, but such a construction would

---

6

The jury was instructed in part as follows:  "If defendant . . . Dawson was not the actual killer, it must be proved beyond a reasonable doubt that he intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of the murder in the first degree . . . ."

7

Section 190.2, subdivision (a)(17) provides in pertinent part:  "The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been . . . specially found . . . to be true:
" . . . . . . . . . . . . . . . . . . . . . . . . .
"(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of . . . the following felonies:
"(i) Robbery in violation of Section 211.
"(ii) Kidnapping in violation of Sections 207 and 209.
"(iii) Rape in violation of Section 261.
"(iv) Sodomy in violation of Section 286.
"(v) The performance of a lewd or lascivious act upon person of a child under the age of 14 in violation of Section 288.
"(vi) Oral copulation in violation of Section 288a.
"(vii) Burglary in the first or second degree in violation of Section 460.
"(ix) Train wrecking in violation of Section 219."

render subdivision (b) [8] largely superfluous contrary to the well-established principle of statutory construction that the courts are not to treat words as surplusage, but are to give effect where reasonably possible to every phrase of a statute. (J. R. Norton Co. v. Agricultural Labor Relations Bd. (1979) 26 Cal.3d 1, 36-37; People v. Gilbert (1969) 1 Cal.3d 475, 480.) Accordingly, any imposition of a sentence of life imprisonment without possibility of parole as to Dawson must be based on subdivision (b).

The gravamen of the People's position is that where the enumerated crime forms the basis for a felony-murder conviction under Penal Code section 189, as does robbery, the language "intentionally aiding . . . in the commission of murder in the first degree" may be construed as requiring only that the defendant have intentionally aided and abetted in the underlying crime of robbery.  This argument is facially valid

---

8

Subdivision (b) provides in pertinent part:  "Every person whether or not the actual killer found guilty of intentionally aiding, abetting . . . or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which . . . the special circumstances enumerated in paragraphs . . . (17) . . . of subdivision (a) of this section has been . . . specially found . . . to be true."

48

as it applies to subparagraphs (i) [robbery], (iii) [rape], (v)
[child molestation], (vii) [burglary] and (viii) [arson]--all
of which are enumerated in Penal Code section 189.  On the
other hand, a criminal defendant may be guilty of first degree
murder pursuant to Penal Code section 189 because a death
resulted from his participation in the crime of mayhem, yet not
be subject to the penalties prescribed by Penal Code section
190.2, subdivision (b).

More importantly, however, section 189 felony murder cannot
be the basis upon which a defendant is found to have
intentionally aided in the commission of first degree murder
committed while he was engaged in or an accomplice in the
commission of kidnaping [ii], sodomy [v], oral copulation [vi]
or train wrecking [ix] in that these offenses are not among
those enumerated in section 189 as inherently dangerous.
Therefore, malice and premeditation must be found independently
from commission of one of those felonies.  As a result, an
adoption of the People's construction would assign a different
meaning to the key phrase "intentionally aiding . . . in the
commission of murder in the first degree" in connection with
subparagraphs (i), (iii), (v), (vii) and (viii) than that
applied to subparagraphs (ii), (iv), (vi) and (ix) of paragraph
(17) of subdivision (a).  Such a construction contravenes a

49

venerable rule of statutory construction:  The scope and
meaning of statutory language remains the same in different
portions of a law.  (E.g., <u>Stillwell</u> v. <u>State Bar</u> (1946) 29
Cal.2d 119, 123; <u>Coleman</u> v. <u>City of Oakland</u> (1930) 110 Cal.App.
715, 719.)

Reason dictates that the key language of subdivision (b)
have the same meaning with respect to all of the subparagraphs
of paragraph (17).  Moreover, an examination of the ballot
arguments for and against proposition 7, which enacted section
190.2, provides additional support for a construction that
requires a defendant to act with intent that the victim be
killed.  The rebuttal argument on page 35 of the California
Voter's Pamphlet for November 7, 1978 general election contains
the following passage:  "The opposition maintains that if
someone were to lend a screwdriver to his neighbor and the
neighbor used it to commit a murder, the poor lender could get
the death penalty, even though 'he had NO INTENTION' that
anyone be killed.

"Please . . . read section 6b . . . . It says that a
person must have INTENTIONALLY aided in the commission of a
murder . . . ."  In determining the intent of a ballot measure,
it is appropriate to consider the ballot arguments.  (<u>Carter</u> v.
<u>Seaboard Finance Co.</u> (1949) 33 Cal.2d 564.)  From the

foregoing, it is apparent that subdivision (b) was intended to
be limited in application to those persons who, in aiding or
assisting another's acts, intend the victim to be killed as a
result.  Our analysis comports with the principle that, in
construing a penal statute, a defendant is to be given the
benefit of every reasonable doubt as to the meaning of the
language employed therein.  (People v. Walker (1976) 18 Cal.3d
232, 242.)

We conclude, however, that there is substantial evidence
Dawson possessed the requisite intent.  In our view, as applied
to aiding and abetting, the use of the word "intentionally" in
subdivision (b) does not require that a defendant share the
slayer's specific intent to kill; but only that he intends to
aid and abet in the commission of a murder.  Hence, under
traditional principles applicable to aiding and abetting, the
intent the victim be killed may be inferred from the actor's
knowledge that a murder is planned and his acts will facilitate
its commission.  (People v. Tewksbury, supra, 15 Cal.3d 953,
960.)

We have analyzed at length the evidence from which Dawson's
intentional aiding and abetting in Cousins' murder may be
inferred (ante, at section VIII of our discussion); we shall

51

not do so again.   Suffice it to say that the substantial
evidence which supports Dawson's aider-abettor liability for
murder without reference to the felony-murder doctrine is
sufficient to support the jury's special circumstance finding.
Accordingly, the trial court erred in striking the finding.

Jordan's judgment of conviction is affirmed.   The order
striking the special circumstance as to Dawson is reversed.
Dawson's judgment is reversed as to the sentence imposed on the
murder conviction and the matter is remanded for resentencing
thereon; in all other respects, Dawson's judgment is affirmed.


                                          SPENCER, P. J.


We concur:


            LILLIE, J.



            HANSON (L. Thaxton), J.