# EXHIBIT F (PART 1)

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number C-30679
                          )
DARRYL DAWSON             )
                          )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 5, 2006

1:50 P.M.


PANEL PRESENT:

Linda Shelton, Presiding Commissioner
Jeff Sellwood, Deputy Commissioner


OTHERS PRESENT:

Darryl Dawson, Inmate
Terri Rutledge, Attorney for Inmate
Bryant Bushling, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum


**Toni Anderson            House of Scribes**

ii

<u>INDEX</u>

                                                    <u>PAGE</u>

Proceedings . . . . . . . . . . . . . . . . . .   1

Case Factors. . . . . . . . . . . . . . . . . .   6

Pre-Commitment Factors. . . . . . . . . . . . .  10

Post-Commitment Factors . . . . . . . . . . . .  22

Parole Plans. . . . . . . . . . . . . . . . . .  40

Closing Statements. . . . . . . . . . . . . . .  59

Recess. . . . . . . . . . . . . . . . . . . . .  66

Decision. . . . . . . . . . . . . . . . . . . .  67

Adjournment . . . . . . . . . . . . . . . . . .  78

Transcriber Certification . . . . . . . . . . .  79

1

<u>**P R O C E E D I N G S**</u>

   **DEPUTY COMMISSIONER SELLWOOD:**  We're on the
record.

   **PRESIDING COMMISSIONER SHELTON:**  All right.
Good afternoon, everyone.  We are here for the first
Subsequent Parole Consideration Hearing for Darryl
Dawson, D-A-W-S-O-N, CDC Number C-30679.  Today's date
is October 5th, 2006.  The time is 1:50 p.m.  And we
are located at CTF, Soledad.  Mr. Dawson was received
on May 22ND, 1981 committed from Los Angeles County.
His life term began September 30th, 1987, and his
minimum eligible parole date is May 31st, 2004.  Mr.
Dawson, uh, was committed for Case Number A-357550,
charging in count one violation P.C., Murder in the
First Degree with a 12022.5, Armed with a Firearm, as
well as 12 counts of robbery, each with a 12022.5
P.C., Use of a Firearm.  Mr. Dawson received a term of
25 plus 13 equally 38 to life.  Mr. Dawson, this
hearing is being tape recorded, so we are going to go
around the room.  I know this is your first Initial
Hearing, so it's a little bit different.  I mean this
is your first Subsequent Hearing which is different
than your Initial Hearing, not a lot but a little.
So, anyway if you have questions feel free to ask as
we go ,.  We'll start with introductions, first name,
last name, spell our last name, and when we get to you
add your CDC number, please.  My name is Linda

2

1  Shelton, S-H-E-L-T-O-N, Commissioner.

2      **DEPUTY COMMISSIONER SELLWOOD:** Jeff Sellwood,

3  S-E-L-L-W-O-O-D, Deputy Commissioner.

4      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Bryant

5  Bushling, B-U-S-H-L-I-N-G, representing the Los

6  Angeles County District Attorney's Office.

7      **ATTORNEY RUTLEDGE:**  Terri E. Rutledge,

8  R-U-T-L-E-D-G-E, attorney for Mr. Dawson.

9      **INMATE DAWSON:**  Darryl Dawson, D-A-W-S-O-N**,**

10  **C**-30679.

11      **PRESIDING COMMISSIONER SHELTON:**  Thank you.  And

12  for the record we have two officers in the room for

13  security purposes who will not be participating in the

14  hearing.  All right, let's start with accommodation

15  for disabilities.  Uh, you signed BPT Form 1073, on

16  January 19, 2006, indicating you did not need any help

17  with anything or any accommodation, uh, for

18  disabilities.  I would note for the record that you

19  are wearing glasses.  Are those prescription glasses?

20      **INMATE DAWSON:**  Yes.

21      **PRESIDING COMMISSIONER SHELTON:**  And do they

22  work for your eyes, sir?

23      **INMATE DAWSON:**  Yes.

24      **PRESIDING COMMISSIONER SHELTON:**  Okay, go ahead

25  and sign on that.  What you are signing there is what

26  your attorney went over with you.  It's Exhibit Two,

27  and that would be, uh, an additional discussion of

3

1   accommodation for disabilities as well as a hearing

2   information sheet for you.  So, we note that you are

3   wearing glasses.  Do you have – is your hearing okay?

4       **INMATE DAWSON:**  Yes, ma'am.

5       **PRESIDING COMMISSIONER SHELTON:**  Okay, and

6   mobility?  Thank you.  You can walk, stand, sit for

7   periods of time and be comfortable?

8       **INMATE DAWSON:**  Yes, ma'am.

9       **PRESIDING COMMISSIONER SHELTON:**  Are you on any

10  medication?

11      **INMATE DAWSON:**  No.

12      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Then it

13  sounds to me like you're comfortable to go forward

14  with this hearing.  Uh, counsel, would you concur?

15      **ATTORNEY RUTLEDGE:**  Yes, ma'am.

16      **PRESIDING COMMISSIONER SHELTON:**  Okay, thank

17  you.  All right.  Sir, you have certain rights.  You

18  have the right to a timely notice of this hearing, the

19  right to review your C-File.  And the record indicates

20  you did review your C-File on January 28th, 2006.  And

21  you have the right to present relevant documents.

22  Counsel, have your client's rights been met thus far?

23      **ATTORNEY RUTLEDGE:**  Yes, ma'am.

24      **PRESIDING COMMISSIONER SHELTON:**  Mr. Dawson, you

25  also have an additional right to be heard by an

26  impartial panel.  And today you panel would be

27  Commissioner Sellwood and myself, is that all right

4

1    with you?

2         **INMATE DAWSON:**  Yes.

3         **PRESIDING COMMISSIONER SHELTON:**  Thank you.  I

4    also want to let you know that on May – in May a

5    couple of years ago the rules changed with regards to

6    appeal rights.  And, uh, if you need additional

7    information in that area feel free to ask your

8    attorney or contact the, uh, prison law library, okay.

9    Now, sir, you are not required to admit to or discuss

10   your offense, however this panel does accept as true

11   the findings of the court.  Can you tell me what that

12   means to you?

13        **INMATE DAWSON:**  That I shouldn't dispute the

14   facts of my – of the record.

15        **PRESIDING COMMISSIONER SHELTON:**  Kinda, it means

16   we're not going to retry your case.  And we are going

17   to go by what the, uh, says happened.  Uh, but it

18   doesn't mean that we're not interested in what you

19   have to say as well, that's very important to us,

20   okay.

21        **INMATE DAWSON:**  Yes, ma'am.

22        **PRESIDING COMMISSIONER SHELTON:**  Thank you.  Uh,

23   Commissioner, do we have any confidential information?

24        **DEPUTY COMMISSIONER SELLWOOD:**  We do have some,

25   we will not use it today.

26        **PRESIDING COMMISSIONER SHELTON:**  Terrific.  I've

27   already passed the hearing checklist around.  I'm not

5

1    sure where it is.  Okay, thank you.  Uh, both

2    attorneys have initialed and signed indicating that

3    they have all the necessary documents to move forward

4    so we will do that.  All right.  Ms. Rutledge, are

5    there any additional documents to be submitted?

6        **ATTORNEY RUTLEDGE:**  Not at this time, ma'am.

7        **PRESIDING COMMISSIONER SHELTON:**  And I did get

8    some here a little bit ago, and these would be, uh,

9    support letters that we'll take into consideration

10   when we go through your parole plans.  Are there any

11   preliminary objections?

12       **ATTORNEY RUTLEDGE:**  No.

13       **PRESIDING COMMISSIONER SHELTON:**  Will your

14   client be speaking with us today?

15       **ATTORNEY RUTLEDGE:**  Not on the commitment

16   offense but all other issues.

17       **PRESIDING COMMISSIONER SHELTON:**  Okay.  Would

18   you please raise your right hand, sir?  Do you

19   solemnly swear or affirm that the testimony you give

20   at this hearing will be the truth, the whole truth and

21   nothing but the truth?

22       **INMATE DAWSON:**  Yes.

23       **PRESIDING COMMISSIONER SHELTON:**  And just to let

24   you know, Mr. Dawson, you don't need to lean forward

25   every time you speak into the mike.  You're going to

26   get dizzy doing this.  So, you can just be comfortable

27   and talk where you from and it'll pick it up fine.

6

1    Okay.  I am going to go to, uh, the summary of the

2    offense as indicated in the April 2003 Board Report

3    which was brought forward.  We are going to

4    incorporate that by reference.  Uh, is that okay with

5    you, Mr. Bushling?

6           **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Yes.

7           **PRESIDING COMMISSIONER SHELTON:**  And Ms.

8    Rutledge?

9           **ATTORNEY RUTLEDGE:**  Yes.

10          **PRESIDING COMMISSIONER SHELTON:**  Since, uh, Mr.

11   Dawson will not be speaking to that, then consider

12   that done.  I will incorporate by reference the Board

13   Report dated April 2003, and that is pages one, two,

14   and three, that information comes from the probation

15   officer's report pages six through eight.  The

16   Appellate Court Decision dated April 25th '83, pages

17   five through six, page 13, and pages 15 through 18.

18   With that, Mr. Dawson, we're going to go to your prior

19   record, and I'll need you to help me out with that so

20   I can make sure – might as well keep this up here --

21   that I have accurate information, okay.  First of all,

22   this indicates that you have no juvenile record.

23          **INMATE DAWSON:**  Correct.

24          **PRESIDING COMMISSIONER SHELTON:**  Is that true?

25          **INMATE DAWSON:**  Yes.

26          **PRESIDING COMMISSIONER SHELTON:**  Never got in

27   trouble, huh?

7

1      **INMATE DAWSON:**  Right.

2      **PRESIDING COMMISSIONER SHELTON:**  Good.  Are you

3  nervous?

4      **INMATE DAWSON:**  Yes.

5      **PRESIDING COMMISSIONER SHELTON:**  Okay, try to

6  relax.  We're not here to beat you up, okay.

7      **INMATE DAWSON:**  Okay.

8      **PRESIDING COMMISSIONER SHELTON:**  This is your

9  hearing, and I want you to feel free to contribute as

10  much to it as you would like to.

11      **INMATE DAWSON:**  Okay.

12      **PRESIDING COMMISSIONER SHELTON:**  Okay.  With

13  regards to your adult prior record we have that, uh,

14  you had three contacts with law enforcement before

15  this commitment offense.

16      **INMATE DAWSON:**  Correct.

17      **PRESIDING COMMISSIONER SHELTON:**  First one was

18  in June of '74, you were arrested by Lynwood Police

19  for Assault with a Deadly Weapon, with the D.A.

20  rejected due to a lack of corpus.

21      **INMATE DAWSON:**  Yeah, they, uh, arrested the

22  wrong person.

23      **PRESIDING COMMISSIONER SHELTON:**  You were the

24  wrong purpose – person?

25      **INMATE DAWSON:**  Yes, I was at a party at my, my

26  sister's cousin's house.  And, uh, apparently he was

27  having a dispute with his neighbor.  And she threw a

8

1  brick and hit my sister in the mouth.  I picked up the

2  brick and threw it at the house, it broke a window.

3  So, they arrested me for Assault with a Deadly Weapon,

4  but they should have arrested her for hitting my

5  sister with the brick, that's what happened.

6      **PRESIDING COMMISSIONER SHELTON:**  So, did that

7  other person get arrested?

8      **INMATE DAWSON:**  No.

9      **PRESIDING COMMISSIONER SHELTON:**  Hmm.  I

10  appreciate the extra information.  It said, uh, as

11  well you were arrested in July of '75 by the Los

12  Angeles Sheriff's Department for possession of

13  marijuana.

14      **INMATE DAWSON:**  Correct.

15      **PRESIDING COMMISSIONER SHELTON:**  Tell me about

16  that one.

17      **INMATE DAWSON:**  I was, uh, (indiscernible) and

18  my cousin wanted some marijuana, so I knew where he

19  was and picked it up – we picked it up, and the

20  Sheriff's Department stopped us and they arrested me.

21      **PRESIDING COMMISSIONER SHELTON:**  And not your

22  cousin.

23      **INMATE DAWSON:**  Not my cousin.

24      **PRESIDING COMMISSIONER SHELTON:**  Because --

25      **INMATE DAWSON:**  He was the driver.

26      **PRESIDING COMMISSIONER SHELTON:**  Oh, and you had

27  the marijuana.

9

1          **INMATE DAWSON:**  No, he had it.

2          **PRESIDING COMMISSIONER SHELTON:**  Oh.

3          **INMATE DAWSON:**  On his possession, but they

4     arrested me for moving in the car.

5          **PRESIDING COMMISSIONER SHELTON:**  Okay.  And

6     then, let's see you were arrested September '79, by

7     Los Angeles Sheriff's for Driving Under the Influence,

8     and you pled guilty to this.

9          **INMATE DAWSON:**  Yes.

10          **PRESIDING COMMISSIONER SHELTON:**  And let's see,

11     you were placed on Summary Probation, which basically

12     means not supervised probation, court probation for

13     one year.  And you had to attend driving school and

14     pay a three hundred dollar fine.   You failed to

15     appear in court on 3/14/80 after receiving an

16     extension to pay the fine, so a warrant was issued.

17     Evidently you had been in county jail.

18          **INMATE DAWSON:**  Correct.

19          **PRESIDING COMMISSIONER SHELTON:**  It says for

20     "issues related to the commitment offense", so all

21     this was happening about the same time.

22          **INMATE DAWSON:**  Yes, ma'am.

23          **PRESIDING COMMISSIONER SHELTON:**  And then you

24     pled guilty to violation of probation.  You were given

25     credit for 10 days, a bench warrant was recalled.

26     What were you under the influence of, sir?

27          **INMATE DAWSON:**  Alcohol.

10

1      **PRESIDING COMMISSIONER SHELTON:**  Then that's
2  when the commitment offense.
3      **INMATE DAWSON:**  Sometime after that.
4      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Did I
5  leave anything out, or is that accurate information
6  for your prior record?
7      **INMATE DAWSON:**  Yes, ma'am.
8      **PRESIDING COMMISSIONER SHELTON:**  Okay.  You can
9  smile now, there you go.  Let's talk about your social
10  history.
11      **INMATE DAWSON:**  Fairly well.  I --
12      **PRESIDING COMMISSIONER SHELTON:**  Let's – let me
13  go through what we have here and I'll take some notes
14  and make sure we have all accurate information, okay.
15      **INMATE DAWSON:**  Okay.
16      **PRESIDING COMMISSIONER SHELTON:**  First, let's
17  verify that you were born on 10/20/55.
18      **INMATE DAWSON:**  Yes.
19      **PRESIDING COMMISSIONER SHELTON:**  In Los Angeles.
20      **INMATE DAWSON:**  Yes.
21      **PRESIDING COMMISSIONER SHELTON:**  And you're the
22  third of three children.
23      **INMATE DAWSON:**  Correct.
24      **PRESIDING COMMISSIONER SHELTON:**  And your dad's
25  name was Leon, and your mom's was Lorraine.
26      **INMATE DAWSON:**  Yes.
27      **PRESIDING COMMISSIONER SHELTON:**  Uh, you told,

11

1  uh, the probation officer doing your report that, uh,

2  you were raised in a united home with two sisters, is

3  that true?

4      **INMATE DAWSON:**  Yes, ma'am.

5      **PRESIDING COMMISSIONER SHELTON:**  So, tell me

6  about growing up, say between the time you were born –

7  which I'm sure you remember that – uh, to when you –

8  say you first started high school, how was family

9  life?  You had two sisters.

10     **INMATE DAWSON:**  Stable, disciplined,

11 comfortable.

12     **PRESIDING COMMISSIONER SHELTON:**  What's your dad

13 do for a living?

14     **INMATE DAWSON:**  He worked at the Uni-Royal Tire

15 Company.

16     **PRESIDING COMMISSIONER SHELTON:**  You can look at

17 me when you talk to me, it's okay.  No, it's okay.

18 You are so nervous, just take a deep breath, okay.

19 Dad worked for Uni-Royal Tire Company.

20     **INMATE DAWSON:**  Yes.

21     **PRESIDING COMMISSIONER SHELTON:**  Okay.  And what

22 did mom do?

23     **INMATE DAWSON:**  She worked there, too.

24     **PRESIDING COMMISSIONER SHELTON:**  Oh, well that's

25 good.  And so you went to grammar school.

26     **INMATE DAWSON:**  Yes.

27     **PRESIDING COMMISSIONER SHELTON:**  Junior high

12

1   school.

2       **INMATE DAWSON:**  Yes.

3       **PRESIDING COMMISSIONER SHELTON:**  And what about

4   high school?

5       **INMATE DAWSON:**  Yes.

6       **PRESIDING COMMISSIONER SHELTON:**  Did you get a

7   high school diploma?

8       **INMATE DAWSON:**  Uh, I got a GED.  I didn't

9   graduate because I was, uh, I think I was 102 credits,

10  uh, from graduating.

11      **PRESIDING COMMISSIONER SHELTON:**  A 102?

12      **INMATE DAWSON:**  Yes, somewhere around there.

13      **PRESIDING COMMISSIONER SHELTON:**  Don't you only

14  need 124 to graduate?

15      **INMATE DAWSON:**  Well, I don't – back in '74, I

16  think it was more, I'm not for sure.

17      **PRESIDING COMMISSIONER SHELTON:**  Oh, okay, but

18  you got your GED.

19      **INMATE DAWSON:**  It's hard for me to remember

20  something that happened --

21      **PRESIDING COMMISSIONER SHELTON:**  Yeah, well

22  that's okay.  You got your GED.

23      **INMATE DAWSON:**  Yes, ma'am.

24      **PRESIDING COMMISSIONER SHELTON:**  Did you get

25  your GED incarcerated or out on the streets?

26      **INMATE DAWSON:**  Yes, I got it at BBI.

27      **PRESIDING COMMISSIONER SHELTON:**  Okay, good.

13

1  So, you were living with your folks at the time of

2  your arrest?

3      **INMATE DAWSON:**  Yes, also with a girlfriend.

4      **PRESIDING COMMISSIONER SHELTON:**  So, you're back

5  and forth kinda?

6      **INMATE DAWSON:**  Yes.

7      **PRESIDING COMMISSIONER SHELTON:**  Okay.

8      **INMATE DAWSON:**  I always went home to do stuff

9  from my father and my mother, cut the grass, take the

10  trash out, anything that my father couldn't do because

11  he hurt his back.

12      **PRESIDING COMMISSIONER SHELTON:**  Oh, very good.

13  It says here you joined the National Guard in October

14  of '75.

15      **INMATE DAWSON:**  Yes, ma'am.  And that's one of

16  my biggest mistakes, I should have, uh, I should have,

17  uh --

18      **PRESIDING COMMISSIONER SHELTON:**  Stayed there?

19      **INMATE DAWSON:**  Should have stayed, I should

20  have went in for regular Army when I had the chance.

21      **PRESIDING COMMISSIONER SHELTON:**  It says you

22  returned from basic training in March of '76, but you

23  failed to attend meetings and you were consistently

24  absent without leave.

25      **INMATE DAWSON:**  Yeah, when I came back to

26  California, uh, employment was kind of hard to get at

27  the time.  So, I decided to move to San Antonio, Texas

14

1    with my sister.  And even though I should have learned

2    the bus routes but I didn't, and they give me an

3    honorable discharge for failure to report.

4        **PRESIDING COMMISSIONER SHELTON:**  I know it says

5    you did get an honorable discharge in October of '77.

6    This says you were a social drinker since the age of

7    17.  You used some marijuana.  And you indicated you

8    had a PCP problem in high school.

9        **INMATE DAWSON:**  Yeah.

10       **PRESIDING COMMISSIONER SHELTON:**  You were in

11   counseling for your drug use, for a week at the Martin

12   Luther King Hospital.

13       **INMATE DAWSON:**  Yes, ma'am, that's another bad

14   judgment I made.  And since I accepted Jesus Christ in

15   my life that pretty much straightened up all the

16   defects of characters and my struggles that I had with

17   alcohol and, uh, any type of substance.  I don't drink

18   water -- I mean I don't drink coffee.  I don't care

19   for cigarettes or nothing like that.  I don't need

20   that anymore in my life.

21       **PRESIDING COMMISSIONER SHELTON:**  Well good for

22   you.

23       **INMATE DAWSON:**  That's something I'm embarrassed

24   to talk about but that's something that happens when

25   you're young.

26       **PRESIDING COMMISSIONER SHELTON:**  You're

27   embarrassed to talk about the mistakes you made with

15

1  drugs?

2     **INMATE DAWSON:**  Yes, because I know, you know,

3  it was wrong.

4     **PRESIDING COMMISSIONER SHELTON:**  Uh-huh.

5     **INMATE DAWSON:**  And I made a mistake, but I

6  didn't really have nobody to talk to for guidance at

7  that level.  And I was scared to talk, embarrassed

8  about that.  But as I said when I accepted Jesus

9  Christ in my life that, that straightened out all my

10  defects of characters and my shortcomings.

11     **PRESIDING COMMISSIONER SHELTON:**  Good.  Do you

12  go to AA and NA right now?

13     **INMATE DAWSON:**  Off and on.

14     **PRESIDING COMMISSIONER SHELTON:**  We'll talk

15  about that.  The Commissioner will talk with you about

16  that.  Uh, it does indicate here that your parents

17  convinced you to, uh, go to San Antonio, Texas to live

18  with a relative because they were concerned about your

19  - the drug influence in the neighborhood.  Uh, you

20  also used, uh, cocaine.

21     **INMATE DAWSON:**  Yes.

22     **PRESIDING COMMISSIONER SHELTON:**  At the age of

23  21.  What other kinds of drugs?

24     **INMATE DAWSON:**  That's about it.

25     **PRESIDING COMMISSIONER SHELTON:**  So, at that

26  particular time it appears that you had a drug problem

27  but not an alcohol problem, or did you have an - well

16

1  you had an alcohol problem, too, because you got a

2  drunk driving so to speak.

3          **INMATE DAWSON:**  Yes, ma'am.

4          **PRESIDING COMMISSIONER SHELTON:**  Okay, good.

5  Uh, have you ever been married?

6          **INMATE DAWSON:**  Twice.

7          **PRESIDING COMMISSIONER SHELTON:**  Tell me when

8  were you married the first time?

9          **INMATE DAWSON:**  Oh, let me see.

10          **PRESIDING COMMISSIONER SHELTON:**  We won't tell

11  if you get it wrong.

12          **INMATE DAWSON:**  My first marriage was, uh, I

13  believe it was 1990.

14          **PRESIDING COMMISSIONER SHELTON:**  Okay, and how

15  long did that last?

16          **INMATE DAWSON:**  Four years.

17          **PRESIDING COMMISSIONER SHELTON:**  Children?

18          **INMATE DAWSON:**  I have a 14-year old daughter.

19          **PRESIDING COMMISSIONER SHELTON:**  From that first

20  marriage?

21          **INMATE DAWSON:**  Yes, ma'am.

22          **PRESIDING COMMISSIONER SHELTON:**  Okay.  And

23  what's her name?

24          **INMATE DAWSON:**  My daughter or my first wife?

25          **PRESIDING COMMISSIONER SHELTON:**  Your daughter.

26          **INMATE DAWSON:**  Michelle Rene Dawson.

27          **PRESIDING COMMISSIONER SHELTON:**  Do you have

17

1   contact with her?

2       **INMATE DAWSON:**  Yes, she's right up the street

3   in Hollister, I call her every week.

4       **PRESIDING COMMISSIONER SHELTON:**  Does she come

5   see you?

6       **INMATE DAWSON:**  Every Friday.  We get – we got

7   Fridays back now, Friday night visits, so I see her

8   every Friday, every other Friday.

9       **PRESIDING COMMISSIONER SHELTON:**  And her mother

10  brings her here?

11      **INMATE DAWSON:**  Yes, ma'am.

12      **PRESIDING COMMISSIONER SHELTON:**  So, you're

13  still getting along with your ex-wife?

14      **INMATE DAWSON:**  Yes, we're good friends.

15      **PRESIDING COMMISSIONER SHELTON:**  Good.  Tell me

16  about your second wife.

17      **INMATE DAWSON:**  I'm married to, uh, my high

18  school sweetheart, Janice Dawson.

19      **PRESIDING COMMISSIONER SHELTON:**  And you're

20  still married to her?

21      **INMATE DAWSON:**  Yes, ma'am.

22      **PRESIDING COMMISSIONER SHELTON:**  Your high

23  school sweetheart, huh?

24      **INMATE DAWSON:**  Yes, ma'am.

25      **PRESIDING COMMISSIONER SHELTON:**  How did you get

26  reacquainted while you've been in here?

27      **INMATE DAWSON:**  Her brother got killed and I

18

1   called to say, send my condolences and --

2       **PRESIDING COMMISSIONER SHELTON:**  That started

3   it, huh?

4       **INMATE DAWSON:**  Well, we always (indiscernible)

5       **PRESIDING COMMISSIONER SHELTON:**  So, how long

6   have you been married?

7       **INMATE DAWSON:**  It will be 11 years in December.

8       **PRESIDING COMMISSIONER SHELTON:**

9   Congratulations.

10      **INMATE DAWSON:**  It's all right.

11      **PRESIDING COMMISSIONER SHELTON:**  Yes.

12      **INMATE DAWSON:**  We're friends.

13      **PRESIDING COMMISSIONER SHELTON:**  That's good,

14  it's important.  Uh, the record says here that you

15  fathered a boy, but evidently that's not true or is

16  it?

17      **INMATE DAWSON:**  Yes, I fathered a son before I

18  went to the Army.  He's a correctional officer at, I

19  believe at Lancaster right now.

20      **PRESIDING COMMISSIONER SHELTON:**  And who's his

21  mom?

22      **INMATE DAWSON:**  Her name is Yvette Grant.

23      **PRESIDING COMMISSIONER SHELTON:**  So, that was

24  outside of a marriage relationship.

25      **INMATE DAWSON:**  Yes, ma'am.

26      **PRESIDING COMMISSIONER SHELTON:**  So, how, how

27  old is your son?

19

1      **INMATE DAWSON:**  I would say he's about 28 right

2  now.

3      **PRESIDING COMMISSIONER SHELTON:**  Do you have

4  contact with him?

5      **INMATE DAWSON:**  Because he's a correctional

6  officer that's not possible.  They tell me he can't be

7  there until I get out.

8      **PRESIDING COMMISSIONER SHELTON:**  Okay.  There

9  might – they might consider that a --

10      **INMATE DAWSON:**  We talked by phone conversation

11  when my father passed.

12      **PRESIDING COMMISSIONER SHELTON:**  Oh, okay.

13      **INMATE DAWSON:**  But that was about it.

14      **PRESIDING COMMISSIONER SHELTON:**  All right.

15  Okay, sir, we've talked about your family.  We've

16  talked about your education.  And what kind of

17  employment experience did you have before you came in

18  custody?

19      **INMATE DAWSON:**  I was a gas station attendant, a

20  janitor, and a security guard.  I was in the process

21  of going to street maintenance for the County of Los

22  Angeles before I came to prison.  I was in the process

23  of trying to do that (indiscernible)

24      **PRESIDING COMMISSIONER SHELTON:**  Is there

25  anything else that you would like to add to the

26  record, uh, based on your social history that I didn't

27  talk about?  We talked about children, marriage,

20

1  vocation, employment, your family life.  Is your mom

2  still alive?

3      **INMATE DAWSON:**  Yes, she has a letter right

4  there.

5      **PRESIDING COMMISSIONER SHELTON:**  And your dad?

6  Take a breath, sir.  There's some fancy Kleenex here

7  for you.

8      **INMATE DAWSON:**  He passed away, uh, three years

9  ago.

10      **PRESIDING COMMISSIONER SHELTON:**  And that

11  affects you still very much, yes?

12      **INMATE DAWSON:**  Yes.

13      **PRESIDING COMMISSIONER SHELTON:**  I'm sorry to

14  hear that, sir.

15      **INMATE DAWSON:**  It affects me because, uh, by

16  being here because he raised me better than this.  I

17  was out of my character by getting involved with

18  somebody I had no business getting involved with.  And

19  I was always focused.  I had a job.  I had never had

20  problems getting a job or finding girlfriends.  I'm

21  just embarrassed by being in front of you people when

22  I'm better than this.  I know I am.  And I was just

23  out of my character.  I had no business walking in

24  somebody's place of business with a loaded weapon,

25  scaring the employees and taking money and run.  And

26  in the commission of doing that, my crime partner

27  decided to take it upon his self to shoot and kill the

21

1  security guard.

2  **ATTORNEY RUTLEDGE:**  I'll have to caution you,

3  Mr. Dawson.  Uh, the Board appreciates of course when

4  you talk about the commitment offense.  But if it is

5  your contention to not discuss it at today's hearing,

6  you're starting to discuss it, and that would make you

7  subject to questions by the District Attorney, by the

8  Board about the commitment offense.

9  **INMATE DAWSON:**  I understand that, but I just

10  wanted to say that because she asked about my father.

11  I just wanted to –

12  **PRESIDING COMMISSIONER SHELTON:**  I understand,

13  sir.  Evidently, and I'll sum it up for you.  You were

14  very close with your family and you think – you feel

15  you let them down because you weren't raised to behave

16  this way.  It appears you got involved in some serious

17  drug stuff that led you down the wrong path.

18  **INMATE DAWSON:**  Drugs wasn't the problem, the,

19  the cause of me being here today.  It was me being out

20  of my character.

21  **PRESIDING COMMISSIONER SHELTON:**  Being somebody

22  you weren't raised to be.

23  **INMATE DAWSON:**  Correct.

24  **PRESIDING COMMISSIONER SHELTON:**  All right, sir.

25  I appreciate that.  We're going to go to Commissioner

26  Sellwood and he's going to talk with you about your

27  post-conviction factors.

22

1      **DEPUTY COMMISSIONER SELLWOOD:**  Good afternoon,

2  sir.

3      **INMATE DAWSON:**  Good afternoon, sir.

4      **DEPUTY COMMISSIONER SELLWOOD:**  I'm going to, uh,

5  discuss some information that's listed both in your C-

6  File and in what we call the Board Report.  Now, it's

7  possible, sir, that I might make a mistake, or that I

8  might leave something important out.  If you find that

9  I do that, please free to let me know so I can correct

10  the record.

11      **INMATE DAWSON:**  Okay.

12      **DEPUTY COMMISSIONER SELLWOOD:**  All right.

13      **INMATE DAWSON:**  Yes, sir.

14      **DEPUTY COMMISSIONER SELLWOOD:**  All right.  What

15  I'm going to start with is some basic information, to

16  start.  Uh, your current classification level is 19,

17  and your current custody level is Medium A, is that

18  correct?

19      **INMATE DAWSON:**  Correct.

20      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Your last

21  hearing was April 15th of 2003, and that was your

22  Initial Hearing, and you received a three-year denial.

23  You were received here at CTF on September 8th of 1997,

24  all those accurate?

25      **INMATE DAWSON:**  Yes, sir.

26      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, good.  Uh,

27  in regards to discipline you have a very, very good

23

1  history with a somewhat recent 115.  You only have two

2  115s in your entire history.

3       **INMATE DAWSON:**  Correct.

4       **DEPUTY COMMISSIONER SELLWOOD:**  All right.  Now,

5  the first one was way back in April of '85, a long

6  time ago.

7       **INMATE DAWSON:**  Yes, sir.  Could I explain?

8       **DEPUTY COMMISSIONER SELLWOOD:**  Well, if you'd

9  like to I would – sure.

10      **INMATE DAWSON:**  Okay.  I left San Quentin and,

11 uh, I did everything right.  I just moved out of that

12 cell because the equipment in there, the counselors

13 and officers told me that the guy was a petafile.

14      **DEPUTY COMMISSIONER SELLWOOD:** All right.

15      **INMATE DAWSON:**  And, uh, one particular night

16 the guy got, uh, naked, said to take my clothes off.

17 I told him I'm not, not with that.  I don't play that.

18 And I tried to tell the officers to let me out, move

19 me, they wouldn't.  They told me to hold on and they

20 would try to find me a cell.  One particular night, he

21 made a – he approached me and I defended myself.  And

22 then things cleared up.  The officers had handcuffed

23 and they was taking him out.

24      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Now,

25 actually what I did was I made a mistake on the date,

26 that was '82.

27      **INMATE DAWSON:**  Yes, sir.

24

1      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, '82, I made

2    a mistake on the date.  When I looked at the date, I

3    saw the 128, so I'm sorry.  Yeah, that incident was in

4    '82, all right.  Then the other one 115 was January of

5    '02, and that was for sexual behavior which was

6    inappropriate sexual behavior, uh, with a visitor.

7      **INMATE DAWSON:**  My wife.

8      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And we

9    have all read, uh, the file so we're aware of what

10   that was, all right.  Uh, the 128 was way back in '85,

11   as I mentioned the date, back in April of '85.  So,

12   you actually have a very, very good, uh, disciplinary

13   record.  Uh, I'm sure that you wish that '02 event had

14   not happened because it's closer to your parole

15   hearings.  And had that happened, you know, 10 years

16   ago, it would have been easier to look at it as a

17   distant event, but it was '02, so it's four, four

18   years ago.

19     **INMATE DAWSON:**  Yes, my wife, she demanded some

20   passion as far as we could go and, uh, conversed, but

21   she said even – she wanted some passion or else she

22   was going to find it on the street.

23     **DEPUTY COMMISSIONER SELLWOOD:**  Okay, well, all

24   right.  Uh, but, uh, again, three – a combination of

25   three 115s and 128s all together for your entire

26   history, sir, is very, very good.  Well, two 115s, one

27   128, so a combination all together of three

25

1    disciplinary write-ups for your entire history is

2    excellent.

3         **INMATE DAWSON:**  Thank you.

4         **DEPUTY COMMISSIONER SELLWOOD:**  And you should be

5    congratulated on that, all right.  Uh, let me go over

6    the history as reported since your initial hearing.

7    From 9 of '03 to 9 of '04, it states that you did not

8    participate in any vocational training for that year,

9    that you did not pursue any academics in that year.

10   This is September of '03 to September of '04, okay.

11   Yes, you've something to –

12        **ATTORNEY RUTLEDGE:**  Oh, his – your Voc?

13        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Is there

14   something during that period?

15        **INMATE DAWSON:**  Yes, sir.

16        **DEPUTY COMMISSIONER SELLWOOD:**  She'll give it to

17   the guard here.  And have you got other things that

18   you think I don't have in front of me that you would

19   like me to see and review, sir, do you want me to see

20   those, too?   Why don't we give those to the guard,

21   too, unless –

22        **ATTORNEY RUTLEDGE:**  Yeah, we'll go ahead and

23   then you can figure out what to do.

24        **DEPUTY COMMISSIONER SELLWOOD:**  Thank you, sir.

25   Yeah, I mean I might as well seem them all, then I can

26   take a look at them.  That's fine.

27        **PRESIDING COMMISSIONER SHELTON:**  We'll give them

26

1    back to you, don't worry.  Thank you.

2        **DEPUTY COMMISSIONER SELLWOOD:**  Thank you.  Okay,

3    so, let's see.

4        **INMATE DAWSON:**  You mentioned the Voc.

5        **DEPUTY COMMISSIONER SELLWOOD:**  I was mentioning

6    vocational.  What they said was there was no

7    vocational training during that period of time.  Okay,

8    so let's take a look here.

9        **INMATE DAWSON:**  Well, that's my certificate of

10    completion.

11        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  So, let's

12    take a look here and see.  Okay, this is dated – not.

13    Oh, there it is, sorry.  Okay.  Here's, here's what

14    I'm going – according to this, sir, unless there's

15    another one you want me to see, I'm referring to the

16    one-year period between September of 2003 and

17    September of 2004, so for that one year period only,

18    because I'm covering times since your last hearing.

19    You've given me a certificate of completion for

20    Vocational Graphic Arts.  And it's presented on the

21    second day of October of 2001.

22        **INMATE DAWSON:**  Okay, that's the one mistake,

23    sir.

24        **DEPUTY COMMISSIONER SELLWOOD:**  No, that's fine.

25    I'm glad we – maybe that helps you relax a little,

26    too, a little interchange and --

27        **INMATE DAWSON:**  The time frame.

27

1          **DEPUTY COMMISSIONER SELLWOOD:**  Okay, I'm sorry,

2     I should have made that more clear to you, okay.  But

3     this is great to hear.  My expectation is that this

4     was covered at the initial hearing, and so it's

5     already on the record.  And I'm just bringing this up

6     to date since your last hearing, okay.

7          **INMATE DAWSON:**  Okay.

8          **DEPUTY COMMISSIONER SELLWOOD:**  So, that's what

9     I'm covering specifically.  So, let me take a moment

10    here and look at these – some – these other things

11    because I've something from '97, something here from

12    the year 2000, again 200, again 2000.  Okay, and

13    here's your GED which you had earlier stated that you

14    had accomplished, the GED, and here's that here.  And

15    then – okay.  Now, we'll see if I get to this.  This

16    one is dated, uh, '04 – 9 of '04, so we'll make that I

17    cover this one in this time period.  Okay, this is

18    from back in '02, also.  Okay.  So, these items appear

19    that they should have been covered in the initial

20    hearing.  And this which is a presentation of

21    employment earning for Board of Prison Term Hearing.

22    And these were your earnings prior to the last

23    hearing?

24         **INMATE DAWSON:**  The vocational print shop

25    graphic arts department, too.

26         **DEPUTY COMMISSIONER SELLWOOD:**  Oh, you're

27    suggesting – okay, for instance a Binding and

28

 1  Finishing Supervisor which started between 30 and

 2  65,000 a year.

 3      **INMATE DAWSON:**  Yeah, that's just the

 4  (indiscernible) earnings status of where he scheduled

 5  off the paying of the company.

 6      **DEPUTY COMMISSIONER SELLWOOD:**  Should you leave

 7  prison and go out and find a job as someone doing

 8  that.

 9      **PRESIDING COMMISSIONER SHELTON:**  This might be

10  part of –

11      **DEPUTY COMMISSIONER SELLWOOD:**  This would be

12  parole plans.

13      **PRESIDING COMMISSIONER SHELTON:** -- parole plans

14  --

15      **DEPUTY COMMISSIONER SELLWOOD:**  -- I think we've

16  covered that.

17      **PRESIDING COMMISSIONER SHELTON:** -- so let me add

18  this to my pile over here.

19      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, good,

20  that's fine.  Thank you for bringing all that up.

21  It's real important that the record is accurate, and

22  that you agree that it's accurate.  And that way, you

23  don't have to – you can come back at some time and say

24  well that was wrong.  We're going to do it right here.

25  So, that's fine, no problem at all.  So, let me

26  continue with this one-year period, from September of

27  '03 to September of '04, okay.  And again let me know

29

1   if anything is wrong.  Work record, it says that you

2   were dropped from the Vocational Print Shop, non-

3   adversely, it was not your fault.  You had simply been

4   there too long, is what they said.

5       **INMATE DAWSON:**  Correct.

6       **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Uh, group

7   activities you were not involved in any self-help

8   group activities for that one year period, and you

9   remained disciplinary free.  Now, I'm going to move

10  onto the next year.  This year being September of '04

11  through September of '05, okay, for one year only.

12  Vocational training, none.  Academics, none.  Work

13  record, central lunch box crew.  All right.  Group

14  activities, none documented during that period.  Okay,

15  and remain disciplinary - Yes, please, go ahead.

16      **INMATE DAWSON:**  As of September 1 --

17      **DEPUTY COMMISSIONER SELLWOOD:**  Uh-huh.

18      **INMATE DAWSON:**  -- I'm in textile, sewing

19  machine operator.

20      **DEPUTY COMMISSIONER SELLWOOD:**  As of September,

21  this September?

22      **INMATE DAWSON:**  Yes, sir.

23      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, that's

24  fine.

25      **PRESIDING COMMISSIONER SHELTON:**  We're not there

26  yet.

27      **DEPUTY COMMISSIONER SELLWOOD:**  We're not there

30

1  yet, I'll get there.  Uh, and that you remained

2  disciplinary free for that period.

3        **INMATE DAWSON:**  Yes, sir.

4        **DEPUTY COMMISSIONER SELLWOOD:**  All right.  Now,

5  I'm going to go to next year.  This year that I'm

6  going to cover now is actually not a full year, it's

7  from September of '05 up to January of '06, so only

8  about a four month period.  During that period there

9  was no vocational training, no academics.  You

10  remained on the central lunch box crew.  And you

11  participated in Narcotics Anonymous and Anger

12  Management groups, okay, and that you received the

13  authorization for – now we're in the (indiscernible)

14  okay.  Now, I'm going to go up here –

15        **PRESIDING COMMISSIONER SHELTON:**  Can I –

16        **DEPUTY COMMISSIONER SELLWOOD:** Yes.

17        **PRESIDING COMMISSIONER SHELTON:**  -- bust in for

18  a second?  You mentioned textiles, right now.

19        **INMATE DAWSON:**  Yes, ma'am.

20        **PRESIDING COMMISSIONER SHELTON:**  What are you

21  doing – is that your work right now?

22        **INMATE DAWSON:**  Yes, ma'am.

23        **PRESIDING COMMISSIONER SHELTON:**  And when did

24  you start that?

25        **INMATE DAWSON:**  September 1.

26        **DEPUTY COMMISSIONER SELLWOOD:**  Yeah, a month

27  ago.

31

1        **PRESIDING COMMISSIONER SHELTON:**  Oh, okay.  So,

2   we have that big blank spot from January to September

3   then, huh?  Do you have a record of that?

4        **DEPUTY COMMISSIONER SELLWOOD:**  I'm, I'm going –

5   I have a January up through August.

6        **PRESIDING COMMISSIONER SHELTON:**  Okay, awesome,

7   wonderful.

8        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  So, from

9   January of this year, sir, 2006 until August of this

10  year, okay, it says that there was no vocational

11  training, no academics, that you worked in culinary,

12  which I assume is the central lunch box crew.

13       **INMATE DAWSON:**  Yes, sir.

14       **DEPUTY COMMISSIONER SELLWOOD:**  Same thing, okay,

15  cool.  You participated in Narcotics Anonymous and

16  you're doing well in that, and that you remain

17  disciplinary free.  And then from August up until this

18  date, the only thing I had in terms of new chronos, I

19  did not have a chrono – well, unless this is it.

20  There's a chrono in there dated September 6th, so just

21  about one month ago.  And it says that you

22  participated in the training on Cal-Osha Hazardous

23  Communications Standards.

24       **INMATE DAWSON:**  Yes, sir.

25       **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And, uh,

26  and then where – what happened on September 1 of this

27  year, you got what?

32

1        **INMATE DAWSON:**  I got reassigned to the textile.

2        **DEPUTY COMMISSIONER SELLWOOD:**  Textile, okay.

3        **INMATE DAWSON:** Yeah, PIA.

4        **DEPUTY COMMISSIONER SELLWOOD:**  You're in PIA,

5    now.

6        **INMATE DAWSON:**  Yes, sir.

7        **DEPUTY COMMISSIONER SELLWOOD:**  So, you came out

8    of the lunch box crew and went over to PIA?

9        **INMATE DAWSON:**  Yes, sir.

10        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And so

11    that was continuous.  You had been on lunch box crew

12    all the way up until that point and then you just went

13    over there?

14        **INMATE DAWSON:**  Yes, sir.

15        **DEPUTY COMMISSIONER SELLWOOD:**  Okay, good.  And

16    in textiles, I know what the word "textiles" means,

17    but I don't always know what it means in terms of what

18    you do when you work over there.

19        **INMATE DAWSON:**  I'm a sewing machine operator.

20        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And when

21    you do that do you take courses that also teach you

22    how to be better at that along with actually with

23    doing the work?

24        **INMATE DAWSON:**  No, sir.

25        **DEPUTY COMMISSIONER SELLWOOD:**  No, okay.  So,

26    and here's my question – go ahead.

27        **INMATE DAWSON:**  I have 12 years experience, uh,

33

1  of being, uh, sewing machine operator.

2      **DEPUTY COMMISSIONER SELLWOOD:**  Oh, you do, where

3  did that come from?

4      **INMATE DAWSON:** PDI, PIA.

5      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, okay.  So,

6  you're simply going back to something you've really

7  done well.

8      **INMATE DAWSON:**  Yes, sir.

9      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And that

10  leads right into my next question.  If you were to be

11  paroled and you wanted to earn a living -- which

12  you've talked about having jobs before and doing that

13  - do you believe that you are employable by someone;

14  and why they hire you; what is your trade; what is

15  your skill?

16      **INMATE DAWSON:**  A mattress fabricator.

17      **DEPUTY COMMISSIONER SELLWOOD:**  Mattress

18  fabricator?

19      **INMATE DAWSON:**  Yes, building mattresses from

20  scratch and being a sewing machine operator, that's,

21  uh, potential earnings of $8.00 an hour to $15.00 an

22  hour.

23      **DEPUTY COMMISSIONER SELLWOOD:**  Which is in

24  there, okay.

25      **INMATE DAWSON:**  Uh, I have, uh, as I said I have

26  a very strong work ethic, professional --

27      **DEPUTY COMMISSIONER SELLWOOD:**  But in terms of

34

1  the skill?  I understand the work ethic.

2      **INMATE DAWSON:**  Yes.

3      **DEPUTY COMMISSIONER SELLWOOD:**  But you think

4  that sewing would be where your skills would be, where

5  you would seek employment?

6      **INMATE DAWSON:**  I have options.

7      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, what are

8  the other options?

9      **INMATE DAWSON:**  Vocational graphic arts.

10      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

11      **INMATE DAWSON:**  Print Shop.

12      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

13      **INMATE DAWSON:**  Printing press operator.

14      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

15      **INMATE DAWSON:**  And, uh --

16      **DEPUTY COMMISSIONER SELLWOOD:**  Now, let me ask

17  you question about printing presses.  Do they even

18  exist in this new technological era?

19      **INMATE DAWSON:**  Yes.

20      **DEPUTY COMMISSIONER SELLWOOD:**  Era, era --

21      **INMATE DAWSON:**  Yes.

22      **DEPUTY COMMISSIONER SELLWOOD:**  Era, era.

23      **INMATE DAWSON:**  There's a couple of companies

24  that use Xerox machines, and they're basically on the

25  same format.

26      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

27      **INMATE DAWSON:**  And, uh, I, I learned - I got

35

1  the printing press down pretty good.  And I'm

2  confident enough with my abilities to – if I'm lucky

3  enough to get my feet into any major newspaper

4  company, I can run the press, I even load it up, you

5  know, with the paper.

6      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

7      **INMATE DAWSON:**  Or making plates.  There's a

8  bunch of stages in there that's --

9      **DEPUTY COMMISSIONER SELLWOOD:**  If you had a

10  choice and you were sitting in a job interview today,

11  and she represented the printing press people, and I

12  represented the sewing people, we both offer you a job

13  which one would you go for?

14      **INMATE DAWSON:**  It would be the printing press

15  because it's more money and more money from it.

16      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, very good.

17      **PRESIDING COMMISSIONER SHELTON:**  See, I won.

18      **DEPUTY COMMISSIONER SELLWOOD:**  Now, let me --

19      **INMATE DAWSON:**  It depends on the company, too,

20  sir.

21      **DEPUTY COMMISSIONER SELLWOOD:**  Yeah, of course,

22  I understand.  I was just looking at your interest.

23  You would be more interested in the printing, is that

24  – that's what you're telling me, right?

25      **INMATE DAWSON:**  Yes, right.  Like I said my

26  options are open.

27      **DEPUTY COMMISSIONER SELLWOOD:**  I understand.

36

1  You don't always get everything you want, but you've

2  got the other experience.

3      **INMATE DAWSON:**  Yes, sir.

4      **DEPUTY COMMISSIONER SELLWOOD:**  All right, now

5  let me look at this one.  This is a – that you've

6  handed me is September of '04 Chrono that says you've

7  successfully completed an impact workshop consisting

8  other 13 two hour sessions.  "Impact Program is a

9  self-help therapy designed to provide an opportunity

10  for educational awareness as to the profound negative

11  impact of crime on its victims".  So, I don't think I

12  did cover that, so you've given me that one to put on

13  the record.  Okay, very good.  Uh, now let me go, sir,

14  to the psychological reports.  I have a March 21 of

15  2003 report, prior to that I have a July of 1995

16  report.  That's quite a distance in between those so

17  I'm not going to refer to the 1995 report, it's very

18  old.  I'm going to refer to the 2003 report.  And I'm

19  going to take some information out of here, let me

20  start with Substance Abuse History.

21          "Inmate Dawson smoked marijuana and PCP for

22          several years until about the age of 20.

23          From the age of 21 on, he used cocaine on

24          and off.  He also drank alcohol

25          occasionally.  He has been attending

26          Alcoholics Anonymous and Narcotics

27          Anonymous".

37

1  Do you attend those, sir, on a regular basis?

2      **INMATE DAWSON:**  No, sir.

3      **DEPUTY COMMISSIONER SELLWOOD:**  Did you at some

4  time them on a regular basis?

5      **INMATE DAWSON:**  Yes, sir.

6      **DEPUTY COMMISSIONER SELLWOOD:**  For about how

7  long, sir?

8      **INMATE DAWSON:**  Uh --

9      **DEPUTY COMMISSIONER SELLWOOD:**  I mean, two

10 months, 10 years?

11     **INMATE DAWSON:**  It's been years, sir.

12     **DEPUTY COMMISSIONER SELLWOOD:**  Now, when you

13 were attending regularly did that go for months or

14 years?

15     **INMATE DAWSON:**  It was months, like twice a

16 month.

17     **DEPUTY COMMISSIONER SELLWOOD:**  And twice a

18 month.  And did you go twice a month for two years,

19 five years, 10 years?

20     **INMATE DAWSON:**  I don't know exactly how many

21 years, sir.  It probably should be on --

22     **DEPUTY COMMISSIONER SELLWOOD:**  But do you think

23 a number of years?

24     **INMATE DAWSON:**  Yes, sir.

25     **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  It wasn't

26 just two or three times.

27     **INMATE DAWSON:**  No, sir.

38

1         **DEPUTY COMMISSIONER SELLWOOD:**  It was a long
2  period of time.
3         **INMATE DAWSON:**  Yeah.
4         **DEPUTY COMMISSIONER SELLWOOD:**  Okay, that's what
5  I was looking for.  And when do you think was the last
6  time you attended an AA or NA class?
7         **INMATE DAWSON:**  It's been a while, sir.
8         **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Do you
9  think a year, two years, five years?
10        **INMATE DAWSON:**  About a year.
11        **DEPUTY COMMISSIONER SELLWOOD:**  About a year,
12  okay.  Thank you, that's what I needed.  Uh, under
13  psychiatric and medical history:
14              "Inmate Dawson was a participant in the
15              Triple CMS Program until 1997.  He was
16              depressed at the time, was evaluated as not,
17              not a sociopath and was prescribed Vistiril
18              for sleep.  The inmate said about this, 'I
19              wasn't seeing my people enough.  I was
20              stressed out from moving to cell living to
21              dorm living where it was very noisy.  I
22              couldn't sleep".  Uh, the diagnosis was,
23              "Axis One, poly-substance abuse in
24              institutional remission.  Axis Two, no
25              contributory personality disorder, a GAF
26              score of 80.  Should this inmate at this
27              time be given a parole or release date his

39

1           prognosis for maintaining his present gains

2           in the community is excellent".   Under

3           assessment of dangerousness, "This inmate

4           has received only two 115 violations during

5           his entire incarceration of 23 years.   If

6           released to the community" – oh, excuse me.

7           "Therefore it is felt that he would pose a

8           less than average risk for violence when

9           compared to the Level Two inmate

10          population".

11   So, he rates you as less of a risk for violence than

12   the normal Level Two inmate.   Then in talking about

13   release to the community:

14          "His violence potential is estimated to be

15          no higher than the average citizen in the

16          community.   The lack of arrest for violent

17          behavior prior to his conviction, and his

18          lack of violent behavior since his

19          incarceration are reasons for the assessment

20          of a low risk of violence.   Although he was

21          not the shooter in the particular crime for

22          which he was convicted, he was using a

23          loaded weapon to commit robberies, but he

24          did not actually hurt anyone.   He accepts

25          full responsibility for his actions and

26          their consequences, and he is to be

27          commended for improving his understanding by

40

1              accepting full responsibility in no longer

2              trying to shift responsibility to the

3              influence of his crime partner as he has in

4              past evaluations".

5    So, he's noting a significant change in you, and that

6    you're accepting full responsibility for all the

7    things that happened instead of trying to lay some

8    part of it off onto your crime partner.  And that

9    concludes my part, Commissioner.

10         **PRESIDING COMMISSIONER SHELTON:**  Okay. Mr.

11   Dawson, let's talk about your parole plans.

12         **INMATE DAWSON:**  Yes, ma'am.

13         **PRESIDING COMMISSIONER SHELTON:**  Are you okay?

14         **INMATE DAWSON:**  Yes, ma'am.

15         **PRESIDING COMMISSIONER SHELTON:**  Is your heart

16   pounding?  Oh, okay, take a breath.  Uh, we'll go

17   through it.  I have a new report and we'll go through

18   the letters and stuff, okay.  First of all, it says

19   for residence that you, uh, obviously would like to

20   live with your wife.

21         **INMATE DAWSON:**  Yes, but upon if it's granted,

22   uh, she and I would be living with my mother seeing

23   that she's 83-years old and she needs me there to take

24   care of the house and do things for her.

25         **PRESIDING COMMISSIONER SHELTON:**  So, you would

26   both move into your, uh, mom's house?

27         **INMATE DAWSON:**  Yes, ma'am.

41

1      **PRESIDING COMMISSIONER SHELTON:**  And mom lives

2  in Compton?

3      **INMATE DAWSON:**  Yes, ma'am.

4      **PRESIDING COMMISSIONER SHELTON:**  Would living

5  there pose any problems for you?

6      **INMATE DAWSON:**  No, ma'am, that's where I was

7  raised.

8      **PRESIDING COMMISSIONER SHELTON:**  I know, that's

9  where you also got in trouble.

10      **INMATE DAWSON:**  Naw, I'm way past that.  As I

11  said, uh, the moment I accepted Jesus Christ in my

12  life I straightened out all my defective characters

13  and my shortcomings now.  As I said I shouldn't be

14  sitting here.  I've never involved myself in gangs.  I

15  always stayed focused, always went to work, never hung

16  out with a bunch of guys.  And when I did hang out,

17  nothing happened.

18      **PRESIDING COMMISSIONER SHELTON:**  And the real

19  fact is, sir, you in fact are sitting here.

20      **INMATE DAWSON:**  Yes, ma'am, I am, yeah.

21      **PRESIDING COMMISSIONER SHELTON:**  So, you need to

22  own that and --

23      **INMATE DAWSON:**  I accept the responsibility.

24      **PRESIDING COMMISSIONER SHELTON:**  Okay, good.

25  So, your mom's getting up there in years, right?

26      **INMATE DAWSON:**  Yes, ma'am.

27      **PRESIDING COMMISSIONER SHELTON:**  Okay.  What

42

1   about – we've talked about employment to some degree.

2   This one – this here says that you would, uh, secure

3   employment using the skills you acquired in the offset

4   printing and mattress fabrication trades.

5       **INMATE DAWSON:**  Yes, ma'am.

6       **PRESIDING COMMISSIONER SHELTON:**  Okay.  Uh, do

7   you have any idea where you might work?

8       **INMATE DAWSON:**  Well, for starters, for my

9   second or third day out on parole I would be attending

10  my brother-in-law's driving school, truck driving

11  school.  And in the meantime searching for employment

12  where I'm skilled at.

13      **PRESIDING COMMISSIONER SHELTON:**  Tell me why you

14  would be attending truck driving school?

15      **INMATE DAWSON:**  Because at my age, I'll be 51 in

16  October, I might have to just get a truck and be

17  (indiscernible) California, if I have a good record

18  (indiscernible).

19      **PRESIDING COMMISSIONER SHELTON:**  Okay.  So,

20  you're keeping your options open.

21      **INMATE DAWSON:**  Yes, ma'am.

22      **PRESIDING COMMISSIONER SHELTON:**  That's good.

23  Let's take a look at your support letters.  We'll

24  discuss – well let's discuss this one first.  This is

25  your presentation, or this is what you were talking

26  about earlier with the Commissioner about your

27  potential earnings.

43

1        **INMATE DAWSON:**  Yes, ma'am.

2        **PRESIDING COMMISSIONER SHELTON:**  And, uh, I

3   think it's very good of you to sit down and prepare

4   this because it kind of gives you an idea of what to

5   look forward to.  I'm not going to read all of this.

6   But basically, you have gone through equipment

7   operations and customer service and mattress

8   fabrication, listing the variety of jobs that might be

9   available –

10       **DEPUTY COMMISSIONER SELLWOOD:**  Excuse me.

11  (RECESS)

12       **DEPUTY COMMISSIONER SELLWOOD:**  We're on side two

13  of tape one.

14       **PRESIDING COMMISSIONER SHELTON:**  Thank you very

15  much.  And as I was discussing with Mr. Dawson, we

16  were looking at the, the services and jobs that might

17  be available for you, and you listed down hourly and

18  annual wages.

19       **INMATE DAWSON:**  Yes, ma'am.

20       **PRESIDING COMMISSIONER SHELTON:**  So, uh, how –

21  where did you get these amounts from, out of

22  curiosity?

23       **INMATE DAWSON:**  Out of the training books we had

24  in print shop.

25       **PRESIDING COMMISSIONER SHELTON:**  Okay, good.

26  So, you had a good resource to go with, from.

27       **INMATE DAWSON:**  Yes, ma'am.