# EXHIBIT F (PART 2)

44

1          **PRESIDING COMMISSIONER SHELTON:**  Very good.
2    You're doing good homework, sir.
3          **INMATE DAWSON:**  Thank you.
4          **PRESIDING COMMISSIONER SHELTON:**  Let's talk
5    about support letters.  I reviewed them briefly.  Uh,
6    you have a letter from Janice Dawson, who would be
7    your husband (sic).
8          **INMATE DAWSON:**  Wife.
9          **PRESIDING COMMISSIONER SHELTON:**  Your wife.  I
10   said "husband", didn't I?
11         **DEPUTY COMMISSIONER SELLWOOD:**  Yeah, you did.
12   Yeah, you did.
13         **PRESIDING COMMISSIONER SHELTON:**  That's okay, I
14   figured she would be your wife.  I think my tongue is
15   getting tired.  I did that another time with somebody
16   else.  I called the, uh, client the husband of the
17   attorney.  That was kind of an interesting hearing
18   then.  Okay.  Uh, your wife says she's been
19   established for over 20 years.  She's attending
20   college at the present time.  And she's looking into
21   employment with the probation department.
22         **INMATE DAWSON:**  Yes, ma'am.
23         **PRESIDING COMMISSIONER SHELTON:**  She wants to be
24   a probation officer?
25         **INMATE DAWSON:**  Yes.
26         **PRESIDING COMMISSIONER SHELTON:**  Boy, you're
27   going to have all the supervision in the world, aren't

45

1   you, parole and probation?

2       **INMATE DAWSON:**  She's going to be the boss, too.

3       **PRESIDING COMMISSIONER SHELTON:**  Yeah, I happen

4   to be partial to probation.  Uh, so this is a nice

5   letter.  She's doing what she can to help get you, uh,

6   squared away.  And obviously, she's offering housing.

7   And there's transportation she's discussing and, uh,

8   talking about helping you with completion of your

9   driver's education like you mentioned.  Very nice.

10  Uh, this is called "Another Chance Outreach Ministry",

11  signed by Rev. Ricky Hammond.  Uh, he says he's known

12  you for over 30 years.

13      **INMATE DAWSON:**  We went to school together.

14      **PRESIDING COMMISSIONER SHELTON:**  Okay.  And, uh,

15  they're offering you a position working with troubled

16  youth.  You know I see that a lot.  Do they pay you

17  anything for that or is it kind of role model work?

18      **INMATE DAWSON:**  It's like role model being, uh,

19  (indiscernible) how can I say it now, "self-

20  explanatory".  It's like, "see what happened to me by

21  doing certain things".

22      **PRESIDING COMMISSIONER SHELTON:**  Yeah, good.

23      **INMATE DAWSON:**  Almost like "Scared Straight".

24      **PRESIDING COMMISSIONER SHELTON:**  Yeah, you would

25  be a role model.

26      **INMATE DAWSON:**  Yes, a role model.

27      **PRESIDING COMMISSIONER SHELTON:**  Yeah, don't do

46

1  what I do just do what I say.  Do you remember that

2  one?

3          **INMATE DAWSON:**  Yes.

4          **PRESIDING COMMISSIONER SHELTON:**  Okay.  This

5  letter's from your mom.  She thinks you've been doing

6  a good job.  She says she's a senior citizen living

7  alone, and she would like to spend time with you.  A

8  letter from your sister, Lynette.

9          **INMATE DAWSON:**  Yes.

10         **PRESIDING COMMISSIONER SHELTON:**  Uh, she thinks

11  you're doing a good job as well.  And, uh, she's the

12  one whose husband is an instructor at the driver

13  trucking school and, uh, plans to teach you how to

14  drive an 18-wheeler.  Did you have a driver's license

15  when you came in here?

16         **INMATE DAWSON:**  Yes.

17         **PRESIDING COMMISSIONER SHELTON:**  Oh, okay.  I

18  was going to say that 18 wheels is a lot to drive.

19  Uh, a letter from Roschandra (ph) Jones and, uh, it's

20  a support letter, very nice.  And we have a letter

21  from Zetty Harvest, family friend.

22         **INMATE DAWSON:**  Yes.

23         **PRESIDING COMMISSIONER SHELTON:**  And, uh, she

24  has always seen you as a well-mannered young man and

25  thinks that you will be a useful citizen.  So, very

26  nice support letters.  Did I miss anything?

27         **INMATE DAWSON:**  No, ma'am.

47

1          **PRESIDING COMMISSIONER SHELTON:**  Okay.  I'm
2    going to make sure you get all of this back so you can
3    - as well as this, so we can -
4          **DEPUTY COMMISSIONER SELLWOOD:**  Yes.
5          **PRESIDING COMMISSIONER SHELTON:**  -- uh, you can
6    get copies for your file, okay.  Always make sure you
7    have on hand all those originals.  All right, sir,
8    this is the portion of the hearing that we go into
9    with asking questions.  And we are not discussing the
10   offense, but I want you to tell me what you feel, and
11   how you feel about not only the person that was killed
12   in your offense, but all the other victims involved in
13   the robberies.  Tell me what, what's been going on in
14   your head and heart and all that with that?
15         **INMATE DAWSON:**  I'm very sad about that.  As I
16   said I was out of my character by putting a loaded
17   weapon in my hand, going in somebody's place of
18   business and scaring their employees.
19         **PRESIDING COMMISSIONER SHELTON:**  Uh-huh.
20         **INMATE DAWSON:**  And through the impact
21   programming, it gives me - it gave me a insight on
22   fear that I caused some people (indiscernible) taking
23   money and running.
24         **PRESIDING COMMISSIONER SHELTON:**  What kind of
25   insight did it give you?
26         **INMATE DAWSON:**  The feeling of what happened, of
27   this - the never ending feeling that I have.  It's

48

1    something I have to live with for the rest of my life.
2    I know I'm not directly responsible for the murder of
3    Mr. Dwight cousin and security guard.  But I'm
4    indirectly responsible because I participated in a
5    robbery which I shouldn't have.  If there was some
6    kind of way I could tell family how sorry I am, I
7    would, without affecting them, of bringing back
8    anymore pain.  If it was some way that I could, I
9    would give up a limb if it would bring him back
10   because he shouldn't have lost his life.  I shouldn't
11   have participated in no robbery in the first place.
12   As I said my father taught me better than that.  It's,
13   it's – I was just ignorant in going along with
14   something so stupid when I didn't have to.  I always
15   stayed focused.  I always had a job.  This was
16   embarrassing.  I embarrassed my people, my family, my
17   friends.  And this, this is just something I just have
18   to live with for the rest of my life.  And I wish
19   there was some kind of way I could turn back the hands
20   of time, I would do things differently.  I would have
21   kept myself in the Army.
22           **PRESIDING COMMISSIONER SHELTON:**  You know, if we
23   all had that 20-20 hindsight, huh?   Were you under
24   the influence of drugs or alcohol at the time of the
25   commitment offense?
26           **INMATE DAWSON:**  No.
27           **PRESIDING COMMISSIONER SHELTON:**  No.  Because I

49

1  know we talked about the fact that you did have an

2  alcohol and drug problem.  Okay.  I'm going to go to

3  Commissioner Sellwood and see if you have any

4  questions, because I can't think of anymore.  We've

5  been asking questions all along.

6      **DEPUTY COMMISSIONER SELLWOOD:**  Actually, I do.

7  I've got some questions for you, sir.  You came out of

8  Compton, is that right?

9      **INMATE DAWSON:**  Yes, sir.

10      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And you

11  came out of Compton in the early – late 60s, early

12  70s, basically, when you were a teenager that period

13  of time period?

14      **INMATE DAWSON:**  Yes, sir.

15      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Compton in

16  that time period was not merely as rough as it has

17  been in recent years, but it was still a – I mean it

18  was still a pretty nice residential area then, but it

19  has rough components in Compton.

20      **INMATE DAWSON:**  Yes, but where my, where my

21  parents stay at is very nice.

22      **DEPUTY COMMISSIONER SELLWOOD:**  It was a nice

23  area.

24      **INMATE DAWSON:**  Uh-huh, it was a nice --

25      **DEPUTY COMMISSIONER SELLWOOD:**  Yeah, it, it had

26  its various components and --

27      **INMATE DAWSON:**  Yes, sir.

50

1          **DEPUTY COMMISSIONER SELLWOOD:**  But, I, I, I
2    listened to you, and I watch you, and you talk with
3    great earnest – earnestness, if I can say that, with
4    great sincerity about I wasn't raised that way; I'm
5    embarrassed to be here.  Uh, you clearly have lots of
6    feelings about your father passing while you're in
7    jail as a lifer for such a horrendous crime.  So,
8    you've got this reference point that you talk about
9    easily about your upbringing, and the people around
10   you, but you did have a prior criminal history before
11   the life term, is that right?
12         **INMATE DAWSON:**  Minor.
13         **DEPUTY COMMISSIONER SELLWOOD:**  Okay, minor but
14   you did.  So, what was going on with that?  Were you
15   just a rebellious kid, all those other things, what
16   was that about?
17         **INMATE DAWSON:**  It was just bad judgment, sir.
18         **DEPUTY COMMISSIONER SELLWOOD:**  You don't have
19   the lean forward, just – okay, all right.  I mean who
20   were you doing stuff with?  I don't mean the names.  I
21   mean like the kids, the bad kids on the side?  Were
22   you choosing bad friends, what was going on?
23         **INMATE DAWSON:**  Some bad friends, but we were –
24   I wasn't, I wasn't involved in any gang activities.
25         **DEPUTY COMMISSIONER SELLWOOD:**  Okay.
26         **INMATE DAWSON:**  I was just going out and
27   partying too much with some of my friends that had a

51

1   little (indiscernible).  I was just out of my

2   character.

3       **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And you

4   talk about your character as the guy who goes home and

5   mows the lawn because dad wasn't able to do that

6   anymore.

7       **INMATE DAWSON:**  Yes, sir.  I get up every

8   morning and go to work.

9       **DEPUTY COMMISSIONER SELLWOOD:**  And you go to

10  work.  And you talk about that as if that's your

11  character.  And you say I was out of character.  But

12  you were out character more than once.

13      **INMATE DAWSON:**  Yes, sir.

14      **DEPUTY COMMISSIONER SELLWOOD:**  It wasn't the

15  life crime.  There were these other things.

16      **INMATE DAWSON:**  Yes, sir.

17      **DEPUTY COMMISSIONER SELLWOOD:**  Did you view that

18  at the time as being out of character for you?

19      **INMATE DAWSON:**  Yes, sir.

20      **DEPUTY COMMISSIONER SELLWOOD:**  So, even at the

21  time you were cognizant that --

22      **INMATE DAWSON:**  I shouldn't have been --

23      **DEPUTY COMMISSIONER SELLWOOD:**  -- I shouldn't be

24  doing that stuff?

25      **INMATE DAWSON:**  Yes, sir.

26      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And you

27  talk about accepting Jesus Christ into your life.

52

1     **INMATE DAWSON:**  Yes, sir, because that was, that
2  would be because of the guys that I'm meeting.
3     **DEPUTY COMMISSIONER SELLWOOD:**  And you said
4  something that I understood --
5     **INMATE DAWSON:**  It energizes.
6     **DEPUTY COMMISSIONER SELLWOOD:**  I understand.
7  You said that I do understand but I want to ask you
8  about it.  As a person listening to you, you talk
9  about accepting Jesus Christ, and you said the words,
10  "And that cured my defects", and you talked about
11  those defects.  One could be - one could question you,
12  "Oh, so now you're the perfect guy because Jesus
13  Christ is in your life.  You don't have to think about
14  it anymore.  It's all just Jesus and you're cured".  I
15  mean one could be cynical when listening to you say
16  that.
17     **INMATE DAWSON:**  I understand that, sir, no one's
18  perfect.
19     **DEPUTY COMMISSIONER SELLWOOD:**  Okay.
20     **INMATE DAWSON:**  It's an ongoing thing.
21     **DEPUTY COMMISSIONER SELLWOOD:**  So, what is it
22  about --
23     **INMATE DAWSON:**  Every day - every day judgment.
24     **DEPUTY COMMISSIONER SELLWOOD:**  So, let me ask
25  you the question.  Are you still as capable of being
26  out of character and doing those other things even
27  though Jesus Christ is in your life, or has he somehow

53

1  cured that part?

2      **INMATE DAWSON:**  I would he cured that part, I'm

3  no longer out of character doing things against the

4  law, of breaking the law.

5      **DEPUTY COMMISSIONER SELLWOOD:**  So, you've

6  learned how to stay within your character?

7      **INMATE DAWSON:**  Yes, sir, very much so and

8  within the law.

9      **DEPUTY COMMISSIONER SELLWOOD:**  And you credit to

10 some extent the power and the strength of Jesus Christ

11 helping you do that?

12     **INMATE DAWSON:**  And my learning and seeing

13 things within here.

14     **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  I needed

15 to hear you talk a little bit more about that.  I

16 wanted to make --

17     **INMATE DAWSON:**  Okay.

18     **DEPUTY COMMISSIONER SELLWOOD:**  -- sure you

19 weren't just saying, "Oh, okay, I accepted Christ so

20 the world's fine now".

21     **INMATE DAWSON:**  No, sir, the world is not fine.

22 We got Afghanistan, all right, the world is not fine.

23     **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Uh, in the

24 past you've been out of character.  You've talked

25 about it.  If you get paroled and you go out into the

26 community what's apt to happen to you is a lot of

27 pressures, a lot of things that you don't expect.

54

1    Life is going to come at you quickly and sometimes

2    harshly.  What are the anchors that you're going to

3    rely upon, that you're going to turn to, that said,

4    "Oh, man, I didn't expect this.  Oh, I didn't get that

5    job.  Oh, it didn't pay as much as I thought.  Oh,

6    these guys want me to do drugs".  Whatever it is what

7    are you going to grab onto and hang onto and say,

8    "Okay, I'm all right here while I figure out these

9    other things".  Do you have some anchors that you'll

10   hang onto?

11        **INMATE DAWSON:**  Yes, I do.

12        **DEPUTY COMMISSIONER SELLWOOD:**  What are those?

13        **INMATE DAWSON:**  The Lord Jesus Christ and my

14   parents.

15        **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

16        **INMATE DAWSON:**  And my family.

17        **DEPUTY COMMISSIONER SELLWOOD:**  Okay, and --

18        **INMATE DAWSON:**  And my determination and will to

19   get any type of job available.  It may not be what I'm

20   skilled at, but as long as I bring some money home to

21   pay the bills, put some food on the table and maintain

22   the taxes on my mother's house, that's what I'm

23   determined to do, sir.

24        **DEPUTY COMMISSIONER SELLWOOD:**  Getting

25   employment as a convicted felon is sometimes hard.

26        **INMATE DAWSON:**  It's going to be hard, but doors

27   are opening.  They got programs for us.  And if I

55

1  present myself --

2      **DEPUTY COMMISSIONER SELLWOOD:**  Do you have any

3  church affiliation?

4      **INMATE DAWSON:**  Yes, my, my parents' church.

5      **DEPUTY COMMISSIONER SELLWOOD:**   And so you can

6  go to that church?

7      **INMATE DAWSON:**  That's where I'll be going.

8      **DEPUTY COMMISSIONER SELLWOOD:**  Okay, all right.

9  Thank you, Commissioner.

10      **PRESIDING COMMISSIONER SHELTON:**  Okay.  Mr.

11  Bushling, any questions?

12      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  I don't have

13  any questions.

14      **PRESIDING COMMISSIONER SHELTON:**  Ms. Rutledge.

15      **ATTORNEY RUTLEDGE:**  I just –

16      **PRESIDING COMMISSIONER SHELTON:**  Do you have any

17  questions?

18      **ATTORNEY RUTLEDGE:**  Uh, I do.  Excuse me.  Uh,

19  the parole plans that you – the letter that you got

20  from the church from your pastor?

21      **INMATE DAWSON:**  Yes.

22      **ATTORNEY RUTLEDGE:**  Have you had contact with

23  him over the years?

24      **INMATE DAWSON:**  I call him at least once a

25  month.

26      **ATTORNEY RUTLEDGE:**  And is he a spiritual – do

27  you – he's your spiritual advisor or what's your

56

1  relationship?

2      **INMATE DAWSON:**  We went to school together.

3      **ATTORNEY RUTLEDGE:**  All right.  And –

4      **DEPUTY COMMISSIONER SELLWOOD:**  I know it's your

5  time, but let me just understand.  Is that person

6  different from the pastor of the church you would go

7  to that your mom goes to?   You talk about going to

8  mom's church.

9      **INMATE DAWSON:**  Yes.

10     **DEPUTY COMMISSIONER SELLWOOD:**  Is he the same

11 guy?

12     **INMATE DAWSON:**  No.

13     **DEPUTY COMMISSIONER SELLWOOD:**  Or he's

14 different?

15     **INMATE DAWSON:**  Different guy.

16     **DEPUTY COMMISSIONER SELLWOOD:**  Thank you.  Thank

17 you.

18     **ATTORNEY RUTLEDGE:**  All right.  And, uh, when

19 the commissioners asked you, you know, if you had your

20 choice of work which one would you choose and you said

21 the print shop.  Uh, what other – are there other

22 opportunities do you know if Los Angeles where you

23 could work doing – where you could use your skills

24 that you have at PIA here?

25     **INMATE DAWSON:**  To my knowledge there are bunch

26 of mattress factories off the 91 Freeway that's not

27 too far from my parents' house.  And, uh, according to

57

1   the book where I got all my potential earnings,

2   there's – there's options open.  So, I have just to

3   hit the bricks and put in my resumes.  But as I said

4   in the meantime, I will be – I learned how to drive a

5   truck, so it's not like I'm just going out there and

6   doing nothing.

7        **ATTORNEY RUTLEDGE:**  And, uh, you've worked, uh,

8   at the prison.  Have you worked with a pay number?

9        **INMATE DAWSON:**  Yes, I always had a pay number.

10        **ATTORNEY RUTLEDGE:**  And were you expected to

11   work so many hours a day?

12        **INMATE DAWSON:**  Ten hours a day.

13        **ATTORNEY RUTLEDGE:**  Ten, okay.  And so you were,

14   uh, held to the standards of a – were you held to the

15   same standards that a boss would hold an employee to?

16        **INMATE DAWSON:**  Yes.

17        **ATTORNEY RUTLEDGE:**  All right.

18        **INMATE DAWSON:**  The production level has to be –

19   they want 85 percent.  At the time right now I'm doing

20   53, that's roughly 600 pieces of work, 600 pieces of

21   (indiscernible)

22        **ATTORNEY RUTLEDGE:**  And how many years were you

23   – were you – weren't you foreman?

24        **INMATE DAWSON:**  Yes, at the time I was, uh, in

25   the mattress factory, and for 12 years I was lead man.

26        **ATTORNEY RUTLEDGE:**  All right.

27        **INMATE DAWSON:**  I was, uh, I was in charge of 22

58

1  inmates making sure they pick up the (indiscernible),

2  make sure they supply and everything.

3      **ATTORNEY RUTLEDGE:**  Now, since you got that 115

4  in 2002, have you – do you have visiting privileges?

5      **INMATE DAWSON:**  Yes.

6      **ATTORNEY RUTLEDGE:**  And --

7      **INMATE DAWSON:**  I just had a 30-day loss of

8  privilege.

9      **ATTORNEY RUTLEDGE:**  All right.  So, have you,

10  uh, been able to, uh, visit with your wife and other

11  people without incident?

12      **INMATE DAWSON:**  Yes.

13      **ATTORNEY RUTLEDGE:**  So, right now your visiting

14  is – is it back to normal?

15      **INMATE DAWSON:**  Yes, that was like a ultimatum

16  to keep my marriage.

17      **ATTORNEY RUTLEDGE:**  Okay.

18      **PRESIDING COMMISSIONER SHELTON:**  I'm sure your

19  wife understood.

20      **INMATE DAWSON:**  Well, she's been mad because I

21  got a 115.

22      **PRESIDING COMMISSIONER SHELTON:**  Uh-huh.

23      **INMATE DAWSON:**  She knew what was going to

24  happen with the Board.

25      **PRESIDING COMMISSIONER SHELTON:**  Yeah.

26      **INMATE DAWSON:**  Because I told her about it.

27      **PRESIDING COMMISSIONER SHELTON:**  I'm sure when

59

1  you talk to her she'll go --

2      **INMATE DAWSON:**  I try to –

3      **PRESIDING COMMISSIONER SHELTON:**  -- "so what did

4  they say?"

5      **INMATE DAWSON:**  -- pride myself on keeping out –

6  keeping away from the 115s, staying out of trouble.

7      **DEPUTY COMMISSIONER SELLWOOD:**  You've done a

8  fairly good job.

9      **ATTORNEY RUTLEDGE:**  No further questions for –

10      **PRESIDING COMMISSIONER SHELTON:**  Okay.

11      **ATTORNEY RUTLEDGE:**  -- Mr. Dawson.

12      **PRESIDING COMMISSIONER SHELTON:**  We're going to

13  go into closing statements, sir.  And what that means

14  is that Mr. Bushling will go first, followed by your

15  attorney, and then you will have an opportunity to

16  make a closing statement.  Mr. Bushling.

17      **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Thank you,

18  I'll be, uh, very brief.  Uh, the D.A.'s Office is

19  opposed, uh, a finding of suitability at the time,

20  this time based on the facts of the crime, or rather

21  crimes I should say.  These were two separate

22  incidents, uh, that occurred over a period of a month,

23  February 29th and January 30th.  In the first incident,

24  uh, the co-defendant actually pulled the trigger – or

25  rather, uh, cocked the gun, uh, and we got that from

26  the facts that the Board adopted.  So, the inmate knew

27  the danger that was, uh, uh, his conduct subjected

60

1    others to.  Uh, so just based on the horrendous of the
2    crimes, the people are opposed.  Also, uh, and the
3    Board may disagree with me on this, but I was under
4    the impression listening to the inmate speak of his,
5    uh, remorse, that his remorse was more centered on
6    himself than it was on the victims that were involved.
7    Uh, he, he just tended to dwell what it's done to him,
8    even though he did say (indiscernible) things about
9    the impact it had on the victims.  But most of it
10   seemed to be, uh, on what this had done to him.  So, I
11   think he needs some more insight at this time, and
12   those are the reasons.
13       **PRESIDING COMMISSIONER SHELTON:**  I would ask a
14   favor of you, Mr. Bushling.  We, we had done some
15   research prior to starting this hearing.  Could you
16   give us a brief time frame of the fact that – I think
17   originally Mr. Dawson was given, uh, life without
18   parole.  And there's – since there was confusion, I
19   want to state on the record that that did get
20   overturned.  And I would just – he's going to address
21   that right now.
22       **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Yes, in
23   fact, uh –
24       **PRESIDING COMMISSIONER SHELTON:**  Because it took
25   us a while to do some homework, and I'd like to save
26   any future homework.
27       **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Uh, actually

 1    looking at the Initial Parole Consideration Hearing,

 2    April 2003 Calendar, uh, at the bottom of Section One,

 3    of your life crime, uh, there's an explanation laid

 4    out here that's pretty good.

 5         **PRESIDING COMMISSIONER SHELTON:**  Good.

 6         **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Uh, if you

 7    would you like me to read it I can?

 8         **PRESIDING COMMISSIONER SHELTON:**  Why don't you

 9    just to –

10         **DEPUTY DISTRICT ATTORNEY BUSHLING:**  Okay.

11         **PRESIDING COMMISSIONER SHELTON:**  -- carry it

12    forward.

13         **DEPUTY DISTRICT ATTORNEY BUSHLING:**  "On April

14              24, 1981, the trial court denied Dawson's

15              motion for a new trial but did strike the

16              special circumstance finding on the murder

17              count in sentencing the 38 years to life, 25

18              to life plus 13 years.  As a result of a

19              remitter from the Second Appellate District

20              Court of Appeals, directing the Los Angeles

21              Superior Court to either impose the life

22              possibility of parole under Count 12, or to

23              strike the special circumstance, it was

24              found to be true by the jury that the trial

25              court acted on December 13th, 1984 to modify

26              the original sentence to impose the term of

27              life without possibility of parole on Count

62

```
1           12.  Responding to a second remitter from
2                the Court of Appeals, the Los Angeles County
3                Superior Court acted on November 24, 1986 to
4                strike the special circumstance allegation
5                and re-sentence Dawson to the original term
6                of 25 to life plus 13 years".
```

7        **PRESIDING COMMISSIONER SHELTON:**  Thank you very

8  much, I appreciate that.  It's a good summation of

9  what we walked through.  All right, Ms. Rutledge, do

10 you have a closing statement?

11       **ATTORNEY RUTLEDGE:**  Yes, thank you.  While Mr.

12 Dawson, uh, today has taken responsibility for his

13 behavior in, uh, the commitment offense and the other

14 offenses for which he was convicted, uh, according to

15 the psyche reports, beginning with the most recent one

16 which is 2003, he, uh, the, the psychiatrist writes

17 that he has, uh, uh, he regrets – well, uh, he, he –

18 that the co-defendant was an old friend of his.  And,

19 uh, even though he was in a good life position, uh, he

20 went with them do something that was wrong.  And, he

21 describes the motives he had as greed, uh, stupidity

22 and ignorance.  Uh, and he told the psychologist that

23 he never had any intention of harming anyone, uh, and

24 that he no longer puts most of the blame on his

25 partner for influencing him.  Uh, but says that he

26 takes full responsibility for breaking the law and

27 committing robberies.  He was sentenced to 38 years to

63

 1  life.  At this time he has now served 25 years.  And
 2  in those 25 years, he has, uh, make good on his part
 3  of the deal that if he wants an opportunity for
 4  parole, he's got – he has to, uh, show society and the
 5  parole board that, uh, he's suitable to be back on the
 6  outside.  He has served the amount of years that are
 7  required to meet that at this time.  And he may have
 8  had this 115 in 2004, but that's in the many – over
 9  two decades that he's been locked up.  He's had two
10  115s, and he explained what happened with the first
11  one, which you – Uh, and also during that time, he's
12  not only – he worked as a foreman for 12 years, in
13  charge other inmates.  Uh, and then here he was very
14  active with the – they had to get – finally get him
15  out of graphics because he had been in there too long,
16  and others would have an opportunity.  Uh, but that's
17  surely what he's most interested in but not allowed to
18  do that at this time.  He, uh, has done other things
19  to show the Board that he's suitable including impact
20  and getting his GED.  And he did complete anger
21  management uh, and has received certificates, uh, in
22  other areas of self-help including.  Uh, and he, and
23  he also has participated in basketball, and just done
24  a lot of things to I think keep his end of the bargain
25  as far as, uh, paying the price for what he did.  I
26  would note, too, that, uh, as the court – the, the
27  reason why he got the 38 to life was the court felt

64

1    that his role in the offense – and I'm quote – I'm

2    referring to the sentencing transcripts – that the

3    trial judge felt that due to his role in the crime

4    that, uh, life without the possibility of parole was

5    not appropriate.  And but he still gave him, uh, you

6    know, an otherwise appropriate sentence he felt was,

7    uh, otherwise appropriate.  So, I know that the Board

8    has to consider his individual culpability for the

9    offense, and I think that's been addressed here today.

10   Uh, he does not pose an unreasonable risk to society.

11   Uh, and on top of that he has marketable skills.  He

12   has a job offer.  He's got family support.  He's

13   married to a woman that he's known since high school,

14   uh, continues contact with his family, uh, continues

15   to do well.  Uh, and he tells the Board today that it

16   was an aberration for him.  And I believe that looking

17   at his record in prison.  Uh, and he's take – he takes

18   this process very seriously.  He's clearly a man who's

19   not just – he isn't here to, you know, give the Board

20   some kind of line.  And he doesn't think of this just

21   as some formality.  He takes – he's done everything he

22   can do to show the Board.  But I can tell by his

23   emotional state that, uh, he respects the seriousness

24   of this proceeding.  So, all those things considered

25   and his age, I would ask that the Board, uh, grant him

26   a parole date today.  Thank you.

27           **PRESIDING COMMISSIONER SHELTON:**  Thank you.  Mr.

65

1    Dawson, would you like to make a closing statement?

2        **INMATE DAWSON:**  Yes, I would.  I would like to,

3    uh, say something pertaining to what the District

4    Attorney said.

5        **PRESIDING COMMISSIONER SHELTON:**  Actually what

6    you need to keep your comments to is telling us why

7    you think you're suitable for parole.

8        **INMATE DAWSON:**  I deserve a second chance

9    because, uh, as I said I was out of my character.  I

10   take full responsibility for my actions.  I had no

11   right, no business walking in somebody's place of

12   business with a loaded weapon scaring their employees

13   and taking money.  If there's anyway possible I can

14   apologize to each and every one of those people I

15   scared, I would.  I couldn't hurt nobody like that

16   unless, unless my life was in danger, or if I was

17   defending my country.  This is just something I have

18   to live with for the rest of my life.  Somebody lost

19   their life by my careless, stupid act for going along

20   and committing a robbery.  I wish somewhere – I wish

21   there were – I could change it but I can't.  And I

22   wish I can somehow make up for it.  I learned my

23   lesson.  As I said I have straightened myself out.  I

24   know what I really needed in my life.  I got trades.

25   I got marketable skills where, you know – I'm

26   determined to be a upstanding citizen.  I just pray

27   that this panel will give me a second chance.  I

66

1  didn't actually shoot nobody but, uh, I'm responsible

2  because I participated in that robbery.  I wish I

3  would have seen what would happen, what was going on

4  but I didn't see it happen.  I didn't know it happened

5  until I got charged with it.  I just myself involved

6  with wrong people, and that's something that will

7  never happen again.  I'm older, wiser, and I'm focused

8  on trying to have an upstanding life.

9          **PRESIDING COMMISSIONER SHELTON:**  Okay.

10         **INMATE DAWSON:**  Thank you.

11         **DEPUTY COMMISSIONER SELLWOOD:**  You're welcome,

12  sir.  Let's recess for deliberations.  It's a few

13  minutes after 3:00 p.m.

14                       R E C E S S

15                       --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

67

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                **D E C I S I O N**

3        **DEPUTY COMMISSIONER SELLWOOD:**  We are on the

4    record.

5        **PRESIDING COMMISSIONER SHELTON:**  All right.  We

6    are back in the matter of, uh, the Subsequent Parole

7    Consideration Hearing for Darryl Dawson, D-A-W-S-O-N,

8    CDC Number C-30679.  Everyone has returned to the room

9    that was here during the hearing.  Mr. Dawson, the

10   panel has reviewed all the information received, and

11   we've relied on the following circumstances in

12   concluding that you are not yet suitable for parole.

13   I realize that's not what you want to hear, and we'll

14   go there in a second.  And you would pose an

15   unreasonable risk of danger to society or a threat to

16   public safety if released.  This if your, uh, first

17   subsequent hearing, is it not?

18       **INMATE DAWSON:**  Yes.

19       **PRESIDING COMMISSIONER SHELTON:**  Okay.  And you

20   had an initial hearing where you got a three-year

21   denial.

22       **INMATE DAWSON:**  Yes.

23       **PRESIDING COMMISSIONER SHELTON:**  I want you to

24   understand this process.  You could have gotten a

25   five-year denial on your initial hearing, so you are

26   doing something right.  You want the numbers to go

27   **D. DAWSON C-30679    DECISION PAGE 1  10/04/06**

68

1  down, you don't want them to go up.  So, you got a

2  three last year.  You're getting a two-year denial

3  this year, and that's because you're doing well.  Does

4  that make sense to you?

5      **INMATE DAWSON:**  Yes.

6      **PRESIDING COMMISSIONER SHELTON:**  Oh, that was a

7  hard yes, wasn't it?  You have some work to do, sir.

8  And we're going to tell you specifically what we need

9  you to work on, but we think you're moving in right

10  direction.  And we think you are most likely going to

11  earn a parole date some day if you keep doing what

12  you're doing, okay.  First of all, we have to talk

13  about the commitment offense.  Do you remember how

14  many victims there were, sir?

15     **INMATE DAWSON:**  No.

16     **PRESIDING COMMISSIONER SHELTON:**  You should,

17  that's part of the problem.  This commitment offense

18  was disastrous.  It was awful, somebody died.

19     **INMATE DAWSON:**  Yes, I understand that.

20     **PRESIDING COMMISSIONER SHELTON:**  And you

21  mentioned the name of the person that died, so I'm

22  glad you know that.  You should know how many other

23  victims there were.  You have 12 counts of robbery.

24  You have at least 12 victims.

25     **INMATE DAWSON:**  Yes, ma'am.

26     **PRESIDING COMMISSIONER SHELTON:**  And you talked

27  **D. DAWSON C-30679    DECISION PAGE 2  10/04/06**

69

1    a little bit with us about how that in the class that

2    you took, which was the impact class, how you learned

3    about victims.  You need to know your victims, at

4    least how many there were.  The offense was carried

5    out in an especially cruel and callous manner,

6    multiple victims were attacked and one was killed.

7    And this was in more than one incident.  There are

8    three separate crimes committed here.  Three separate

9    acts of violence.  The offense was carried out in a

10   dispassionate and calculated manner that showed

11   exceptionally callous disregard for human suffering.

12   And for the loss of life and at least 12 other victims

13   that suffered there was something like 33 hundred

14   dollars.  Did you get any of that money?

15        **INMATE DAWSON:**  The Sheriff took it back.

16        **PRESIDING COMMISSIONER SHELTON:**  Were you going

17   to get half?

18        **INMATE DAWSON:**  Excuse me?

19        **PRESIDING COMMISSIONER SHELTON:**  Were you going

20   to get half of that?

21        **INMATE DAWSON:**  Yes.

22        **PRESIDING COMMISSIONER SHELTON:**  So, you're

23   looking at 16-17 hundred dollars to pay for the loss

24   of human life and not to mention your own.

25        **INMATE DAWSON:**  Yes.

26        **PRESIDING COMMISSIONER SHELTON:**  So, you need to

27   **D. DAWSON C-30679    DECISION PAGE 3    10/04/06**

70

1  understand that, sir.

2      **INMATE DAWSON:**  I do.

3      **PRESIDING COMMISSIONER SHELTON:**  Good.  These

4  conclusions are drawn from the statement of facts that

5  came from the April 2003 Board Report, and we

6  incorporated that already into the record, so I will

7  not repeat it.  With regards to a prior record, uh,

8  Mr. Dawson had no juvenile record which is good.  He

9  has, uh, three, uh, incidents of arrests, uh, as an

10  adult.  And I would say the most serious of the three,

11  uh, were, was the driving under the influence of

12  alcohol.  So, with regards to that it's to your

13  benefit that you do not have a record of violence or

14  assault in your background.  So, you're doing the

15  things that you need to be doing.  With regards to

16  institutional behavior, you've received a total of two

17  115s, the last being in 2002.  You've received one

18  128, the last being in – the only one being in 1985.

19  I will go into your positive attributes here in a

20  minute.  But I do want to indicate that we both feel

21  that you have programmed in a limited manner.  It

22  hasn't been much in the way of self-help, uh, during

23  the course of your time.  You got your, uh, vocation

24  early on, haven't upgraded that in any way.  You got

25  your GED early on and, uh, haven't upgraded that in

26  any way.  You're a good worker, which I'll get into in

27  **D. DAWSON C-30679    DECISION PAGE 4   10/04/06**

71

1  a second. Uh, and our concern, too, is that you need

2  to concentrate on some more self-help programs, which

3  I'll be more specific about, but with regards to

4  substance abuse issues. Because you by your own

5  admission and the records indicated you had a serious

6  drug and alcohol problem early on. I don't see

7  anywhere as of late where you've – you need to

8  consistently participate in something like AA or a

9  substance abuse program of your choice. And again

10  I'll summarize that shortly. Your psychological

11  evaluation is fairly positive. Uh, I don't remember

12  hearing, uh, a GAF Score, but we're going to request a

13  new psychiatric evaluation be done prior to your next

14  hearing, so all that information for your next hearing

15  is current. And so that when you get to your next

16  hearing the Commissioners don't go, "Oh, we need a new

17  psyche eval". So, that will be brought up to date for

18  you and with you, okay. Your parole plans are pretty

19  good. Uh, I would suggest doing a few things, uh, to

20  bring them even better and stronger. Uh, first of all

21  make sure that your support letters are updated at the

22  time of your next hearing, you know, get new letters.

23  You mentioned something yourself. I think you need to

24  start working on a resume right now. You have learned

25  a variety of skills and have developed a variety of

26  talent since you've been in here, put them down on

27  **D. DAWSON C-30679    DECISION PAGE 5  10/04/06**

72

1   paper as a form of a resume, bring that to your next

2   Board hearing.  As well as when you develop a resume

3   start sending them out.  Your wife said she had lots

4   of contacts, start sending that resume out and seeing

5   what kind of response you get.  I worked with an

6   inmate, I think it was last week, who had three

7   different resumes.  He developed each one around the

8   specific vocation that he had and he sent them out.

9   So, you can start working on that.  The other thing,

10   uh, I would suggest, you might want to find – this had

11   something to do with the question that Commissioner

12   Sellwood asked you, about what your support systems

13   would be if you got out there and the world turned

14   upside down.  You can get a sponsor like AA or NA or

15   something equivalent before you get out of here that

16   would help bridge that gap for you.

17       **INMATE DAWSON:**  Wouldn't that be in the lines if

18   I still had an ongoing problem with drugs and alcohol?

19       **PRESIDING COMMISSIONER SHELTON:**  Sir, let me

20   tell you this,  Because it's all in your record, and

21   the fact that you were doing drugs on a daily basis

22   and the seriousness of your offense, I would recommend

23   that that would be in your best interest to pursue

24   that activity for at least as long as you're on parole

25   if not longer.

26       **INMATE DAWSON:**  Even though it was something

27   **D. DAWSON C-30679    DECISION PAGE 6  10/04/06**

73

1    that happened 26 years ago?

2        **PRESIDING COMMISSIONER SHELTON:**  Yes, sir.

3        **INMATE DAWSON:** Okay.

4        **PRESIDING COMMISSIONER SHELTON:**  And the reason

5    the say – let me give you an example.  And this is a

6    true story because it involves my brother.  He stopped

7    drinking for like over 20 years, and about six months

8    ago he started again because he quit going to AA and

9    NA.  The support system is there whether you need it

10   for drinking or whether you need it because you didn't

11   get the job you wanted.  Sponsors is not just dealing

12   with alcoholism or drug addiction, it's also dealing

13   with personal problems.  There are friends that's not

14   as close as a wife or family but kind of be distance,

15   and maybe give you unemotional advice.

16       **INMATE DAWSON:**  I understand.

17       **PRESIDING COMMISSIONER SHELTON:**  You follow?

18       **INMATE DAWSON:**  Yes, I do.

19       **PRESIDING COMMISSIONER SHELTON:**  So, it's like

20   having a buddy back there saying, "God, you know, my

21   world's caving in".  They can look, stand back outside

22   the picture and look in at you, be a support system

23   for you no matter the issue.  Does that make sense?

24       **INMATE DAWSON:**  Yes, ma'am.

25       **PRESIDING COMMISSIONER SHELTON:**  Okay.  With

26   regards to the 3042 Notices we send out, uh, that's

27   **D. DAWSON C-30679    DECISION PAGE 7  10/04/06**

74

1  why the District Attorney is here from Los Angeles

2  County.  And he, uh - those letters get sent out to

3  agencies that might have an interest in your case.

4  And we didn't get any responses other than that.  And

5  as you indicate - as you know he indicated he's in

6  opposition to your parole at this time.  I do want put

7  on your record the things you've been doing well,

8  because you are so on the right track, okay.  You did

9  get your GED.  Your disciplinary record's fairly good.

10  Uh, you have, uh, worked in vocation print shop.  You

11  got moved out of that, not by your fault just that it

12  was time because you've been there a long time.  You

13  have your vocation in graphic arts.  You have, uh,

14  work - spent time working in the Cen - with the

15  Central Lunch Box Crew.  And now current you are in

16  PIA Textiles.  You've recently participated in a Cal-

17  Osha Training.  You participated in an impact program

18  which involves 13 two-hour sessions.  And I understand

19  it's an intense program.  And most of the inmates I

20  talk to really, really like it, and you did that in

21  2004.  Uh, so, with that standing I want to, uh,

22  indicate that in a separate decision the hearing panel

23  finds that it's not reasonable to expect that parole

24  would be granted at a hearing during the following two

25  years.  And to specifics reasons we have talked about

26  and I will summarize.  One, we talked about the

27  **D. DAWSON C-30679    DECISION PAGE 8  10/04/06**

75

1  summary of the offense and, you know, you indicated on
2  several occasions that you were out of character
3  there.  And the Commissioner also tried to talk with
4  you about what out of character meant, how often were
5  you going to go in and out of character.  Spend a
6  little bit more time dealing with those circumstances
7  so you have — you're more grounded.  Uh, I applaud you
8  your faith in Jesus Christ and those philosophies that
9  you follow.  But I want to see you more well-rounded
10 in terms of the whole real world picture, and that you
11 have as many tools to support yourself as possible.
12 Because it's a different world than when you came in
13 here, and we so much want for your success.
14      **INMATE DAWSON:**  Yes, I understand.  You got
15 people flying planes into the building and
16 restaurants, it's crazy out there.
17      **PRESIDING COMMISSIONER SHELTON:**  It is, sir.
18 And there's a part of me I think that thinks you're a
19 tidbit naïve about the rest of the real world.  And I
20 want you to be strong person to deal with those
21 realities.
22      **INMATE DAWSON:**  I just wish I would have stayed
23 in the Army where I could probably be a leader or a
24 commander, uh, of a combat unit over there, take care
25 of business, but that's the mistake I made by not
26 staying in the Army.
27 **D. DAWSON C-30679    DECISION PAGE 9  10/04/06**

76

1      **PRESIDING COMMISSIONER SHELTON:**  As I was saying

2    we probably need to work on some insight.  And you

3    know, it's, uh, one of the things and based on the

4    statement that you made, I appreciate what you say.

5    And you've talked about defending the country before.

6    You can't always fight all the ills of the world, so

7    you have to find ways to deal with you and taking care

8    of your family.

9      **INMATE DAWSON:**  Yes.

10     **PRESIDING COMMISSIONER SHELTON:**  My concern is

11   is that you can't go fight those battles anymore.

12   You've got to take care of you, and that has to be in

13   a peaceful way.

14     **INMATE DAWSON:**  Exactly.

15     **PRESIDING COMMISSIONER SHELTON:**  All right.  Uh,

16   with regards to what else we talked about, uh, let's

17   just do a review of what we're wanting for you.  You

18   know, we want you to develop a greater insight into

19   the offense as we talked about.  We want you to

20   participate in as many self-help programs as you can,

21   especially those having to do with substance abuse.  I

22   would also suggest relationship building.  I know that

23   some classes are available or even books on – you

24   know, when you do get back home with your wife there's

25   going to be a different world.  And, you know, she's

26   going to have make room for your toothbrush, so to

27   **D. DAWSON C-30679    DECISION PAGE 10   10/04/06**

77

1   speak, and there's going to be differences of how you

2   guys might want to do things.  So, there are books

3   that you could read and do book reports and present to

4   your Board next time about what you've learned about

5   developing or strengthening interpersonal

6   relationships, uh, insight, uh, strengthening your

7   resolve to not participate in substance abuse and

8   alcohol, uh, hookup with something here in the

9   institution like AA or NA and something similar, stay

10   with it consistently.  We talked about, uh, you will

11   also have to distance yourself from that 115 that you

12   got.  We're going to request that you get a new

13   psychological evaluation that will be – we've already

14   put the paperwork in for that.  And I would also

15   suggest as part of your parole plans since you do have

16   a lot of skills and talents, something like you did

17   with -- you know you spelled out how much money you

18   might make doing different types of jobs, start

19   playing with developing a resume.

20   **INMATE DAWSON:**  Referring to the 115, you said

21   distance myself with, that was a non-violent one.  But

22   I know it's a rule violation.  I understand all that.

23   **PRESIDING COMMISSIONER SHELTON:**  Good, I'm glad

24   you do.  Thank you.  Commissioner, do you have

25   anything to add at this point?

26   **DEPUTY COMMISSIONER SELLWOOD:**  No, I think

27   **D. DAWSON C-30679    DECISION PAGE 11  10/04/06**

78

1  you've addressed the thoughts that I had.  Thank you.

2          **PRESIDING COMMISSIONER SHELTON:**  Okay.  Sir, we

3  wish you all the luck in the world.  You're moving in

4  the right direction.

5          **INMATE DAWSON:**  Thank you.

6          **DEPUTY COMMISSIONER SELLWOOD:**  Good luck to you,

7  sir.

8          **PRESIDING COMMISSIONER SHELTON:**  Good luck to

9  you.  That concludes this hearing at about 3:40 p.m.

10                          --o00--

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED TWO YEARS**

24  **THIS DECISION WILL BE FINAL ON: <u>February 1, 2007</u>**

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **D. DAWSON C-30679    DECISION PAGE 12  10/04/06**

79

## CERTIFICATE AND DECLARATION
## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of Scribes, have designated TONI ANDERSON, a duly designated transcriber with House of Scribes residing in the State of California, to prepare the foregoing transcript. With my signature I do hereby declare and certify, under penalty of perjury, that I have directed her to transcribe audio video(s) that total one in number and cover a total of 81 pages. The recording was duly recorded at CALIFORNIA DEPARTMENT OF CORRECTIONS, CORRECTIONAL TRAINING FACILITY, SOLEDAD, and the foregoing pages constitute a true, complete and accurate transcription of the aforementioned tape to the best of her ability.

I hereby certify that House of Scribes and its designated transcribers are disinterested parties in the above-captioned matter and have no interest in the outcome of the proceeding.

Dated January 19, 2007 in Stockton, California.


Owner, House of Scribes