# EXHIBIT G

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

DAWSON, DARRYL                                                              C30679

I. **COMMITMENT FACTORS**:

    A.    **Life Crime**: Murder 1st, Armed with a Firearm [187 and 12022(a) PC], Count 12, and 13 counts of Robbery with Use of Firearm (211 and 12022.5 PC), Los Angeles County case number A-357550. Victim: Dwight Cousins, age unknown. Received in CDC on 5/22/81. Sentenced to 25 years to Life on the Murder plus one year for Being Armed with a Firearm and 12 years on the 12 counts of Robbery, for a total term of 25 years to Life plus 13 years. Life term started 9/30/87. MEPD: 5/31/04.

        1.    **Summary of Crime**: Darryl Dawson and his crime partner, Kenneth Lamart Jordan, participated in three Los Angeles area robberies: a Jack-in-the-Box at 4069 Century Boulevard in Inglewood on January 30, 1980 (two victims), at McCoy's Market at 10905 South Atlantic Boulevard in Lynwood on February 29, 1980 (five victims) and at a Boy's Market at 3670 Crenshaw Boulevard also on February 29, 1980 (six victims).

            At about 10:40 p.m. on January 30, 1980, T. Jackson, the assistant manager of the Jack-in-the-Box on Century Boulevard, noticed the cashier give something through the drive-up window to a man later identified as Dawson. When Jackson complained, Dawson pointed a handgun at him. Jackson ducked behind a grill, whereupon a man later identified as Jordan told Jackson to come out or there would be shooting. At gunpoint, Jordan ordered Jackson to have another employee admit Dawson through the back door. Dawson walked Jackson to the front of the restaurant, where Jordan ordered Jackson to open the safe. As Jackson reached for his wallet to obtain the safe combination, Jordan cocked the handgun that he was aiming at Jackson. Jackson explained his purpose and was allowed to remove his wallet, which Dawson took and removed the combination for Jackson. Dawson retained the wallet. In addition to the wallet, Dawson and Jordan took all the coins from the safe, money from the cash register, and the wallet from the cashier. The reported loss was about $170.

            At about 8:00 p.m. on February 29, 1980, a man later identified as Jordan entered McCoy's Market in Lynwood, approached a checker from behind and ordered him to remain at his checkstand, to remove the cash from the register and place it in a paper bag. The checker complied and then turned around to see that Jordan was holding a gun. A second gunman, later identified as Dawson, held a gun pointed to the floor and ordered a second checker to empty her register. Dawson directed this checker to also empty the till from two closed checkstands. A third, unidentified person was also involved in this robbery. The liquor clerk, the snack bar manager and his wife were all robbed, as well. Before the three perpetrators left the store, Jordan placed a gun in the side of the uniformed but unarmed security

guard and ordered him to the rear of the store. The reported loss was $2,000.

At about 9:00 p.m. on the same date, a box boy at the Boy's Market on Crenshaw Boulevard in Los Angeles observed Jordan enter the store. He immediately came back outside and walked around the corner toward the telephones. Shortly before, the uniformed and armed security guard, Dwight Cousins, had passed the box boy, walking in the same direction. The box boy heard a shot, after which he looked in the direction of the telephones in time to see the security guard falling. Cousins, clutching a telephone receiver as he fell, was heard to cry out, "Oh my God, I've been hit." Jordan, who was holding a gun, told Cousins, "Give me your gun." after which he took the guard's gun. Jordan then entered the store. Cousins bled to death. In the store, two men approached the checker at checkstand 11 and demanded the money from the register. A man later identified as Dawson approached the assistant manager, pointed a gun at him and told him that he would be shot if he did not do as he was told. Dawson then marched the assistant manager to checkstands 6, 5 and 2 in succession (numbers 3 and 4 were closed) where he demanded money from each of the checkers. Jordan approached the checker at checkstand 8 and demanded food stamps and change. He helped the checker to empty the register. Thereafter, Jordan called across the room to Dawson and proceeded to the next checkstand. He then approached the checker at checkstand 6 who informed Jordan that his friend had already been there. As one of the box boys was calling for security, a nearby box girl heard Jordan respond, "I've already killed one person. Do you want to be next?" After Jordan learned that Dawson had been to checkstand 6, he called, "Let's go," and the pair left the store. The reported loss was $1,200.

Dawson and Jordan were arrested at about 11:00 p.m. subsequent to investigation of the McCoy's robbery, after the car they were in was stopped for running a red light. Los Angeles Police Department officers investigating the robbery and murder at the Boy's Market received an anonymous tip regarding the description of the vehicle used in the commission of the offense. They broadcast this information and were contacted by the Los Angeles Sheriff's Department. A subsequent investigation revealed that a vehicle fitting the description was parked at Jordan's residence. Jordan's roommate had a large amount of money when investigated by the officers and revealed that Jordan had called from jail, told him where to find the money and to use it for rent, etc. Dawson and Jordan were seen in custody, interviewed and subsequently placed under arrest on March 10, 1980.

Dawson's crime partner, Kenneth Lamart Jordan, was convicted on 18 or 20 counts of Robbery and 2 counts of Murder 1st and was sentenced to Life Without the Possibility of Parole. On April 24, 1981, the trial court denied Dawson's motion for a new trial but did strike the special circumstances finding on the murder count and sentenced him to 38 years to Life (25-Life plus 13 years). As a result of a remittitur from the Second Appellate District Court of Appeals directing the Los Angeles Superior Court to either impose the Life Without Possibility of Parole under Count 12 or to strike the special circumstance that was found to be true by the jury, the trial court acted on December 3, 1984 to modify the original

sentence to impose the term of Life Without Possibility of Parole on Count 12. Responding to a second remittitur from the Court of Appeals, the Los Angeles County Superior Court acted on November 24, 1986 to strike the special circumstances allegation and resentenced Dawson to the original term of 25 years to Life plus 13 years.

[POR, pp 6-8, 10; Appellate Court Decision (4/25/83) pp 5-6, 13, 15-18]

2. **Prisoner's Version**: In an interview for this report, Dawson stated that the following statement represents his version of the issues behind his life crime:

I had no business committing robberies. I had a job and was in the process of moving up into a higher position. I was living with my parents as well as with a girl friend. I knew that Kenneth Jordan was a person who always was in trouble with the law, and during a casual conversation, he asked if I had ever tried doing a robbery, and that all you have to do is show the gun and tell them that this is a robbery and put all the money in the bag. No one was supposed to get hurt. Kenneth Jordan took it upon himself to shoot the security guard, Mr. Cousins.

I did not see what happened, nor did I have any knowledge of what had happened. I would have never went along with committing a crime of robbery if I would have known he was going to harm anyone. If I would have seen what he was about to do, maybe I could have stopped him. He didn't have to shoot the security guard, Mr. Cousins. That was Jordan's judgement, and his only.

Mr. Cousins should have never been harmed; no one should have. I had no business going into someone else's place of business and demanding money from their workers. I had no business breaking the law. I always held a job and didn't have to do these crimes which have put my life in the control of others. I was trying to impress the ladies by always having money and by being able to take them out. But what I've come to realize is that what really impressed everyone who knew me was that I always held down a job and didn't hang out getting in trouble along with the people who stayed in trouble with the law.

My reason for doing these crimes of robbery was stupidity. My motivation was pure ignorance. I have great remorse for my actions and for the families who were affected by my stupidity. No one should have been hurt. Kenneth Jordan acted on his own judgement. I take full responsibility for my actions. I had no business committing crimes of robbery. I am very sorry. This is not in my character.

3. **Aggravating/Mitigating Circumstances**:

   a. The following factors in aggravation were noted per Title 15 CCR §2283:

   - The victim, who was shot without warning while he was trying to use a telephone, was particularly vulnerable.

- During the commission of the crime, the prisoner had a clear opportunity to cease but instead continued.

- The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime.

- The prisoner was on (summary) probation at the time the crime was committed.

b.  The following factors in mitigation were noted per Title 15 CCR §2284:

- The prisoner was a passive participant or played a minor role in the commission of the crime.

- The prisoner has a minimal or no history of criminal behavior.

B.  **Multiple Crime(s)**: None.

II.  **PRECONVICTION FACTORS**:

A.  **Juvenile Record**: None.

B.  **Adult Convictions and Arrests**: Dawson has a minor criminal history of a total of three contacts with law enforcement before the commitment offense.

He was first arrested on 6/14/74 by Lynwood police for Assault with a Deadly Weapon (245 PC), which was a DA reject due to lack of corpus.

Dawson's second arrest was on 7/16/75 by Los Angeles sheriffs for Possession of Marijuana (11357 H&S), which was also a DA reject due to lack of corpus.

Dawson's last arrest before his commitment offense was on 9/24/79, again by Los Angeles sheriffs, for Driving Under the Influence (23102 VC). On 10/10/79, Dawson pleaded guilty in Compton Municipal Court. Imposition of sentence was suspended, and he was placed on summary probation for one year on condition that he attend driving school and pay a $300 fine. Dawson failed to appear in court on 3/14/80 after receiving an extension on 11/16/79 to pay the fine, and a bench warrant was issued (Dawson had been in Los Angeles County Jail since 2/29/80 on issues related to his commitment offense). On 5/6/80, Dawson pleaded guilty to the violation of probation and was given credit for 10 days served in the county jail. The bench warrant was recalled.

[CII and POR, p. 5]

C.  **Personal Factors**: Darryl Leon Dawson was born in Los Angeles on 10/20/55, third of three children to the union of Lauraine (Catley) and Leon Dawson. He told the interviewing officer for his POR that he was raised in a united home with two sisters. At the time of his arrest, Dawson was living with his parents in a three-bedroom house in Compton. He had attended Centennial High School, but dropped out in the twelfth grade. He joined the National Guard in October, 1975.

He returned from basic training in March, 1976, but failed to attend meetings and was consistently absent without leave. Nevertheless, he was awarded an honorable discharge on 10/24/77. The POR (p. 4) notes that Dawson had been a social drinker since the age of 17; the July 23, 1991 Psychological Evaluation (p. 1) notes also marijuana usage during this period. He acknowledged having a PCP problem while in high school. He was in counseling about his drug usage for a week at Martin Luther King Hospital. In order to get him away from the influence of drugs in the neighborhood, his parents convinced him in 1976 to go to San Antonio, Texas, to live with some relatives. Nevertheless, his drug usage continued. Dawson began using cocaine at the age of 21 and used it up to the time of his commitment offenses. The POR (p. 10) notes the opinion of the investigating Los Angeles Police Officer, who opined that Dawson was definitely involved and was more than a peripheral hanger-on. However, the officer stated that Dawson was not the chief motivator in the planning and commission of the crimes. Codefendant Jordan was apparently supplying Dawson with drugs and used this as an inducement to convince Dawson to participate in the robberies. Dawson had not married by the time of incarceration, but had fathered a boy who was six years old at the time of Dawson's commitment. The file shows no evidence of sexual abuse or of a mental disorder.

### III. POSTCONVICTION FACTORS:

**A. Special Programming/Accommodations**: None required.

**B. Custody History**:

| | |
|---|---|
| 05/22/81 to 06/17/81 | RCC-CIM |
| 06/18/81 to 07/16/85 | SQ |
| 07/17/85 to 08/25/96 | DVI |
| 08/26/96 to 02/27/97 | CVSP |
| 02/28/97 to 09/07/97 | CCI |
| 09/08/97 to Present | CTF |

| | |
|---|---|
| 07/02/81 to 09/11/83 | Close B custody |
| 09/12/83 to 02/12/86 | Medium A custody |
| 02/13/86 to 08/17/89 | Close B custody (per guidelines of OP #71) |
| 08/18/89 to Present | Medium A custody |

Dawson was first assigned at San Quentin to A.M. School on 7/2/81. He was in the ABE-II class by 9/8/81 and in the ABE-III class from 1/29/82 until shortly before 11/18/82, when he was dropped non-adversely subsequent to a housing change that precluded participation in the A.M. School. He was assigned as a clerical worker in January, 1983. He earned good ratings, and received the approbation "amazingly efficient" on his CDC 101 chrono dated 7/18/84.

At Deuel Vocational Institution, Dawson was assigned first as a clerk ("exceptional worker" per 12/31/85 CDC 101), then as a general maintenance worker and, on 3/28/86, to the PIA Mattress Factory as a pillow maker. He became a sewing machine operator on 1/1/88 ("excellent worker with exceptional sewing skills" per 10/2/89 CDC 101) and, on 3/15/94, was promoted to Leadman in the Mattress Factory. His final CDC 101 at DVI, dated 7/19/96, stated, "Dawson has had to step up and help up production levels in the factory. He has

done a very good job." In addition to his regular work assignment, Dawson studied for and passed the GED test battery and received his certificate on 5/29/91.

At Chuckawalla Valley State Prison, Dawson was assigned to the Yard Maintenance Crew from 9/17/96 to 10/2/96. He was then introduced to the vocational field of graphic arts through assignment to the CVSP Graphic Arts program from 10/3/96 to 2/27/97.

At the California Correctional Institution, Dawson was assigned to their vocational print shop program from 3/27/97 through 5/9/97.

At the Correctional Training Facility, Dawson was initially assigned as a dining hall worker from 9/27/97 to 9/30/97. He was then assigned to the vocational print program 10/1/97. He was dropped from the program due to course completion on 10/16/01 and reassigned as a Journeyman Graphic Artist on 12/26/01. Per a memo written on 7/6/00, Dawson has the skills to make an excellent employee in the printing industry.

C. **Therapy and Self-Help Activities**: Although Dawson started submitting urine samples for toxicological testing as early as 12/26/95, he did not start participating in AA Group until 10/5/99 (per 128-B chrono dated 1/13/00) or in NA Group until 6/14/01 (per 128-B chronos dated 7/2/01 and 10/1/01).

D. **Disciplinary History**: Dawson's disciplinary history is limited to two Rules Violation Reports. The first, dated 10/21/82, is a serious violation from San Quentin for Involvement in an Altercation (a cell fight). He was found guilty and assessed 10 days Disciplinary Detention and 10 days loss of behavior credits. The second/last, dated 1/12/02, is an administrative violation from CTF for Sexual Behavior (in Visiting Room). He was found guilty and assessed 30 days loss of privileges, counseled, warned and reprimanded.

E. **Other**: Dawson attended his Documentation Hearing #4 on 8/9/00. The BPT Representative made the following evaluations and recommendations:

re: vocational training, 1997 – Voc Graphic Arts / Offset Print program to date. Inmate indicates he's at journeyman stage of program & is assisting instructor Mapes in training other inmates (indicates recent letters from Mapes to support claims, however, not found in file).
re: academics, Received GED per test results document dated 5/29/91 while at DVI.
re: work record, None this period.
re: group activities, Periodic participant of AA (chrono dated 1/13/00).
re: psychiatric treatment, None noted.
re: prison behavior, Disciplinary free.
re: other, Class Score as of 6/22/00 = 0 (has been 0 since 6/16/92); for next hearing, inmate is to:
    1) Remain disciplinary free,
    2) Complete or get Certificate of Completion in Graphic Arts / Offset Print program,
    3) Continue participation in AA/NA as available.
    4) Solicit letters of support from family and/or friends attesting to offers of employment, housing, support.

LIFE PRISONER EVALUATION REPORT                                                                          7
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

IV. **FUTURE PLANS**:

  A. **Residence**: In an interview for this report, Dawson stated that should he receive parole consideration, he would be able to live with his wife, Janice Dawson, who currently resides at 1000 Harbor Heights Dr. #L, in Harbor City. The telephone number at that address is (310) 257-9203. Both he and his wife would also be able to live with his mother, Lauraine Dawson at 1505 W. 138th Street in Compton. The telephone number at that address is (310) 635-6307. Each of these addresses is within Dawson's county of commitment, Los Angeles.

  B. **Employment**: Dawson states that he will be able to secure employment using skills that he has acquired in the off-set printing and mattress fabrication trades.

  C. **Assessment**: Dawson's residence and employment plans appear realistic to this writer. Dawson will not be able to secure any firm offers of employment until he can provide the prospective employer with a parole date, and therefore his lack of specific employment offers does not appear to be a issue subject to his control.

V. **USINS Status**: Not applicable.

VI. **SUMMARY**:

  A. Considering the commitment offense, minor prior record and positive prison adjustment over an extended period of time, this writer believes that the prisoner would probably pose a low degree of threat to the public at this time, if released from prison, should he remain drug and alcohol free.

  B. Prior to release, the prisoner could benefit from remaining disciplinary free, continuing his participation in AA/NA groups as available and maintaining current job skills.

  C. This report is based upon an interview with the prisoner on 2/24/03 lasting approximately one hour and a complete review of the central file.

  D. Prisoner was afforded an opportunity to review his central file, per the Olson Decision, on 2/24/03.

  E. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

DAWSON, DARRYL           C30679                          CTF-Soledad                  APR/2003

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

_____
G. Peabody                3/26/03
Correctional Counselor I        Date

4- L.R. Baker - CCII(A) 3/27/03
_____
C. Plymesser              Date
Correctional Counselor II

_____
L. Trexler                3-27-03
Facility Captain          Date

_____
D.S. Levorse, C&PR 3-27-03
Classification and Parole Representative    Date

DAWSON, DARRYL       C30679            CTF            APR/2003