# EXHIBIT I (PART 1)

x6

| | |
|---|---|
| Name | DARRYL DAWSON |
| Address | P.O. BOX 689   ZW-137L |
| | SOLEDAD, CA 93960-0689 |
| | |
| CDC or ID Number | C30679 |

MC-275

**SUPREME COURT**

# FILED

MAR 1 5 2007

Frederick K. Ohlrich Clerk

_____
Deputy

CALIFORNIA SUPREME COURT

_____

(Court)

DARRYL DAWSON,

Petitioner

vs.

BOARD OF PAROLE HEARINGS,

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No: **S151012**

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

RECEIVED

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

MAR 1 5 2007

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

CLERK SUPREME COURT

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

- [ ] A conviction      [X] Parole
- [ ] A sentence        [ ] Credits
- [ ] Jail or prison conditions    [ ] Prison discipline
- [ ] Other *(specify)*: _____

1. Your name: _____ DARRYL DAWSON _____

2. Where are you incarcerated? __ CORRECTIONAL TRAINING FACILITY - SOLEDAD __

3. Why are you in custody?    [X] Criminal Conviction    [ ] Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      MURDER / ROBBERY    ARMED WITH A FIREARM

   b. Penal or other code sections: ____ 187 PC / 211 PC ____

   c. Name and location of sentencing or committing court: __ LOS ANGELES COUNTY __

   d. Case number: ____ A-357550 ____

   e. Date convicted or committed: ____ May 22, 1981 ____

   f. Date sentenced: ____

   g. Length of sentence: ____ 38 to life ____

   h. When do you expect to be released? ____ Unknown ____

   i. Were you represented by counsel in the trial court?    [X] Yes.    [ ] No.. If yes, state the attorney's name and address:

      _____

4. What was the LAST plea you entered? *(check one)*

   [X] Not guilty    [ ] Guilty    [ ] Nolo Contendere    [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury    [ ] Judge without a jury    [ ] Submitted on transcript    [ ] Awaiting trial

6.  GROUNDS FOR RELIEF
    **Ground 1:**  State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

    SEE ATTACHED

    _____

    _____

    _____

    _____

    a.  Supporting facts:
        Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

    SEE ATTACHED

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    b.  Supporting cases, rules, or other authority (optional):
        *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

    SEE ATTACHED

    _____

    _____

    _____

# SUMMARY OF CIRCUMSTANCES

**THIS IS A MURDER/ROBBERY CASE IN WHICH PETITIONER WAS NOT THE ACTUAL SHOOTER. FOR A MORE DETAILED DESCRIPTION OF THE CIRCUMSTANCES REFER TO THE PSYCHOLOGICAL REPORT HEREIN ATTACHED AS AN EXHIBIT.**

1  DARRYL DAWSON    C-30679
   P.O. BOX 689      ZW-137L
2  SOLEDAD, CA  93960-0689
        in pro per

3

4

5                    SUPREME COURT OF CALIFORNIA

6

7

8

9  In re DAWSON                    ) Case No.: _____
      Petitioner,                  )
10                                 ) PETITION FOR WRIT OF HABEAS
                                   ) CORPUS
11        v.                       )
                                   )
12 B. CURRY, WARDEN (A), et al,    )
      Respondent                   )
13                                 )
                                   )
14                                 )
                                   )
15                                 )
                                   )
16                                 )
                                   )
17 _____)

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

| TITLE | PAGE |
|---|---|
| Cover | 1 |
| Table of Contents | 2 |
| Points and Authorities | 3 – 4 |
| Judicial MC-275 | 5 – 19 |
|        Ground 1 | 7 – 14 |
|        Ground 2 | 14 – 15 |
| Conclusion | 16 |
| Prayer for Relief | 17 |
| Proof of Service by Mail | 18 |
| Exhibit 'A' | 19 – 98 |
|   (Hearing Transcript 2006) | |
| Exhibit 'B' | 98 – 102 |
|   (Psychological Evaluation) | |
| Exhibit 'C' | 102 – 109 |
|   Life Prisoner Evaluation Report (LPER) | |
| Exhibit 'D' | 109 – |
| (Previous Decisions 2003) | |

1

## TABLE OF AUTHORITIES

2

**AUTHORITY**                                                      **PAGE**

3

### CONSTITUTIONAL AUTHORITIES

4

U.S. CONSTITUTION, AMENDMENT 7, 14                    5, 6, 9, 10, 11, 14, 15

5

CALIFORNIA CONSTITUTION, ARTICLE I, SECTIONS 7, 15     5, 6, 9, 10, 11, 14, 15

6

### FEDERAL CASE LAW

7

8

Biggs v. Terhune, (2003 9th Cir.)                     5, 6, 8, 9,
334 F.3d 910

9

Irons v. Warden of Solano                             12
(2005) 358 F.Supp. 936

10

Martin v. Marshall                                    11
(2006) 431 F.Supp.2d 1038

11

McQuillion v. Ducan, (9th Cir.)                       5, 6
306 F.3d 895

12

Rio v. BPT Commissioners                              12
(2006) ND No. C 05-1483 MPH

13

Rosenkrantz v. Marshall                               11
(2006) 444 F.Supp.2d 1063

14
15

### STATE CASE LAW

16
17

In re Capistran, (2003)                               13, 14
107 Cal.App.4th 1299

18

In re Caswell, (10/10/01)                             13, 14
92 Cal.App.4th 1017

19

In re Elkins                                          10
2006 DJDAR 14489

20

In re Jackson, (1985)                                 13, 14
39 Cal.App.3rd 464

21
22

In re Lee                                             10
(2006) 143 Cal.App.4th 1400

23

In re Minnis,                                         6
7 Cal.3d at p. 647

24

In re Norman Morrall, (2002)                          5, 6, 8, 13, 14
102 Cal.App.4th 280

25

In re Edward Ramirez, (2001);                         5, 6, 9, 10 13, 14
94 Cal.App.4th 549

26

In re Rodriguez,                                      13, 14
(1975) 14 C.3d 639

27

In re Rosenkrantz (2002)                              5, 6
29 Cal.App.4th 659

28

1

## STATE CASE LAW

2

3   <u>In re Rosenkrantz</u>,                                    13, 14
    95 Cal.App.4th 358

4   <u>In re George Scott</u>                                    5, 8
    119 Cal.App.4th

5   <u>In re Mark Smith</u>, (2003)                             5
    Cal.App.4th 343

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES PAGE 2**

| PENAL CODE | PAGE |
|---|---|
| § 3000(b)(1) | 5 |
| § 3041(a) | 10, 11 |
| § 3041(b) | 5, 6 |
| § 3041.5 | 5, 6, 9 |
| § 3041.5(b)(2) | 13 |
| § 5076.2 | 13 |

**CALIFORNIA CODE of REGULATIONS**

| CCR SECTION | PAGE |
|---|---|
| CCR § 2000(b) (48) [Good Cause] | 13, 14 |
| CCR § 2000(b) (61) [Material Evidence] | 13, 14 |
| CCR § 2000(b) (89) [Relevant Evidence] | 13, 14 |
| CCR § 2400 et seq. | 13, 14 |
| § 2282(a) | 8 |
| § 2402(a) | 6 |
| § 2402(c)(1)(D) | 8 |
| § 2403(c) | 6, 9 |
| § 3375.2(7)(A) | 8 |

1    Cover Page of MC-275 goes here

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Page 2 of MC-275 goes here

2

3

4

5

6

7

8.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE BOARD OF PRISON TERMS ILLEGALLY USED PENAL CODE
SECTION 3041(b) [THE EXCEPTION] TO FIND PETITIONER
UNSUITABLE FOR PAROLE. AS THERE IS NOT A MODICUM OF
EVIDENCE THAT PETITIONER IS A CURRENT THREAT TO SOCIETY
OR OTHERWISE UNSUITABLE FOR PAROLE THE DECISION WAS
ARBITRARY AND CAPRICIOUS VIOLATING PETITIONER'S STATE
AND FEDERAL DUE PROCESS RIGHTS.**

On OCTOBER 5, 2006, Petitioner DARRYL DAWSON, C-30679 (hereinafter "Petitioner"),

was provided a Life Term Parole Consideration Hearing before the Board of Parole Hearings

(hereinafter "Board", "BPH", or "Panel"); Please refer to Exhibit 'A' which is the Hearing

Transcript (hereinafter "HT" or "Transcript"). Said Hearing was Petitioner's SECOND parole

suitability hearing. Petitioner's Minimum Eligible Parole Date (hereinafter "MEPD"), was

MAY 31, 2004.[1] The purpose of this Board hearing was for the setting of Petitioner's term

uniformly [2] to his offense and for a finding of suitability for parole (See Penal Code § 3041.5;

In re Edward Ramirez, 94 Cal.App.4th 541 (2001); McQuillion v. Ducan, (9th Cir.) 306 F.3d

895; In re Norman Morrall, (2002) 102 Cal.App.4th 280; In re Rosenkrantz, (2002) 29

Cal.App.4th 660; In re Mark Smith, (2003) Cal.App.4th 343; and the recent Biggs v. Terhune,

(2003 9th Cir.) 334 F.3d 910.

The result of this Board hearing was an erroneous and unlawful finding of unsuitability and

a release date was not set. Instead, Petitioner was given a two (2) year denial and did not

appeal this decision through the administrative remedy because the Board has eliminated the

BPT Appeals Unit and no longer allows for the filing of administrative appeals on BPT denials

1 – The Court of Appeal in In re George Scott, (2004) 119 Cal.App.4th 871, reaffirmed the rationale of the
Ramirez and Smith Courts when it declared "..parole is the rule, rather than the exception, and conviction for
second degree murder does not automatically render one unsuitable. (In re Smith, (2003) 114 Cal.App.4th 343,
366). In re Ramirez, supra, 94 Cal.App.4th 549 ...[a]ll violent crimes demonstrate the perpetrator's potential for
posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences.
Penal Code § 3000 subd. (b)(1).) And the Legislature has clearly expressed its intent that when murders – who are
the great majority of inmates serving indeterminate sentences – approach their minimum eligible parole date, the
Board shall normally set a parole release date..." (id. at p. 570).

2. – The Court of Appeal on June 24, 2004, in In re George Scott, supra, 119 Cal.App.4th at 887 fn. 7, also
reaffirmed the Legislative Intent of Uniform terms by stating: "The first two sentences of the DSL declare 'that
the purpose of imprisonment for a crime is punishment' and that [t]his purpose is best served by terms
proportionate to the seriousness of the offense with provisions for uniformity in the sentences of offenders
committing the same offense under similar circumstances. (Penal Code § 1170, subd. (a)(1).) Nothing in the DSL
or its legislative history suggests that legislative concern with uniformity was limited to those serving determinate
terms. Penal Code § 3041 shows that this interest does extend to individuals such as [this Petitioner] who are
serving indeterminate life terms. (Id., citing Ramirez, supra 94 Cal.App.4th at 559).

5

1  of parole for indeterminately sentenced prisoners such as Petitioner. Petitioner submits that the

2  Board's regulation, that is the California Code of Regulations (hereinafter "CCR"), § 2402(a)

3  **DEMANDS that the Board set a release date unless Petitioner CURRENTLY presents an**

4  **unreasonable risk of danger to the public.** Petitioner submits that the representing District

5  Attorney did not provide any new and/or additional evidence whatsoever that Petitioner is an

6  unreasonable risk of danger to the public or otherwise unsuitable for parole.

7      Additionally, Petitioner submits that the Board speaks in meaningless generalities and fails

8  to address the exact nature of Petitioner's CURRENT character. By not doing so, the Board

9  violated the intent and spirit of Penal Code (hereinafter "PC"), § 3041.5 [3] and In re Ramirez,

10  supra, which dictates that the Board shall normally set a parole release date. (citing Biggs v.

11  Terhune, supra).

12      The Court in Biggs, supra, held that the Board's continued use of the crime (or any other

13  unchanging circumstances) as a basis for denial of parole when Petitioner's Institutional

14  Behavior remains exemplary may be a violation of both State and Federal Due Process.

15      Since his incarceration, Petitioner has had two Rules Violations Reports, a serious one on

16  10/21/82 for fighting and an administrative one on 1/12/02 for sexual misconduct. He has had

17  no occurrence of serious or violent disciplinary action since 1982, thus exemplifying a model

18  prisoner. There has been thereafter a continuous TWENTY FIVE (25) year history free of any

19  serious violent disciplinary action or occurrence. Petitioner submits that the Board's failure to

20  uniformly measure his offense and set his term proportionately to others similarly situated and

21  to find him suitable for parole violates both State and Federal due Process. Also, the current

22  policy of the Board, which will be discussed more fully infra, is the setting of a parole date

23  which is all too often the exception rather than the norm, and thus violates Petitioner's Liberty

24  Interest that is present in a parole date; In re Rosenkrantz, supra; McQuillion v. Ducan, supra;

25  Biggs v. Terhune, supra. At the Petitioner's board hearing the BPT relied solely on Petitioner's

26  3 – There is no evidence that the crime is "particularly egregious" to justify the use of the exception clause of PC
    § 3041(b); In re Norman Morrall, supra, the court concluded "[W]e agree that an inmate cannot be denied parole

27  simply on the type of offense he committed." (See also In re Minnis, 7 Cal.3d at p. 647). To the contrary, it falls
    squarely in the Board's own proportionality matrix CCR § 2403(c) at axis B-II. Without post-conviction credits

28  Petitioner has served twenty two (22) years. Adding post conviction credits he has served twenty seven (27) plus
    years, essentially reaching his matrix as required. There is no evidence that Petitioner is a current risk or threat to
    society and the Board's conclusions are not supported by the record. (See Biggs, supra).

commitment offense and prior history to justify its unlawful finding of unsuitability. Beginning at page 68 of Exhibit 'A', the HT, the Board stated:

> "This commitment offense was disastrous. It was awful, somebody died." (line 17-18)
> "The offense was carried out in an especially cruel and callous manner, multiple victims were attacked and one was killed. And this was in more than one incident. There are three separate crimes committed here. Three separate acts of violence. The offense was carried out in a dispassionate and calculated manner that showed exceptionally callous disregard for human suffering. And for the loss of life and at least 12 other victims that suffered there was something like 33 hundred dollars."
> (HT-69 lines 4-14)

In addition, and with regard to the Petitioner's suitability, the board erred in disregarding Petitioner's Mental Health Evaluation which is supportive of release (please refer to HT DECISION pg. 38 lines 14-27 line). Petitioner's Psychiatric Reports have been much instructive. Specifically, Dr. W. Gamard, Ph.D., CTF-Soledad, Staff Psychologist, stated:

> "Inmate DAWSON was a participant in the Triple CMS Program until 1997. He was depressed at the time, was evaluated as not, not a sociopath and was prescribed Vistaril for sleep. The inmate said about this, 'I wasn't seeing my people enough. I was stressed out from moving to cell living to dorm living where it was very noisy. I couldn't sleep.' Uh, the diagnosis was, "Axis One, poly-substance abuse in institutional remission. Axis Two, no contributory personality disorder, a GAF score of 80. Should this inmate at this time be given a parole release date his prognosis for maintaining his present gains in the community is excellent." (See Exhibit 'B' pg. 3, Psychological Evaluation, Current Mental Status)

And under "Assessment of Dangerousness" Dr. Gamard stated:

> "This inmate has received only two 115 violations during his entire incarceration of 23 years. If released to the community" – oh, excuse me. "Therefore it is felt that he would pose a less than average risk of violence when compared to the Level Two inmate population." (Id., p. 4)

1    Additionally, the Board ignored that Petitioner has been deemed by the California

2  Department of corrections a **Model** prisoner with A-1-A status, and **Not** a threat to society, and

3  that Petitioner's crime is not "particularly egregious" (especially cruel and callous SINCE HE

4  WAS NOT THE SHOOTER) by placing Petitioner in a Level II prison setting. [4]

5    Also, in the Life Prisoner Evaluation Report (hereinafter "LPER") attached as Exhibit 'C',

6  Petitioner's Correctional Counselor, CC-I Peabody, states:

7      "Dawsons's residence and employment plans appear realistic to this writer. Dawson

8      will not be able to secure any firm offers of employment until he can provide the

9      prospective employer with a parole date, and therefore his lack of specific

10      employment offers does not appear to be an issue subject to his control.

11      **Considering the commitment offense, minor prior record and positive prison**

12      **adjustment over an extended period of time, this writer believes that the**

13      **prisoner would probably pose a low degree of threat to the public at this time, if**

14      **released from prison, should he remain drug and alcohol free." (Exhibit 'C' p. 7)**

15    Again, in In re Norman G. Morrall, supra, the Court concluded; "A refusal to consider the

16  particular circumstances relevant to an inmate's individual suitability for parole would be

17  contrary to law." Moreover, the Court in Biggs, supra, addressed the Board's continued illegal

18  use of the crime and/or prior history to justify a denial of parole:

19      "... a continued reliance... on an unchanging factor, the circumstances of

20      **the offense and conduct prior to imprisonment, runs contrary to the**

21      **rehabilitative goals espoused by the prison system and could result in a due**

22      **process violation". (Biggs, supra, 334 F.3d at 917).**

23

24

25  4. California Code of Regulations, Title 15, section 3375.2 subd. (7)(A) states: "An inmate serving any life term
shall not be housed in a Level I or II facility if any of the following case factors are present: The Commitment
26  Offense involved... unusual violence...." And on June 24, 2004, the Court of Appeal in In re George Scott, supra,
119 Cal.App.4th at 892 fn. 11, found that the Board's regulations provide that even if the crime is "exceptionally
27  callous" an inmate may be found suitable for parole. The Court declared that "Under the Board regulations, base
terms for life prisoners are not calculated until after an inmate is deemed suitable for release. (§ 2282, subd. (a).)
28  The regulations therefore contemplate that an inmate may be deemed suitable for release even though his offense
demonstrated "exceptionally callous disregard for human suffering." (§ 2402, subd, (c)(1)(D).)" (Id)

1   In Biggs, supra, the appeal was pursuant to his initial suitability hearing. The Petitioner has

2   now had TWO Board hearings and submits that his most recent denial rests solely on the

3   commitment offense, (as did his previous hearings in 2003, included herein as Exhibit 'D'),

4   and therefore violates both State and Federal Due Process. Most importantly, there is no

5   evidence that the public safety requires a lengthier period of incarceration (please refer to PC §

6   3041 (b)), in relation to other instances of the same crime please refer to PC § 3041.5.

7   Petitioner submits that understanding and perspective of the crime is compelled by the

8   Board's own proportionality matrix (please refer to CCR Division 2, § 2403(c). The matrix

9   scale and rating of the more common and routine variations of murder appear to a codification

10   of when a crime of this nature can be more egregious than average.

11   Petitioner submits that his crime falls squarely in the matrix [category B-III, 28-29-30

12   years]. With post conviction credits, Petitioner has exceeded the maximum by more than TWO

13   (2) years and without post conviction credit application, Petitioner has served his matrix. The

14   Board fails in any attempt to substantiate why Petitioner's crime is so heinous as to require that

15   Petitioner be exempted time and time again from the general rule that a parole date shall

16   normally be set; please see In re Ramirez, supra, wherein the court states:

17   **"The Board must weigh the inmate's criminal conduct not against ordinary**

18   **social norms, but against other instances of the same crime or crimes. (Ramirez,**

19   **supra, Cal.App.4[th] at p. 570).**

20   Petitioner submits that the record is devoid of the Board making such a comparison.

21   Similarly, Petitioner's Psychiatric Report evidence, like Biggs, supra, is supportive of release;

22   contrary to the Board's erroneous and specious findings (please see Exhibit 'A' and 'B'). The

23   court in Biggs, addressed the Board's illegal usage of needed therapy and other illegal reasons

24   to justify a highly illegal denial. The Court concluded:

25   **"The record in this case and the transcript of Biggs' hearing before the Board**

26   **clearly show that many of the conclusions and factors relied upon by the Board**

27   **were devoid of evidentiary basis." (Biggs, supra, 334 F.3d at p. 915)**

28   The Court in Biggs, supra, went on to warn the Board that while there was "some

evidence" to use the crime as a basis for denial at his initial hearing, the board's continued use

G.

1   The existence of said policy in denying parole may explain why the Board only grants

2   parole in less than two (2) percent of the cases it hears; it also explains the bias demonstrated in

3   the present case.

4   In this case, Petitioner's own circumstances, the Board's pronouncement of numerous

5   unlawful conclusions, not supported by the record, violates the process due to Petitioner under

6   the State and Federal Constitutions. Based upon the herein-demonstrated bias, the Board's

7   decision cannot be shielded by the "some evidence" standard. The only appropriate remedy is

8   an independent review.

9   Petitioner respectfully requests that the Court take a look and compare this case [**where**

10  **Petitioner did not actually kill the victim**] with others where the circumstances were more

11  aggravated, yet reviewing courts found that due process was violated and the "some evidence"

12  standard not met.

13  The Court in In re Wen Lee (2006) 143 Cal.App.4th 1400, [a multiple victims case with one

14  person dead], found that Lee's crimes were not "especially heinous, atrocious or cruel."

15  Additionally, the Court held, "Besides not being especially atrocious, heinous or callous, Lee's

16  crimes have little, if any, predictive value for future criminality. Simply from the passing of

17  time, Lee's crimes **almost 20 years ago** have lost much of their usefulness in foreseeing the

18  likelihood of future offenses than if he had committed them five or ten years ago." Further,

19  "The test is not whether some evidence supports the reasons cited for denying parole, but

20  whether some evidence indicates a parolee's release unreasonably endangers public safety."

21  Some evidence of the existence of a particular factor does not necessarily equate to some

22  evidence the parolee's release unreasonably endangers public safety.

23  In In re Jeffrey Elkins, 2006 DJDAR 14489, Elkins beat his victim over the head with a

24  baseball bat, robbed him, put the body in his car trunk and drove to a remote area where he

25  dumped the body. He was convicted by a jury in 1980. **He served 26 years.** The Court wrote,

26  "The commitment offense, this court has observed, is an unsuitability factor that is immutable

27  and whose predictive value 'may be very questionable after a long period of time.' (Scott II,

28  supra, 133 Cal.App.4th at pp. 594-595, fn. Omitted.) We have also noted, as has our Supreme

Court, strong legal and scientific support that 'predictions of future dangerousness are

1  exceedingly unreliable,' even where the passage of time is not a factor and the assessment is

2  made by an expert. Reliance on an immutable factor, without regard to or consideration of

3  subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by

4  the prison system, and result in a due process violation. A parole hearing does not ordinarily

5  provide a prisoner a very good opportunity to show his offense was not committed 'in an

6  especially heinous, atrocious or cruel manner,' even if such evidence exists and the prisoner is

7  willing to run the risk his effort to make such a showing will be seen as unwillingness to accept

8  responsibility and therefore evidence of unsuitability."

9    "Our case, while resting on state due process (Cal. Const., art. I, section 7, subd. (a)),

10  compares favorably to cases affording habeas corpus relief on federal due process grounds,

11  against parole denials for California inmates with exemplary post-offense records who had

12  been sentenced to terms of at least 15 years to life for second degree murder . In one, the same

13  inmate earlier involved in our Supreme Court's decision in *Rosenkrantz* had offended at age

14  18, shooting a younger brother's friend [while lying in wait] who had revealed the inmate's

15  homosexuality to the inmate's intolerant father. The inmate's 'perfect prison record' and gains

16  of nearly **two decades** included, like Elkins' act of jeopardizing his own safety to protect a

17  correctional officer, saving the life of a fellow inmate. The Court found due process violated

18  when the former Board of Prison Terms denied parole, as it had before, based solely on the

19  gravity of the commitment offense. (*Rosenkrantz v. Marshall* (C.D. Cal. 2006 444 F.Supp.2d

20  1063, 1065, 1070.)

21    "In a second such case, former Governor Davis had reversed a BPT suitability

22  determination, stressing principally the gravity of the commitment offense. (*Martin v. Marshall*

23  (2006) 431 F.Supp.2d 1038) After first finding no support for other grounds, the court turned

24  to the factors surrounding and preceding the offense, which included the 26-year-old petitioner

25  fleeing the scene of his fatally shooting a drug dealer acquaintance and bystander in a blaze of

26  gunfire at a restaurant, wounding yet another bystander, and without seeking medical

27  assistance for any of his victims. The court reasoned: 'Petitioner has surpassed his minimum

28  sentence, and has already been found suitable for parole by two decision-making bodies ... He

has been in prison for approximately 26 years and has taken advantage of numerous

—                                    —

1   rehabilitation and enrichment programs. He has exceeded his minimum sentence by

2   approximately six years … The Governor's sole reliance on the circumstance of the offense

3   and conduct prior to the offense, constitutes a due process violation.'"

4       "A third instructive case is Irons v. Warden of Solano (2005) 358 F.Supp.936 (Irons) (app.

5   pending sub nom. Irons v. Carey (9th Cir. 2005) 408 F.3d 1165, No. 05-15275), where an

6   inmate serving 17 years to life was found unsuitable for parole at his 5th hearing before the

7   BPT. The facts of the offense, again, in many respects far worse than those before us. The

8   petitioner killed a fellow boarder after an argument in which the victim denied stealing from

9   the landlords, as the landlords had claimed. The petitioner loaded a handgun, went to the

10  victim's room, fired 12 rounds into him, said he was going to let him bleed to death and, when

11  the victim complained of the pain, took out a buck knife and stabbed him twice in the back.

12  The petitioner later borrowed a car and drove the body to an isolated coastal location where he

13  released it into the surf. The BPT had relied exclusively on the facts of the commitment offense

14  and the petitioner's drug use at the time. The Court wrote: 'Important in assessing any due

15  process violation is the fact that continuous reliance on unchanging circumstances transforms

16  an offense for which California law provides eligibility for parole into a de facto life

17  imprisonment without the possibility of parole … The circumstances of the crimes will always

18  be what they were, and petitioner's motive for committing them will always be trivial.

19  Petitioner has no hope for ever obtaining parole except that a panel in the future will arbitrarily

20  hold that the circumstances were not that serious or the motive was more than trivial.' … **After**

21  **15 or so years** in the caldron of prison life, not exactly an ideal therapeutic environment to say

22  the least, and after repeated demonstrations that despite the recognized hardships of prison, this

23  petitioner does not posses those attributes, the predictive ability of the circumstances of the

24  crime is near zero."

25      Finally, in Rio v. BPT Commissioners, ND No. C 05-1483 MPH (Dec. 2006), a case

26  involving a petitioner convicted of second degree murder even though not the actual shooter,

27  Judge Patel wrote: "The BPT considered the circumstances of the murder and concluded that it

28  was an carried out in a cruel and callous manner, carried out in a manner which demonstrates

    exceptionally callous disregard for human suffering, and was done for a trivial motive." Rio

12

1    and his crime partners Amaro and Willie went to Roberto Hernandez's apartment under the

2    pretense of purchasing jewelry. During the robbery, Willie shot Hernandez in the back of the

3    head. The Judge went on to say, "There was not sufficient evidence to support the finding that

4    the circumstances of the commitment offense tended to show unsuitability. The BPT looked at

5    the killing without any attention paid to Rio's role in that killing. The BPT's approach fails to

6    distinguish between the actual killer and those who may be held liable based on their role in the

7    crime such as aiding and abetting or under a felony murder theory as it rates all of them the

8    same on the dangerousness scale. Not only does that approach seem contrary to common sense,

9    it also is contrary to the wording of the regulation. The regulation calls for the BPT to consider

10   whether 'the prisoner committed the offense in an especially heinous, atrocious or cruel

11   manner,' indicating that the focus is on the parole candidate's particular actions in the killing

12   … Here, Rio was present when his crime partner killed the victim. The evidence also was that

13   Rio was there for a robbery and the shooting of the victim was rather unexpected to Rio. There

14   was no evidence that Rio was the leader of the criminal episode, and no evidence that Rio

15   directed the killing or otherwise urged the killer to kill. Under the circumstances, his crime

16   partner's execution-style killing does not provide some evidence that Rio 'committed the

17   offense in an especially heinous, atrocious or cruel manner.' The state may hold a person

18   criminally liable when his crime partner kills during a robbery, but the BPT has a different

19   chore. The BPT is charged with determining whether a prisoner is suitable for parole, not

20   whether he may be held liable for the killing in the first place. The evidence in the record does

21   not support a finding that Rio committed the offense in an especially heinous, atrocious or

22   cruel manner."

23   //

24   //

25   //

26

27

28

13

7. **Ground 2 or Ground** _____ \ .plicable):

_____

_____

_____

_____

a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

_____

PETITIONER'S RIGHT TO HAVE SEPARATELY STATED AND SPECIFICALLY DIRECTED (SEPARATE AND DISTINCT) REASONS WHEN GIVEN A MULTI-YEAR DENIAL WAS NOT PROTECTED BY THE BPT IN VIOLATION OF HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS PROTECTIONS AND CONTRADICTORY OF THE LEGISLATIVE INTENT OF PENAL CODE § 3041.5(b)(2).

1. The statement of reasons for a multi-year denial must be a separate and distinct statement that is not a mere recital of the same reasons used to deny parole worded slightly differently.

2. In denying Petitioner parole for a period of two (2) years, the BPT failed to cite its reasons for a multi-year denial.

3. The BPT's stated reason for parole denial was:

   "The offense was carried out in an especially cruel and callous manner. That's particularly callous and was clearly carried out in a dispassionate calculated manner." (Exhibit 'A' p. 68)

4. The BPT's stated reason for a multi-year denial was:

   NOT GIVEN.

5. A multi-year denial can only be applicable when valid grounds exist to find Petitioner unsuitable for parole. Petitioner has adequately established in his argument ante that the BPT's reasoning for denying parole was unsubstantiated, lacking even "some evidence" that he is CURRENTLY an unreasonable risk to the public and was therefore arbitrary, capricious, lacked basis in fact, and/or was contrary to law.

**Supporting cases:**

"If the Legislature had intended a single statement of reasons to suffice for both the refusal to set a parole date and the decision to postpone annual review, it would not have enacted language specifically calling for a statement of reasons on the latter...Accordingly, this Court holds the Board to the Legislative requirement that its reasons for postponing a suitability hearing be separately stated and specifically directed to that question." In re Jackson, (1985) 39 Cal.App.3d 464

14

Penal Code § 3041.5(b)(2) that requires a separate and distinct statement that is not a mere recital of the same reasons used to deny parole worded slightly differently.

Penal Code § 5076.2

CCR § 2000(b) (48) [Good Cause]; (61) [Material Evidence]; [Relevant Evidence]

CCR § 2400 et seq.

California Constitution Article I §§ 7, 15 [Due Process]

U.S. Constitution Amendment 14 [Due Process]

In re Capistran, (2003) 107 Cal.App.4th 1299

In re Morrall, 102 Cal.App.4th 280

In re Rosenkrantz, 95 Cal.App.4th 358

In re Ramirez, 94 Cal.App.4th 549

In re Caswell, (10/10/01) 92 Cal.App.4th 1017

In re Rodriguez, (1975) 14 C.3d 639

California v. Morales, (1975) 115 S.Ct. 1597

//

//

//

15

## CONCLUSION

The Board's decision was arbitrary and capricious. The Petitioner did not receive a fair hearing, nor will he ever.

Petitioner submits and contends that the finding of unsuitability was arbitrary and capricious:

    1). Due to the Board carrying out it's political function of adhering to a no or anti-parole policy;

    2). Due to the Board's acting contrary to the intent and spirit of PC § 3041 (a);

    3). Due to basing its decisions on unsupported allegations; and

    4). Due to the Board's refusal to adhere to aforementioned decisions and the controlling authorities.

Petitioner prays this Court order him released and /or discharged, or at the very least, direct the Board to issue a decision within ten (10) days granting parole, setting his term "uniformly" as mandated by the legislature.

//
//
//

16

## PRAYER FOR RELIEF

1. Issue an Order to Show Cause on an expedited basis.

2. Appoint Counsel.

3. Conduct an Evidentiary Hearing.

4. Order Petitioner's appearance before the Court.

5. Order Petitioner taken back before the Board for a finding of suitability within ten (10) days, or in the alternative, order Petitioner released forthwith;

6. Declaratory relief, and

7. Any other relief this Court deems fair, just and appropriate.

17

**PROOF OF SERVICE**

I declare that:

I, DARRYL DAWSON, C-30679, am a resident of the State of California, County of Monterey. I am over 18 years of age and I am a party to the within action. My residence address is P.O. Box 689, Soledad, California, 93960-0689.

On March _13_, 2007 I served the foregoing writ of habeas corpus on the parties listed below by placing a true copy thereof enclosed in a sealed envelope with postage fully prepaid in the United States mail at Soledad, California, addressed as follows:

DEPUTY ATTORNEY GENERAL
DARRELL LEPKOWSKY
110 WEST A STREET, SUITE 1100
San Diego, CA 92186-5266

There is regular delivery service by the U.S. Postal Service between the place of mailing and the places so addressed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _13_ day of March, 2007, at Soledad, California.

*Darryl L. Dawson*

DARRYL DAWSON

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No. If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   _____

   b. Result: _____ c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised: (1) _____

           (2) _____

           (3) _____

   f. Where you represented by counsel on appeal? ☐ Yes. ☐ No. If yes, state the attorney's name and address, if known:

   _____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No. If yes, give the following information:

   a. Result: _____ b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   c. Issue raised: (1) _____

           (2) _____

           (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   _____

   _____

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *in re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

   _____

   _____

   _____

   _____

   _____

   _____

   b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No.

   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?    ☐ Yes. If yes, continue with number 13.    ☐ No. If no, skip to number 15.

13. a.  (1) Name of court: _____

      (2) Nature of proceeding (for example, "habeas corpus petition"): _____

      (3) Issues raised: (a) _____

               (b) _____

      (4) Result *(Attach order or explain why unavailable):* _____

      (5) Date of decision: _____

  b.  (1) Name of court: _____

      (2) Nature of proceeding: _____

      (3) Issues raised: (a) _____

               (b) _____

      (4) Result *(Attach order or explain why unavailable):* _____

      (5) Date of decision: _____

  c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

_____

_____

16. Are you presently represented by counsel?    ☐ Yes.    ☐ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes.    ☐ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  3- 13 - 07

                                  ▷ *Darryl L. Dawson*
                                      (SIGNATURE OF PETITIONER)

# EXHIBIT A
## (Hearing Transcript 2006)

—                          —

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

INMATE

In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number C-30679
                          )
DARRYL DAWSON             )
                          )
_____ )


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 5, 2006

1:50 P.M.


PANEL PRESENT:

Linda Shelton, Presiding Commissioner
Jeff Sellwood, Deputy Commissioner


OTHERS PRESENT:

Darryl Dawson, Inmate
Terri Rutledge, Attorney for Inmate
Bryant Bushling, Deputy District Attorney
CORRECTIONAL OFFICERS UNIDENTIFIED


CORRECTIONS TO THE DECISION HAVE BEEN MADE

            _____   No    See Review of Hearing
            _____   Yes   Transcript Memorandum


Toni Anderson                    House of Scribes

ii

## INDEX

|  |  | PAGE |
|---|---|---|
| Proceedings | . . . . . . . . . . . . . . . . . . . . . | 1 |
| Case Factors | . . . . . . . . . . . . . . . . . . . | 6 |
| Pre-Commitment Factors | . . . . . . . . . . . . . . | 10 |
| Post-Commitment Factors | . . . . . . . . . . . . . | 22 |
| Parole Plans | . . . . . . . . . . . . . . . . . . . | 40 |
| Closing Statements | . . . . . . . . . . . . . . . . | 59 |
| Recess | . . . . . . . . . . . . . . . . . . . . . . | 66 |
| Decision | . . . . . . . . . . . . . . . . . . . . . | 67 |
| Adjournment | . . . . . . . . . . . . . . . . . . . | 78 |
| Transcriber Certification | . . . . . . . . . . . . | 79 |

1

```
              P R O C E E D I N G S
```

1           P R O C E E D I N G S

2           DEPUTY COMMISSIONER SELLWOOD:  We're on the

3   record.

4           PRESIDING COMMISSIONER SHELTON:  All right.

5   Good afternoon, everyone.  We are here for the first

6   Subsequent Parole Consideration Hearing for Darryl

7   Dawson, D-A-W-S-O-N, CDC Number C-30679.  Today's date

8   is October 5th, 2006.  The time is 1:50 p.m.  And we

9   are located at CTF, Soledad.  Mr. Dawson was received

10  on May 22ND, 1981 committed from Los Angeles County.

11  His life term began September 30th, 1987, and his

12  minimum eligible parole date is May 31st, 2004.  Mr.

13  Dawson, uh, was committed for Case Number A-357550,

14  charging in count one violation P.C., Murder in the

15  First Degree with a 12022.5, Armed with a Firearm, as

16  well as 12 counts of robbery, each with a 12022.5

17  P.C., Use of a Firearm.  Mr. Dawson received a term of

18  25 plus 13 equally 38 to life.  Mr. Dawson, this

19  hearing is being tape recorded, so we are going to go

20  around the room.  I know this is your first Initial

21  Hearing, so it's a little bit different.  I mean this

22  is your first Subsequent Hearing which is different

23  than your Initial Hearing, not a lot but a little.

24  So, anyway if you have questions feel free to ask as

25  we go ,.  We'll start with introductions, first name,

26  last name, spell our last name, and when we get to you

27  add your CDC number, please.  My name is Linda

2

1   Shelton, S-H-E-L-T-O-N, Commissioner.

2        DEPUTY COMMISSIONER SELLWOOD: Jeff Sellwood,

3   S-E-L-L-W-O-O-D, Deputy Commissioner.

4        DEPUTY DISTRICT ATTORNEY BUSHLING:  Bryant

5   Bushling, B-U-S-H-L-I-N-G, representing the Los

6   Angeles County District Attorney's Office.

7        ATTORNEY RUTLEDGE:  Terri E. Rutledge,

8   R-U-T-L-E-D-G-E, attorney for Mr. Dawson.

9        INMATE DAWSON:  Darryl Dawson, D-A-W-S-O-N,

10  C-30679.

11       PRESIDING COMMISSIONER SHELTON:  Thank you.  And

12  for the record we have two officers in the room for

13  security purposes who will not be participating in the

14  hearing.  All right, let's start with accommodation

15  for disabilities.  Uh, you signed BPT Form 1073, on

16  January 19, 2006, indicating you did not need any help

17  with anything or any accommodation, uh, for

18  disabilities.  I would note for the record that you

19  are wearing glasses.  Are those prescription glasses?

20       INMATE DAWSON:  Yes.

21       PRESIDING COMMISSIONER SHELTON:  And do they

22  work for your eyes, sir?

23       INMATE DAWSON:  Yes.

24       PRESIDING COMMISSIONER SHELTON:  Okay, go ahead

25  and sign on that.  What you are signing there is what

26  your attorney went over with you.  It's Exhibit Two,

27  and that would be, uh, an additional discussion of

3

1   accommodation for disabilities as well as a hearing

2   information sheet for you.  So, we note that you are

3   wearing glasses.  Do you have - is your hearing okay?

4       INMATE DAWSON:  Yes, ma'am.

5       PRESIDING COMMISSIONER SHELTON:  Okay, and

6   mobility?  Thank you.  You can walk, stand, sit for

7   periods of time and be comfortable?

8       INMATE DAWSON:  Yes, ma'am.

9       PRESIDING COMMISSIONER SHELTON:  Are you on any

10  medication?

11      INMATE DAWSON:  No.

12      PRESIDING COMMISSIONER SHELTON:  Okay.  Then it

13  sounds to me like you're comfortable to go forward

14  with this hearing.  Uh, counsel, would you concur?

15      ATTORNEY RUTLEDGE:  Yes, ma'am.

16      PRESIDING COMMISSIONER SHELTON:  Okay, thank

17  you.  All right.  Sir, you have certain rights.  You

18  have the right to a timely notice of this hearing, the

19  right to review your C-File.  And the record indicates

20  you did review your C-File on January 28th, 2006.  And

21  you have the right to present relevant documents.

22  Counsel, have your client's rights been met thus far?

23      ATTORNEY RUTLEDGE:  Yes, ma'am.

24      PRESIDING COMMISSIONER SHELTON:  Mr. Dawson, you

25  also have an additional right to be heard by an

26  impartial panel.  And today you panel would be

27  Commissioner Sellwood and myself, is that all right

4

1    with you?

2        INMATE DAWSON:  Yes.

3        PRESIDING COMMISSIONER SHELTON:  Thank you.  I

4    also want to let you know that on May - in May a

5    couple of years ago the rules changed with regards to

6    appeal rights.  And, uh, if you need additional

7    information in that area feel free to ask your

8    attorney or contact the, uh, prison law library, okay.

9    Now, sir, you are not required to admit to or discuss

10   your offense, however this panel does accept as true

11   the findings of the court.  Can you tell me what that

12   means to you?

13.      INMATE DAWSON:  That I shouldn't dispute the

14   facts of my - of the record.

15       PRESIDING COMMISSIONER SHELTON:  Kinda, it means

16   we're not going to retry your case.  And we are going

17   to go by what the, uh, says happened.  Uh, but it

18   doesn't mean that we're not interested in what you

19   have to say as well, that's very important to us,

20   okay.

21       INMATE DAWSON:  Yes, ma'am.

22       PRESIDING COMMISSIONER SHELTON:  Thank you.  Uh,

23   Commissioner, do we have any confidential information?

24       DEPUTY COMMISSIONER SELLWOOD:  We do have some,

25   we will not use it today.

26       PRESIDING COMMISSIONER SHELTON:  Terrific.  I've

27   already passed the hearing checklist around.  I'm not

5

1   sure where it is.  Okay, thank you.  Uh, both

2   attorneys have initialed and signed indicating that

3   they have all the necessary documents to move forward

4   so we will do that.  All right.  Ms. Rutledge, are

5   there any additional documents to be submitted?

6          ATTORNEY RUTLEDGE:  Not at this time, ma'am.

7          PRESIDING COMMISSIONER SHELTON:  And I did get

8   some here a little bit ago, and these would be, uh,

9   support letters that we'll take into consideration

10  when we go through your parole plans.  Are there any

11  preliminary objections?

12         ATTORNEY RUTLEDGE:  No.

13         PRESIDING COMMISSIONER SHELTON:  Will your

14  client be speaking with us today?

15         ATTORNEY RUTLEDGE:  Not on the commitment

16  offense but all other issues.

17         PRESIDING COMMISSIONER SHELTON:  Okay.  Would

18  you please raise your right hand, sir?  Do you

19  solemnly swear or affirm that the testimony you give

20  at this hearing will be the truth, the whole truth and

21  nothing but the truth?

22         INMATE DAWSON:  Yes.

23         PRESIDING COMMISSIONER SHELTON:  And just to let

24  you know, Mr. Dawson, you don't need to lean forward

25  every time you speak into the mike.  You're going to

26  get dizzy doing this.  So, you can just be comfortable

27  and talk where you from and it'll pick it up fine.

6

1    Okay.  I am going to go to, uh, the summary of the

2    offense as indicated in the April 2003 Board Report

3    which was brought forward.  We are going to

4    incorporate that by reference.  Uh, is that okay with

5    you, Mr. Bushling?

6            DEPUTY DISTRICT ATTORNEY BUSHLING:  Yes.

7            PRESIDING COMMISSIONER SHELTON:  And Ms.

8    Rutledge?

9            ATTORNEY RUTLEDGE:  Yes.

10           PRESIDING COMMISSIONER SHELTON:  Since, uh, Mr.

11   Dawson will not be speaking to that, then consider

12   that done.  I will incorporate by reference the Board

13   Report dated April 2003, and that is pages one, two,

14   and three, that information comes from the probation

15   officer's report pages six through eight.  The

16   Appellate Court Decision dated April 25th '83, pages

17   five through six, page 13, and pages 15 through 18.

18   With that, Mr. Dawson, we're going to go to your prior

19   record, and I'll need you to help me out with that so

20   I can make sure - might as well keep this up here --

21   that I have accurate information, okay.  First of all,

22   this indicates that you have no juvenile record.

23           INMATE DAWSON:  Correct.

24           PRESIDING COMMISSIONER SHELTON:  Is that true?

25           INMATE DAWSON:  Yes.

26           PRESIDING COMMISSIONER SHELTON:  Never got in

27   trouble, huh?

7

1      INMATE DAWSON:  Right.

2      PRESIDING COMMISSIONER SHELTON:  Good.  Are you

3  nervous?

4      INMATE DAWSON:  Yes.

5      PRESIDING COMMISSIONER SHELTON:  Okay, try to

6  relax.  We're not here to beat you up, okay.

7      INMATE DAWSON:  Okay.

8      PRESIDING COMMISSIONER SHELTON:  This is your

9  hearing, and I want you to feel free to contribute as

10  much to it as you would like to.

11      INMATE DAWSON:  Okay.

12      PRESIDING COMMISSIONER SHELTON:  Okay.  With

13  regards to your adult prior record we have that, uh,

14  you had three contacts with law enforcement before

15  this commitment offense.

16      INMATE DAWSON:  Correct.

17      PRESIDING COMMISSIONER SHELTON:  First one was

18  in June of '74, you were arrested by Lynwood Police

19  for Assault with a Deadly Weapon, with the D.A.

20  rejected due to a lack of corpus.

21      INMATE DAWSON:  Yeah, they, uh, arrested the

22  wrong person.

23      PRESIDING COMMISSIONER SHELTON:  You were the

24  wrong purpose - person?

25      INMATE DAWSON:  Yes, I was at a party at my, my

26  sister's cousin's house.  And, uh, apparently he was

27  having a dispute with his neighbor.  And she threw a

8

1   brick and hit my sister in the mouth.  I picked up the

2   brick and threw it at the house, it broke a window.

3   So, they arrested me for Assault with a Deadly Weapon,

4   but they should have arrested her for hitting my

5   sister with the brick, that's what happened.

6          PRESIDING COMMISSIONER SHELTON:  So, did that

7   other person get arrested?

8          INMATE DAWSON:  No.

9          PRESIDING COMMISSIONER SHELTON:  Hmm.  I

10  appreciate the extra information.  It said, uh, as

11  well you were arrested in July of '75 by the Los

12  Angeles Sheriff's Department for possession of

13  marijuana.

14         INMATE DAWSON:  Correct.

15         PRESIDING COMMISSIONER SHELTON:  Tell me about

16  that one.

17         INMATE DAWSON:  I was, uh, (indiscernible) and

18  my cousin wanted some marijuana, so I knew where he

19  was and picked it up - we picked it up, and the

20  Sheriff's Department stopped us and they arrested me.

21         PRESIDING COMMISSIONER SHELTON:  And not your

22  cousin.

23         INMATE DAWSON:  Not my cousin.

24         PRESIDING COMMISSIONER SHELTON:  Because --

25         INMATE DAWSON:  He was the driver.

26         PRESIDING COMMISSIONER SHELTON:  Oh, and you had

27  the marijuana.

9

1           INMATE DAWSON:  No, he had it.

2           PRESIDING COMMISSIONER SHELTON:  Oh.

3           INMATE DAWSON:  On his possession, but they

4    arrested me for moving in the car.

5           PRESIDING COMMISSIONER SHELTON:  Okay.  And

6    then, let's see you were arrested September '79, by

7    Los Angeles Sheriff's for Driving Under the Influence,

8    and you pled guilty to this.

9           INMATE DAWSON:  Yes.

10          PRESIDING COMMISSIONER SHELTON:  And let's see,

11   you were placed on Summary Probation, which basically

12   means not supervised probation, court probation for

13   one year.  And you had to attend driving school and

14   pay a three hundred dollar fine.  You failed to

15   appear in court on 3/14/80 after receiving an

16   extension to pay the fine, so a warrant was issued.

17   Evidently you had been in county jail.

18          INMATE DAWSON:  Correct.

19          PRESIDING COMMISSIONER SHELTON:  It says for

20   "issues related to the commitment offense", so all

21   this was happening about the same time.

22          INMATE DAWSON:  Yes, ma'am.

23          PRESIDING COMMISSIONER SHELTON:  And then you

24   pled guilty to violation of probation.  You were given

25   credit for 10 days, a bench warrant was recalled.

26   What were you under the influence of, sir?

27          INMATE DAWSON:  Alcohol.

10

1       PRESIDING COMMISSIONER SHELTON:  Then that's

2  when the commitment offense.

3       INMATE DAWSON:  Sometime after that.

4       PRESIDING COMMISSIONER SHELTON:  Okay.  Did I

5  leave anything out, or is that accurate information

6  for your prior record?

7       INMATE DAWSON:  Yes, ma'am.

8       PRESIDING COMMISSIONER SHELTON:  Okay.  You can

9  smile now, there you go.  Let's talk about your social

10  history.

11       INMATE DAWSON:  Fairly well.  I --

12       PRESIDING COMMISSIONER SHELTON:  Let's - let me

13  go through what we have here and I'll take some notes

14  and make sure we have all accurate information, okay.

15       INMATE DAWSON:  Okay.

16       PRESIDING COMMISSIONER SHELTON:  First, let's

17  verify that you were born on 10/20/55.

18       INMATE DAWSON:  Yes.

19       PRESIDING COMMISSIONER SHELTON:  In Los Angeles.

20       INMATE DAWSON:  Yes.

21       PRESIDING COMMISSIONER SHELTON:  And you're the

22  third of three children.

23       INMATE DAWSON:  Correct.

24       PRESIDING COMMISSIONER SHELTON:  And your dad's

25  name was Leon, and your mom's was Lorraine.

26       INMATE DAWSON:  Yes.

27       PRESIDING COMMISSIONER SHELTON:  Uh, you told,

11

1  uh, the probation officer doing your report that, uh,

2  you were raised in a united home with two sisters, is

3  that true?

4       INMATE DAWSON:  Yes, ma'am.

5       PRESIDING COMMISSIONER SHELTON:  So, tell me

6  about growing up, say between the time you were born –

7  which I'm sure you remember that – uh, to when you –

8  say you first started high school, how was family

9  life?  You had two sisters.

10      INMATE DAWSON:  Stable, disciplined,

11 comfortable.

12      PRESIDING COMMISSIONER SHELTON:  What's your dad

13 do for a living?

14      INMATE DAWSON:  He worked at the Uni-Royal Tire

15 Company.

16      PRESIDING COMMISSIONER SHELTON:  You can look at

17 me when you talk to me, it's okay.  No, it's okay.

18 You are so nervous, just take a deep breath, okay.

19 Dad worked for Uni-Royal Tire Company.

20      INMATE DAWSON:  Yes.

21      PRESIDING COMMISSIONER SHELTON:  Okay.  And what

22 did mom do?

23      INMATE DAWSON:  She worked there, too.

24      PRESIDING COMMISSIONER SHELTON:  Oh, well that's

25 good.  And so you went to grammar school.

26      INMATE DAWSON:  Yes.

27      PRESIDING COMMISSIONER SHELTON:  Junior high

12

1   school.

2         INMATE DAWSON:  Yes.

3         PRESIDING COMMISSIONER SHELTON:  And what about

4   high school?

5         INMATE DAWSON:  Yes.

6         PRESIDING COMMISSIONER SHELTON:  Did you get a

7   high school diploma?

8         INMATE DAWSON:  Uh, I got a GED.  I didn't

9   graduate because I was, uh, I think I was 102 credits,

10  uh, from graduating.

11        PRESIDING COMMISSIONER SHELTON:  A 102?

12        INMATE DAWSON:  Yes, somewhere around there.

13        PRESIDING COMMISSIONER SHELTON:  Don't you only

14  need 124 to graduate?

15        INMATE DAWSON:  Well, I don't - back in '74, I

16  think it was more, I'm not for sure.

17        PRESIDING COMMISSIONER SHELTON:  Oh, okay, but

18  you got your GED.

19        INMATE DAWSON:  It's hard for me to remember

20  something that happened --

21        PRESIDING COMMISSIONER SHELTON:  Yeah, well

22  that's okay.  You got your GED.

23        INMATE DAWSON:  Yes, ma'am.

24        PRESIDING COMMISSIONER SHELTON:  Did you get

25  your GED incarcerated or out on the streets?

26        INMATE DAWSON:  Yes, I got it at BBI.

27        PRESIDING COMMISSIONER SHELTON:  Okay, good.

13

1    So, you were living with your folks at the time of

2    your arrest?

3          INMATE DAWSON:  Yes, also with a girlfriend.

4          PRESIDING COMMISSIONER SHELTON:  So, you're back

5    and forth kinda?

6          INMATE DAWSON:  Yes.

7          PRESIDING COMMISSIONER SHELTON:  Okay.

8          INMATE DAWSON:  I always went home to do stuff

9    from my father and my mother, cut the grass, take the

10   trash out, anything that my father couldn't do because

11   he hurt his back.

12         PRESIDING COMMISSIONER SHELTON:  Oh, very good.

13   It says here you joined the National Guard in October

14   of '75.

15         INMATE DAWSON:  Yes, ma'am.  And that's one of

16   my biggest mistakes, I should have, uh, I should have,

17   uh --

18         PRESIDING COMMISSIONER SHELTON:  Stayed there?

19         INMATE DAWSON:  Should have stayed, I should

20   have went in for regular Army when I had the chance.

21         PRESIDING COMMISSIONER SHELTON:  It says you

22   returned from basic training in March of '76, but you

23   failed to attend meetings and you were consistently

24   absent without leave.

25         INMATE DAWSON:  Yeah, when I came back to

26   California, uh, employment was kind of hard to get at

27   the time.  So, I decided to move to San Antonio, Texas

14

1    with my sister.  And even though I should have learned

2    the bus routes but I didn't, and they give me an

3    honorable discharge for failure to report.

4         PRESIDING COMMISSIONER SHELTON:  I know it says

5    you did get an honorable discharge in October of '77.

6    This says you were a social drinker since the age of

7    17.  You used some marijuana.  And you indicated you

8    had a PCP problem in high school.

9         INMATE DAWSON:  Yeah.

10         PRESIDING COMMISSIONER SHELTON:  You were in

11    counseling for your drug use, for a week at the Martin

12    Luther King Hospital.

13         INMATE DAWSON:  Yes, ma'am, that's another bad

14    judgment I made.  And since I accepted Jesus Christ in

15    my life that pretty much straightened up all the

16    defects of characters and my struggles that I had with

17    alcohol and, uh, any type of substance.  I don't drink

18    water -- I mean I don't drink coffee.  I don't care

19    for cigarettes or nothing like that.  I don't need

20    that anymore in my life.

21         PRESIDING COMMISSIONER SHELTON:  Well good for

22    you.

23         INMATE DAWSON:  That's something I'm embarrassed

24    to talk about but that's something that happens when

25    you're young.

26         PRESIDING COMMISSIONER SHELTON:  You're

27    embarrassed to talk about the mistakes you made with