# EXHIBIT I (PART 2)

15

1   drugs?

2          INMATE DAWSON:  Yes, because I know, you know,

3   it was wrong.

4          PRESIDING COMMISSIONER SHELTON:  Uh-huh.

5          INMATE DAWSON:  And I made a mistake, but I

6   didn't really have nobody to talk to for guidance at

7   that level.  And I was scared to talk, embarrassed

8   about that.  But as I said when I accepted Jesus

9   Christ in my life that, that straightened out all my

10  defects of characters and my shortcomings.

11         PRESIDING COMMISSIONER SHELTON:  Good.  Do you

12  go to AA and NA right now?

13         INMATE DAWSON:  Off and on.

14         PRESIDING COMMISSIONER SHELTON:  We'll talk

15  about that.  The Commissioner will talk with you about

16  that.  Uh, it does indicate here that your parents

17  convinced you to, uh, go to San Antonio, Texas to live

18  with a relative because they were concerned about your

19  - the drug influence in the neighborhood.  Uh, you

20  also used, uh, cocaine.

21         INMATE DAWSON:  Yes.

22         PRESIDING COMMISSIONER SHELTON:  At the age of

23  21.  What other kinds of drugs?

24         INMATE DAWSON:  That's about it.

25         PRESIDING COMMISSIONER SHELTON:  So, at that

26  particular time it appears that you had a drug problem

27  but not an alcohol problem, or did you have an - well

16

1    you had an alcohol problem, too, because you got a

2    drunk driving so to speak.

3         INMATE DAWSON:  Yes, ma'am.

4         PRESIDING COMMISSIONER SHELTON:  Okay, good.

5    Uh, have you ever been married?

6         INMATE DAWSON:  Twice.

7         PRESIDING COMMISSIONER SHELTON:  Tell me when

8    were you married the first time?

9         INMATE DAWSON:  Oh, let me see.

10        PRESIDING COMMISSIONER SHELTON:  We won't tell

11   if you get it wrong.

12        INMATE DAWSON:  My first marriage was, uh, I

13   believe it was 1990.

14        PRESIDING COMMISSIONER SHELTON:  Okay, and how

15   long did that last?

16        INMATE DAWSON:  Four years.

17        PRESIDING COMMISSIONER SHELTON:  Children?

18        INMATE DAWSON:  I have a 14-year old daughter.

19        PRESIDING COMMISSIONER SHELTON:  From that first

20   marriage?

21        INMATE DAWSON:  Yes, ma'am.

22        PRESIDING COMMISSIONER SHELTON:  Okay.  And

23   what's her name?

24        INMATE DAWSON:  My daughter or my first wife?

25        PRESIDING COMMISSIONER SHELTON:  Your daughter.

26        INMATE DAWSON:  Michelle Rene Dawson.

27        PRESIDING COMMISSIONER SHELTON:  Do you have

17

1  contact with her?

2      INMATE DAWSON:  Yes, she's right up the street

3  in Hollister, I call her every week.

4      PRESIDING COMMISSIONER SHELTON:  Does she come

5  see you?

6      INMATE DAWSON:  Every Friday.  We get — we got

7  Fridays back now, Friday night visits, so I see her

8  every Friday, every other Friday.

9      PRESIDING COMMISSIONER SHELTON:  And her mother

10  brings her here?

11      INMATE DAWSON:  Yes, ma'am.

12      PRESIDING COMMISSIONER SHELTON:  So, you're

13  still getting along with your ex-wife?

14      INMATE DAWSON:  Yes, we're good friends.

15      PRESIDING COMMISSIONER SHELTON:  Good.  Tell me

16  about your second wife.

17      INMATE DAWSON:  I'm married to, uh, my high

18  school sweetheart, Janice Dawson.

19      PRESIDING COMMISSIONER SHELTON:  And you're

20  still married to her?

21      INMATE DAWSON:  Yes, ma'am.

22      PRESIDING COMMISSIONER SHELTON:  Your high

23  school sweetheart, huh?

24      INMATE DAWSON:  Yes, ma'am.

25      PRESIDING COMMISSIONER SHELTON:  How did you get

26  reacquainted while you've been in here?

27      INMATE DAWSON:  Her brother got killed and I

18

1   called to say, send my condolences and --

2           PRESIDING COMMISSIONER SHELTON:  That started

3   it, huh?

4           INMATE DAWSON:  Well, we always (indiscernible)

5           PRESIDING COMMISSIONER SHELTON:  So, how long

6   have you been married?

7           INMATE DAWSON:  It will be 11 years in December.

8           PRESIDING COMMISSIONER SHELTON:

9   Congratulations.

10          INMATE DAWSON:  It's all right.

11          PRESIDING COMMISSIONER SHELTON:  Yes.

12          INMATE DAWSON:  We're friends.

13          PRESIDING COMMISSIONER SHELTON:  That's good,

14  it's important.  Uh, the record says here that you

15  fathered a boy, but evidently that's not true or is

16  it?

17          INMATE DAWSON:  Yes, I fathered a son before I

18  went to the Army.  He's a correctional officer at, I

19  believe at Lancaster right now.

20          PRESIDING COMMISSIONER SHELTON:  And who's his

21  mom?

22          INMATE DAWSON:  Her name is Yvette Grant.

23          PRESIDING COMMISSIONER SHELTON:  So, that was

24  outside of a marriage relationship.

25          INMATE DAWSON:  Yes, ma'am.

26          PRESIDING COMMISSIONER SHELTON:  So, how, how

27  old is your son?

19

1      INMATE DAWSON:  I would say he's about 28 right

2  now.

3      PRESIDING COMMISSIONER SHELTON:  Do you have

4  contact with him?

5      INMATE DAWSON:  Because he's a correctional

6  officer that's not possible.  They tell me he can't be

7  there until I get out.

8      PRESIDING COMMISSIONER SHELTON:  Okay.  There

9  might - they might consider that a --

10      INMATE DAWSON:  We talked by phone conversation

11  when my father passed.

12      PRESIDING COMMISSIONER SHELTON:  Oh, okay.

13      INMATE DAWSON:  But that was about it.

14      PRESIDING COMMISSIONER SHELTON:  All right.

15  Okay, sir, we've talked about your family.  We've

16  talked about your education.  And what kind of

17  employment experience did you have before you came in

18  custody?

19      INMATE DAWSON:  I was a gas station attendant, a

20  janitor, and a security guard.  I was in the process

21  of going to street maintenance for the County of Los

22  Angeles before I came to prison.  I was in the process

23  of trying to do that (indiscernible)

24      PRESIDING COMMISSIONER SHELTON:  Is there

25  anything else that you would like to add to the

26  record, uh, based on your social history that I didn't

27  talk about?  We talked about children, marriage,

20

1  vocation, employment, your family life.  Is your mom

2  still alive?

3      INMATE DAWSON:  Yes, she has a letter right

4  there.

5      PRESIDING COMMISSIONER SHELTON:  And your dad?

6  Take a breath, sir.  There's some fancy Kleenex here

7  for you.

8      INMATE DAWSON:  He passed away, uh, three years

9  ago.

10      PRESIDING COMMISSIONER SHELTON:  And that

11  affects you still very much, yes?

12      INMATE DAWSON:  Yes.

13      PRESIDING COMMISSIONER SHELTON:  I'm sorry to

14  hear that, sir.

15      INMATE DAWSON:  It affects me because, uh, by

16  being here because he raised me better than this.  I

17  was out of my character by getting involved with

18  somebody I had no business getting involved with.  And

19  I was always focused.  I had a job.  I had never had

20  problems getting a job or finding girlfriends.  I'm

21  just embarrassed by being in front of you people when

22  I'm better than this.  I know I am.  And I was just

23  out of my character.  I had no business walking in

24  somebody's place of business with a loaded weapon,

25  scaring the employees and taking money and run.  And

26  in the commission of doing that, my crime partner

27  decided to take it upon his self to shoot and kill the

21

1    security guard.

2         ATTORNEY RUTLEDGE:  I'll have to caution you,

3    Mr. Dawson.  Uh, the Board appreciates of course when

4    you talk about the commitment offense.  But if it is

5    your contention to not discuss it at today's hearing,

6    you're starting to discuss it, and that would make you

7    subject to questions by the District Attorney, by the

8    Board about the commitment offense.

9         INMATE DAWSON:  I understand that, but I just

10   wanted to say that because she asked about my father.

11   I just wanted to –

12        PRESIDING COMMISSIONER SHELTON:  I understand,

13   sir.  Evidently, and I'll sum it up for you.  You were

14   very close with your family and you think – you feel

15   you let them down because you weren't raised to behave

16   this way.  It appears you got involved in some serious

17   drug stuff that led you down the wrong path.

18        INMATE DAWSON:  Drugs wasn't the problem, the,

19   the cause of me being here today.  It was me being out

20   of my character.

21        PRESIDING COMMISSIONER SHELTON:  Being somebody

22   you weren't raised to be.

23        INMATE DAWSON:  Correct.

24        PRESIDING COMMISSIONER SHELTON:  All right, sir.

25   I appreciate that.  We're going to go to Commissioner

26   Sellwood and he's going to talk with you about your

27   post-conviction factors.

22

1          DEPUTY COMMISSIONER SELLWOOD:  Good afternoon,

2     sir.

3          INMATE DAWSON:  Good afternoon, sir.

4          DEPUTY COMMISSIONER SELLWOOD:  I'm going to, uh,

5     discuss some information that's listed both in your C-

6     File and in what we call the Board Report.  Now, it's

7     possible, sir, that I might make a mistake, or that I

8     might leave something important out.  If you find that

9     I do that, please free to let me know so I can correct

10    the record.

11         INMATE DAWSON:  Okay.

12         DEPUTY COMMISSIONER SELLWOOD:  All right.

13         INMATE DAWSON:  Yes, sir.

14         DEPUTY COMMISSIONER SELLWOOD:  All right.  What

15    I'm going to start with is some basic information, to

16    start.  Uh, your current classification level is 19,

17    and your current custody level is Medium A, is that

18    correct?

19         INMATE DAWSON:  Correct.

20         DEPUTY COMMISSIONER SELLWOOD:  Okay.  Your last

21    hearing was April 15th of 2003, and that was your

22    Initial Hearing, and you received a three-year denial.

23    You were received here at CTF on September 8th of 1997,

24    all those accurate?

25         INMATE DAWSON:  Yes, sir.

26         DEPUTY COMMISSIONER SELLWOOD:  Okay, good.  Uh,

27    in regards to discipline you have a very, very good

—                    —

23

1   history with a somewhat recent 115.  You only have two

2   115s in your entire history.

3        INMATE DAWSON:  Correct.

4        DEPUTY COMMISSIONER SELLWOOD:  All right.  Now,

5   the first one was way back in April of '85, a long

6   time ago.

7        INMATE DAWSON:  Yes, sir.  Could I explain?

8        DEPUTY COMMISSIONER SELLWOOD:  Well, if you'd

9   like to I would - sure.

10       INMATE DAWSON:  Okay.  I left San Quentin and,

11  uh, I did everything right.  I just moved out of that

12  cell because the equipment in there, the counselors

13  and officers told me that the guy was a petafile.

14       DEPUTY COMMISSIONER SELLWOOD:  All right.

15       INMATE DAWSON:  And, uh, one particular night

16  the guy got, uh, naked, said to take my clothes off.

17  I told him I'm not, not with that.  I don't play that.

18  And I tried to tell the officers to let me out, move

19  me, they wouldn't.  They told me to hold on and they

20  would try to find me a cell.  One particular night, he

21  made a - he approached me and I defended myself.  And

22  then things cleared up.  The officers had handcuffed

23  and they was taking him out.

24       DEPUTY COMMISSIONER SELLWOOD:  Okay.  Now,

25  actually what I did was I made a mistake on the date,

26  that was '82.

27       INMATE DAWSON:  Yes, sir.

24

1          DEPUTY COMMISSIONER SELLWOOD:  Okay, '82, I made

2    a mistake on the date.  When I looked at the date, I

3    saw the 128, so I'm sorry.  Yeah, that incident was in

4    '82, all right.  Then the other one 115 was January of

5    '02, and that was for sexual behavior which was

6    inappropriate sexual behavior, uh, with a visitor.

7          INMATE DAWSON:  My wife.

8          DEPUTY COMMISSIONER SELLWOOD:  Okay.  And we

9    have all read, uh, the file so we're aware of what

10   that was, all right.  Uh, the 128 was way back in '85,

11   as I mentioned the date, back in April of '85.  So,

12   you actually have a very, very good, uh, disciplinary

13   record.  Uh, I'm sure that you wish that '02 event had

14   not happened because it's closer to your parole

15   hearings.  And had that happened, you know, 10 years

16   ago, it would have been easier to look at it as a

17   distant event, but it was '02, so it's four, four

18   years ago.

19         INMATE DAWSON:  Yes, my wife, she demanded some

20   passion as far as we could go and, uh, conversed, but

21   she said even – she wanted some passion or else she

22   was going to find it on the street.

23         DEPUTY COMMISSIONER SELLWOOD:  Okay, well, all

24   right.  Uh, but, uh, again, three – a combination of

25   three 115s and 128s all together for your entire

26   history, sir, is very, very good.  Well, two 115s, one

27   128, so a combination all together of three

25

1   disciplinary write-ups for your entire history is

2   excellent.

3          INMATE DAWSON:  Thank you.

4          DEPUTY COMMISSIONER SELLWOOD:  And you should be

5   congratulated on that, all right.  Uh, let me go over

6   the history as reported since your initial hearing.

7   From 9 of '03 to 9 of '04, it states that you did not

8   participate in any vocational training for that year,

9   that you did not pursue any academics in that year.

10  This is September of '03 to September of '04, okay.

11  Yes, you've something to –

12         ATTORNEY RUTLEDGE:  Oh, his – your Voc?

13         DEPUTY COMMISSIONER SELLWOOD:  Okay.  Is there

14  something during that period?

15         INMATE DAWSON:  Yes, sir.

16         DEPUTY COMMISSIONER SELLWOOD:  She'll give it to

17  the guard here.  And have you got other things that

18  you think I don't have in front of me that you would

19  like me to see and review, sir, do you want me to see

20  those, too?  Why don't we give those to the guard,

21  too, unless –

22         ATTORNEY RUTLEDGE:  Yeah, we'll go ahead and

23  then you can figure out what to do.

24         DEPUTY COMMISSIONER SELLWOOD:  Thank you, sir.

25  Yeah, I mean I might as well seem them all, then I can

26  take a look at them.  That's fine.

27         PRESIDING COMMISSIONER SHELTON:  We'll give them

26

1   back to you, don't worry.  Thank you.

2       DEPUTY COMMISSIONER SELLWOOD:  Thank you.  Okay,

3   so, let's see.

4       INMATE DAWSON:  You mentioned the Voc.

5       DEPUTY COMMISSIONER SELLWOOD:  I was mentioning

6   vocational.  What they said was there was no

7   vocational training during that period of time.  Okay,

8   so let's take a look here.

9       INMATE DAWSON:  Well, that's my certificate of

10  completion.

11      DEPUTY COMMISSIONER SELLWOOD:  Okay.  So, let's

12  take a look here and see.  Okay, this is dated - not.

13  Oh, there it is, sorry.  Okay.  Here's, here's what

14  I'm going - according to this, sir, unless there's

15  another one you want me to see, I'm referring to the

16  one-year period between September of 2003 and

17  September of 2004, so for that one year period only,

18  because I'm covering times since your last hearing.

19  You've given me a certificate of completion for

20  Vocational Graphic Arts.  And it's presented on the

21  second day of October of 2001.

22      INMATE DAWSON:  Okay, that's the one mistake,

23  sir.

24      DEPUTY COMMISSIONER SELLWOOD:  No, that's fine.

25  I'm glad we - maybe that helps you relax a little,

26  too, a little interchange and --

27      INMATE DAWSON:  The time frame.

1         DEPUTY COMMISSIONER SELLWOOD:  Okay, I'm sorry,

2    I should have made that more clear to you, okay.  But

3    this is great to hear.  My expectation is that this

4    was covered at the initial hearing, and so it's

5    already on the record.  And I'm just bringing this up

6    to date since your last hearing, okay.

7         INMATE DAWSON:  Okay.

8         DEPUTY COMMISSIONER SELLWOOD:  So, that's what

9    I'm covering specifically.  So, let me take a moment

10   here and look at these - some - these other things

11   because I've something from '97, something here from

12   the year 2000, again 200, again 2000.  Okay, and

13   here's your GED which you had earlier stated that you

14   had accomplished, the GED, and here's that here.  And

15   then - okay.  Now, we'll see if I get to this.  This

16   one is dated, uh, '04 - 9 of '04, so we'll make that I

17   cover this one in this time period.  Okay, this is

18   from back in '02, also.  Okay.  So, these items appear

19   that they should have been covered in the initial

20   hearing.  And this which is a presentation of

21   employment earning for Board of Prison Term Hearing.

22   And these were your earnings prior to the last

23   hearing?

24        INMATE DAWSON:  The vocational print shop

25   graphic arts department, too.

26        DEPUTY COMMISSIONER SELLWOOD:  Oh, you're

27   suggesting - okay, for instance a Binding and

28

1   Finishing Supervisor which started between 30 and

2   65,000 a year.

3         INMATE DAWSON:  Yeah, that's just the

4   (indiscernible) earnings status of where he scheduled

5   off the paying of the company.

6         DEPUTY COMMISSIONER SELLWOOD:  Should you leave

7   prison and go out and find a job as someone doing

8   that.

9         PRESIDING COMMISSIONER SHELTON:  This might be

10  part of -

11        DEPUTY COMMISSIONER SELLWOOD:  This would be

12  parole plans.

13        PRESIDING COMMISSIONER SHELTON: -- parole plans

14  --

15        DEPUTY COMMISSIONER SELLWOOD:  -- I think we've

16  covered that.

17        PRESIDING COMMISSIONER SHELTON: -- so let me add

18  this to my pile over here.

19        DEPUTY COMMISSIONER SELLWOOD:  Okay, good,

20  that's fine.  Thank you for bringing all that up.

21  It's real important that the record is accurate, and

22  that you agree that it's accurate.  And that way, you

23  don't have to - you can come back at some time and say

24  well that was wrong.  We're going to do it right here.

25  So, that's fine, no problem at all.  So, let me

26  continue with this one-year period, from September of

27  '03 to September of '04, okay.  And again let me know

29

1   if anything is wrong.  Work record, it says that you

2   were dropped from the Vocational Print Shop, non-

3   adversely, it was not your fault.  You had simply been

4   there too long, is what they said.

5       INMATE DAWSON:  Correct.

6       DEPUTY COMMISSIONER SELLWOOD:  Okay.  Uh, group

7   activities you were not involved in any self-help

8   group activities for that one year period, and you

9   remained disciplinary free.  Now, I'm going to move

10  onto the next year.  This year being September of '04

11  through September of '05, okay, for one year only.

12  Vocational training, none.  Academics, none.  Work

13  record, central lunch box crew.  All right.  Group

14  activities, none documented during that period.  Okay,

15  and remain disciplinary - Yes, please, go ahead.

16      INMATE DAWSON:  As of September 1 --

17      DEPUTY COMMISSIONER SELLWOOD:  Uh-huh.

18      INMATE DAWSON:  -- I'm in textile, sewing

19  machine operator.

20      DEPUTY COMMISSIONER SELLWOOD:  As of September,

21  this September?

22      INMATE DAWSON:  Yes, sir.

23      DEPUTY COMMISSIONER SELLWOOD:  Okay, that's

24  fine.

25      PRESIDING COMMISSIONER SHELTON:  We're not there

26  yet.

27      DEPUTY COMMISSIONER SELLWOOD:  We're not there

30

1   yet, I'll get there.  Uh, and that you remained

2   disciplinary free for that period.

3          INMATE DAWSON:  Yes, sir.

4          DEPUTY COMMISSIONER SELLWOOD:  All right.  Now,

5   I'm going to go to next year.  This year that I'm

6   going to cover now is actually not a full year, it's

7   from September of '05 up to January of '06, so only

8   about a four month period.  During that period there

9   was no vocational training, no academics.  You

10  remained on the central lunch box crew.  And you

11  participated in Narcotics Anonymous and Anger

12  Management groups, okay, and that you received the

13  authorization for - now we're in the (indiscernible)

14  okay.  Now, I'm going to go up here -

15         PRESIDING COMMISSIONER SHELTON:  Can I -

16         DEPUTY COMMISSIONER SELLWOOD:  Yes.

17         PRESIDING COMMISSIONER SHELTON:  -- bust in for

18  a second?  You mentioned textiles, right now.

19         INMATE DAWSON:  Yes, ma'am.

20         PRESIDING COMMISSIONER SHELTON:  What are you

21  doing - is that your work right now?

22         INMATE DAWSON:  Yes, ma'am.

23         PRESIDING COMMISSIONER SHELTON:  And when did

24  you start that?

25         INMATE DAWSON:  September 1.

26         DEPUTY COMMISSIONER SELLWOOD:  Yeah, a month

27  ago.

31

1        PRESIDING COMMISSIONER SHELTON:  Oh, okay.  So,

2   we have that big blank spot from January to September

3   then, huh?  Do you have a record of that?

4        DEPUTY COMMISSIONER SELLWOOD:  I'm, I'm going –

5   I have a January up through August.

6        PRESIDING COMMISSIONER SHELTON:  Okay, awesome,

7   wonderful.

8        DEPUTY COMMISSIONER SELLWOOD:  Okay.  So, from

9   January of this year, sir, 2006 until August of this

10  year, okay, it says that there was no vocational

11  training, no academics, that you worked in culinary,

12  which I assume is the central lunch box crew.

13        INMATE DAWSON:  Yes, sir.

14        DEPUTY COMMISSIONER SELLWOOD:  Same thing, okay,

15  cool.  You participated in Narcotics Anonymous and

16  you're doing well in that, and that you remain

17  disciplinary free.  And then from August up until this

18  date, the only thing I had in terms of new chronos, I

19  did not have a chrono – well, unless this is it.

20  There's a chrono in there dated September 6th, so just

21  about one month ago.  And it says that you

22  participated in the training on Cal-Osha Hazardous

23  Communications Standards.

24        INMATE DAWSON:  Yes, sir.

25        DEPUTY COMMISSIONER SELLWOOD:  Okay.  And, uh,

26  and then where – what happened on September 1 of this

27  year, you got what?

32

1          INMATE DAWSON:  I got reassigned to the textile.

2          DEPUTY COMMISSIONER SELLWOOD:  Textile, okay.

3          INMATE DAWSON: Yeah, PIA.

4          DEPUTY COMMISSIONER SELLWOOD:  You're in PIA,

5     now.

6          INMATE DAWSON:  Yes, sir.

7          DEPUTY COMMISSIONER SELLWOOD:  So, you came out

8     of the lunch box crew and went over to PIA?

9          INMATE DAWSON:  Yes, sir.

10          DEPUTY COMMISSIONER SELLWOOD:  Okay.  And so

11     that was continuous.  You had been on lunch box crew

12     all the way up until that point and then you just went

13     over there?

14          INMATE DAWSON:  Yes, sir.

15          DEPUTY COMMISSIONER SELLWOOD:  Okay, good.  And

16     in textiles, I know what the word "textiles" means,

17     but I don't always know what it means in terms of what

18     you do when you work over there.

19          INMATE DAWSON:  I'm a sewing machine operator.

20          DEPUTY COMMISSIONER SELLWOOD:  Okay.  And when

21     you do that do you take courses that also teach you

22     how to be better at that along with actually with

23     doing the work?

24          INMATE DAWSON:  No, sir.

25          DEPUTY COMMISSIONER SELLWOOD:  No, okay.  So,

26     and here's my question — go ahead.

27          INMATE DAWSON:  I have 12 years experience, uh,

1    of being, uh, sewing machine operator.

2           DEPUTY COMMISSIONER SELLWOOD:  Oh, you do, where

3    did that come from?

4           INMATE DAWSON: PDI, PIA.

5           DEPUTY COMMISSIONER SELLWOOD:  Okay, okay.  So,

6    you're simply going back to something you've really

7    done well.

8           INMATE DAWSON:  Yes, sir.

9           DEPUTY COMMISSIONER SELLWOOD:  Okay.  And that

10   leads right into my next question.  If you were to be

11   paroled and you wanted to earn a living -- which

12   you've talked about having jobs before and doing that

13   - do you believe that you are employable by someone;

14   and why they hire you; what is your trade; what is

15   your skill?

16           INMATE DAWSON:  A mattress fabricator.

17           DEPUTY COMMISSIONER SELLWOOD:  Mattress

18   fabricator?

19           INMATE DAWSON:  Yes, building mattresses from

20   scratch and being a sewing machine operator, that's,

21   uh, potential earnings of $8.00 an hour to $15.00 an

22   hour.

23           DEPUTY COMMISSIONER SELLWOOD:  Which is in

24   there, okay.

25           INMATE DAWSON:  Uh, I have, uh, as I said I have

26   a very strong work ethic, professional --

27           DEPUTY COMMISSIONER SELLWOOD:  But in terms of

34

1    the skill?  I understand the work ethic.

2         INMATE DAWSON:  Yes.

3         DEPUTY COMMISSIONER SELLWOOD:  But you think

4    that sewing would be where your skills would be, where

5    you would seek employment?

6         INMATE DAWSON:  I have options.

7         DEPUTY COMMISSIONER SELLWOOD:  Okay, what are

8    the other options?

9         INMATE DAWSON:  Vocational graphic arts.

10        DEPUTY COMMISSIONER SELLWOOD:  Okay.

11        INMATE DAWSON:  Print Shop.

12        DEPUTY COMMISSIONER SELLWOOD:  Okay.

13        INMATE DAWSON:  Printing press operator.

14        DEPUTY COMMISSIONER SELLWOOD:  Okay.

15        INMATE DAWSON:  And, uh --

16        DEPUTY COMMISSIONER SELLWOOD:  Now, let me ask

17   you question about printing presses.  Do they even

18   exist in this new technological era?

19        INMATE DAWSON:  Yes.

20        DEPUTY COMMISSIONER SELLWOOD:  Era, era --

21        INMATE DAWSON:  Yes.

22        DEPUTY COMMISSIONER SELLWOOD:  Era, era.

23        INMATE DAWSON:  There's a couple of companies

24   that use Xerox machines, and they're basically on the

25   same format.

26        DEPUTY COMMISSIONER SELLWOOD:  Okay.

27        INMATE DAWSON:  And, uh, I, I learned - I got

35

1   the printing press down pretty good.  And I'm

2   confident enough with my abilities to - if I'm lucky

3   enough to get my feet into any major newspaper

4   company, I can run the press, I even load it up, you

5   know, with the paper.

6        DEPUTY COMMISSIONER SELLWOOD:  Okay.

7        INMATE DAWSON:  Or making plates.  There's a

8   bunch of stages in there that's --

9        DEPUTY COMMISSIONER SELLWOOD:  If you had a

10  choice and you were sitting in a job interview today,

11  and she represented the printing press people, and I

12  represented the sewing people, we both offer you a job

13  which one would you go for?

14       INMATE DAWSON:  It would be the printing press

15  because it's more money and more money from it.

16       DEPUTY COMMISSIONER SELLWOOD:  Okay, very good.

17       PRESIDING COMMISSIONER SHELTON:  See, I won.

18       DEPUTY COMMISSIONER SELLWOOD:  Now, let me --

19       INMATE DAWSON:  It depends on the company, too,

20  sir.

21       DEPUTY COMMISSIONER SELLWOOD:  Yeah, of course,

22  I understand.  I was just looking at your interest.

23  You would be more interested in the printing, is that

24  - that's what you're telling me, right?

25       INMATE DAWSON:  Yes, right.  Like I said my

26  options are open.

27       DEPUTY COMMISSIONER SELLWOOD:  I understand.

36

1   You don't always get everything you want, but you've

2   got the other experience.

3        INMATE DAWSON: Yes, sir.

4        DEPUTY COMMISSIONER SELLWOOD: All right, now

5   let me look at this one. This is a - that you've

6   handed me is September of '04 Chrono that says you've

7   successfully completed an impact workshop consisting

8   other 13 two hour sessions. "Impact Program is a

9   self-help therapy designed to provide an opportunity

10  for educational awareness as to the profound negative

11  impact of crime on its victims". So, I don't think I

12  did cover that, so you've given me that one to put on

13  the record. Okay, very good. Uh, now let me go, sir,

14  to the psychological reports. I have a March 21 of

15  2003 report, prior to that I have a July of 1995

16  report. That's quite a distance in between those so

17  I'm not going to refer to the 1995 report, it's very

18  old. I'm going to refer to the 2003 report. And I'm

19  going to take some information out of here, let me

20  start with Substance Abuse History.

21           "Inmate Dawson smoked marijuana and PCP for

22           several years until about the age of 20.

23           From the age of 21 on, he used cocaine on

24           and off. He also drank alcohol

25           occasionally. He has been attending

26           Alcoholics Anonymous and Narcotics

27           Anonymous".

37

1    Do you attend those, sir, on a regular basis?

2            INMATE DAWSON:  No, sir.

3            DEPUTY COMMISSIONER SELLWOOD:  Did you at some

4    time them on a regular basis?

5            INMATE DAWSON:  Yes, sir.

6            DEPUTY COMMISSIONER SELLWOOD:  For about how

7    long, sir?

8            INMATE DAWSON:  Uh --

9            DEPUTY COMMISSIONER SELLWOOD:  I mean, two

10   months, 10 years?

11           INMATE DAWSON:  It's been years, sir.

12           DEPUTY COMMISSIONER SELLWOOD:  Now, when you

13   were attending regularly did that go for months or

14   years?

15           INMATE DAWSON:  It was months, like twice a

16   month.

17           DEPUTY COMMISSIONER SELLWOOD:  And twice a

18   month.  And did you go twice a month for two years,

19   five years, 10 years?

20           INMATE DAWSON:  I don't know exactly how many

21   years, sir.  It probably should be on --

22           DEPUTY COMMISSIONER SELLWOOD:  But do you think

23   a number of years?

24           INMATE DAWSON:  Yes, sir.

25           DEPUTY COMMISSIONER SELLWOOD:  Okay.  It wasn't

26   just two or three times.

27           INMATE DAWSON:  No, sir.

1          DEPUTY COMMISSIONER SELLWOOD:  It was a long

2    period of time.

3          INMATE DAWSON:  Yeah.

4          DEPUTY COMMISSIONER SELLWOOD:  Okay, that's what

5    I was looking for.  And when do you think was the last

6    time you attended an AA or NA class?

7          INMATE DAWSON:  It's been a while, sir.

8          DEPUTY COMMISSIONER SELLWOOD:  Okay.  Do you

9    think a year, two years, five years?

10         INMATE DAWSON:  About a year.

11         DEPUTY COMMISSIONER SELLWOOD:  About a year,

12   okay.  Thank you, that's what I needed.  Uh, under

13   psychiatric and medical history:

14              "Inmate Dawson was a participant in the

15              Triple CMS Program until 1997.  He was

16              depressed at the time, was evaluated as not,

17              not a sociopath and was prescribed Vistiril

18              for sleep.  The inmate said about this, 'I

19              wasn't seeing my people enough.  I was

20              stressed out from moving to cell living to

21              dorm living where it was very noisy.  I

22              couldn't sleep".  Uh, the diagnosis was,

23              "Axis One, poly-substance abuse in

24              institutional remission.  Axis Two, no

25              contributory personality disorder, a GAF

26              score of 80.  Should this inmate at this

27              time be given a parole or release date his

1           prognosis for maintaining his present gains

2           in the community is excellent". Under

3           assessment of dangerousness, "This inmate

4           has received only two 115 violations during

5           his entire incarceration of 23 years. If

6           released to the community" - oh, excuse me.

7           "Therefore it is felt that he would pose a

8           less than average risk for violence when

9           compared to the Level Two inmate

10          population".

11 So, he rates you as less of a risk for violence than

12 the normal Level Two inmate. Then in talking about

13 release to the community:

14          "His violence potential is estimated to be

15          no higher than the average citizen in the

16          community. The lack of arrest for violent

17          behavior prior to his conviction, and his

18          lack of violent behavior since his

19          incarceration are reasons for the assessment

20          of a low risk of violence. Although he was

21          not the shooter in the particular crime for

22          which he was convicted, he was using a

23          loaded weapon to commit robberies, but he

24          did not actually hurt anyone. He accepts

25          full responsibility for his actions and

26          their consequences, and he is to be

27          commended for improving his understanding by

40

1          accepting full responsibility in no longer

2          trying to shift responsibility to the

3          influence of his crime partner as he has in

4          past evaluations".

5    So, he's noting a significant change in you, and that

6    you're accepting full responsibility for all the

7    things that happened instead of trying to lay some

8    part of it off onto your crime partner.  And that

9    concludes my part, Commissioner.

10          PRESIDING COMMISSIONER SHELTON:  Okay.  Mr.

11   Dawson, let's talk about your parole plans.

12          INMATE DAWSON:  Yes, ma'am.

13          PRESIDING COMMISSIONER SHELTON:  Are you okay?

14          INMATE DAWSON:  Yes, ma'am.

15          PRESIDING COMMISSIONER SHELTON:  Is your heart

16   pounding?  Oh, okay, take a breath.  Uh, we'll go

17   through it.  I have a new report and we'll go through

18   the letters and stuff, okay.  First of all, it says

19   for residence that you, uh, obviously would like to

20   live with your wife.

21          INMATE DAWSON:  Yes, but upon if it's granted,

22   uh, she and I would be living with my mother seeing

23   that she's 83-years old and she needs me there to take

24   care of the house and do things for her.

25          PRESIDING COMMISSIONER SHELTON:  So, you would

26   both move into your, uh, mom's house?

27          INMATE DAWSON:  Yes, ma'am.

41

1        PRESIDING COMMISSIONER SHELTON:  And mom lives

2    in Compton?

3        INMATE DAWSON:  Yes, ma'am.

4        PRESIDING COMMISSIONER SHELTON:  Would living

5    there pose any problems for you?

6        INMATE DAWSON:  No, ma'am, that's where I was

7    raised.

8        PRESIDING COMMISSIONER SHELTON:  I know, that's

9    where you also got in trouble.

10       INMATE DAWSON:  Naw, I'm way past that.  As I

11   said, uh, the moment I accepted Jesus Christ in my

12   life I straightened out all my defective characters

13   and my shortcomings now.  As I said I shouldn't be

14   sitting here.  I've never involved myself in gangs.  I

15   always stayed focused, always went to work, never hung

16   out with a bunch of guys.  And when I did hang out,

17   nothing happened.

18       PRESIDING COMMISSIONER SHELTON:  And the real

19   fact is, sir, you in fact are sitting here.

20       INMATE DAWSON:  Yes, ma'am, I am, yeah.

21       PRESIDING COMMISSIONER SHELTON:  So, you need to

22   own that and --

23       INMATE DAWSON:  I accept the responsibility.

24       PRESIDING COMMISSIONER SHELTON:  Okay, good.

25   So, your mom's getting up there in years, right?

26       INMATE DAWSON:  Yes, ma'am.

27.      PRESIDING COMMISSIONER SHELTON:  Okay.  What

42

1    about - we've talked about employment to some degree.

2,   This one - this here says that you would, uh, secure

3    employment using the skills you acquired in the offset

4    printing and mattress fabrication trades.

5         INMATE DAWSON:  Yes, ma'am.

6         PRESIDING COMMISSIONER SHELTON:  Okay.  Uh, do

7    you have any idea where you might work?

8         INMATE DAWSON:  Well, for starters, for my

9    second or third day out on parole I would be attending

10   my brother-in-law's driving school, truck driving

11   school.  And in the meantime searching for employment

12   where I'm skilled at.

13        PRESIDING COMMISSIONER SHELTON:  Tell me why you

14   would be attending truck driving school?

15.       INMATE DAWSON:  Because at my age, I'll be 51 in

16   October, I might have to just get a truck and be

17   (indiscernible) California, if I have a good record

18   (indiscernible).

19        PRESIDING COMMISSIONER SHELTON:  Okay.  So,

20   you're keeping your options open.

21        INMATE DAWSON:  Yes, ma'am.

22        PRESIDING COMMISSIONER SHELTON:  That's good.

23   Let's take a look at your support letters.  We'll

24   discuss - well let's discuss this one first.  This is

25   your presentation, or this is what you were talking

26   about earlier with the Commissioner about your

27   potential earnings.

43

1       INMATE DAWSON:  Yes, ma'am.

2       PRESIDING COMMISSIONER SHELTON:  And, uh, I

3   think it's very good of you to sit down and prepare

4   this because it kind of gives you an idea of what to

5   look forward to.  I'm not going to read all of this.

6   But basically, you have gone through equipment

7   operations and customer service and mattress

8   fabrication, listing the variety of jobs that might be

9   available -

10      DEPUTY COMMISSIONER SELLWOOD:  Excuse me.

11   (RECESS)

12      DEPUTY COMMISSIONER SELLWOOD:  We're on side two

13  of tape one.

14      PRESIDING COMMISSIONER SHELTON:  Thank you very

15  much.  And as I was discussing with Mr. Dawson, we

16  were looking at the, the services and jobs that might

17  be available for you, and you listed down hourly and

18  annual wages.

19      INMATE DAWSON:  Yes, ma'am.

20      PRESIDING COMMISSIONER SHELTON:  So, uh, how -

21  where did you get these amounts from, out of

22  curiosity?

23      INMATE DAWSON:  Out of the training books we had

24  in print shop.

25      PRESIDING COMMISSIONER SHELTON:  Okay, good.

26  So, you had a good resource to go with, from.

27      INMATE DAWSON:  Yes, ma'am.

1       PRESIDING COMMISSIONER SHELTON:  Very good.

2  You're doing good homework, sir.

3       INMATE DAWSON:  Thank you.

4       PRESIDING COMMISSIONER SHELTON:  Let's talk

5  about support letters.  I reviewed them briefly.  Uh,

6  you have a letter from Janice Dawson, who would be

7  your husband (sic).

8       INMATE DAWSON:  Wife.

9       PRESIDING COMMISSIONER SHELTON:  Your wife.  I

10  said "husband", didn't I?

11       DEPUTY COMMISSIONER SELLWOOD:  Yeah, you did.

12  Yeah, you did.

13       PRESIDING COMMISSIONER SHELTON:  That's okay, I

14  figured she would be your wife.  I think my tongue is

15  getting tired.  I did that another time with somebody

16  else.  I called the, uh, client the husband of the

17  attorney.  That was kind of an interesting hearing

18  then.  Okay.  Uh, your wife says she's been

19  established for over 20 years.  She's attending

20  college at the present time.  And she's looking into

21  employment with the probation department.

22       INMATE DAWSON:  Yes, ma'am.

23       PRESIDING COMMISSIONER SHELTON:  She wants to be

24  a probation officer?

25       INMATE DAWSON:  Yes.

26       PRESIDING COMMISSIONER SHELTON:  Boy, you're

27  going to have all the supervision in the world, aren't

45

1   you, parole and probation?

2          INMATE DAWSON:  She's going to be the boss, too.

3          PRESIDING COMMISSIONER SHELTON:  Yeah, I happen

4   to be partial to probation.  Uh, so this is a nice

5   letter.  She's doing what she can to help get you, uh,

6   squared away.  And obviously, she's offering housing.

7   And there's transportation she's discussing and, uh,

8   talking about helping you with completion of your

9   driver's education like you mentioned.  Very nice. .

10  Uh, this is called "Another Chance Outreach Ministry",

11  signed by Rev. Ricky Hammond.  Uh, he says he's known

12  you for over 30 years.

13         INMATE DAWSON:  We went to school together.

14         PRESIDING COMMISSIONER SHELTON:  Okay.  And, uh,

15  they're offering you a position working with troubled

16  youth.  You know I see that a lot.  Do they pay you

17  anything for that or is it kind of role model work?

18         INMATE DAWSON:  It's like role model being, uh,

19  (indiscernible) how can I say it now, "self-

20  explanatory".  It's like, "see what happened to me by

21  doing certain things".

22         PRESIDING COMMISSIONER SHELTON:  Yeah, good.

23         INMATE DAWSON:  Almost like "Scared Straight".

24         PRESIDING COMMISSIONER SHELTON:  Yeah, you would

25  be a role model.

26         INMATE DAWSON:  Yes, a role model.

27         PRESIDING COMMISSIONER SHELTON:  Yeah, don't do

46

1  what I do just do what I say.  Do you remember that

2  one?

3       INMATE DAWSON:  Yes.

4       PRESIDING COMMISSIONER SHELTON:  Okay.  This

5  letter's from your mom.  She thinks you've been doing

6  a good job.  She says she's a senior citizen living

7  alone, and she would like to spend time with you.  A

8  letter from your sister, Lynette.

9       INMATE DAWSON:  Yes.

10       PRESIDING COMMISSIONER SHELTON:  Uh, she thinks

11  you're doing a good job as well.  And, uh, she's the

12  one whose husband is an instructor at the driver

13  trucking school and, uh, plans to teach you how to

14  drive an 18-wheeler.  Did you have a driver's license

15  when you came in here?

16       INMATE DAWSON:  Yes.

17       PRESIDING COMMISSIONER SHELTON:  Oh, okay.  I

18  was going to say that 18 wheels is a lot to drive.

19  Uh, a letter from Roschandra (ph) Jones and, uh, it's

20  a support letter, very nice.  And we have a letter

21  from Zetty Harvest, family friend.

22       INMATE DAWSON:  Yes.

23       PRESIDING COMMISSIONER SHELTON:  And, uh, she

24  has always seen you as a well-mannered young man and

25  thinks that you will be a useful citizen.  So, very

26  nice support letters.  Did I miss anything?

27       INMATE DAWSON:  No, ma'am.

47

1        PRESIDING COMMISSIONER SHELTON:   Okay.   I'm

2    going to make sure you get all of this back so you can

3    - as well as this, so we can -

4        DEPUTY COMMISSIONER SELLWOOD:   Yes.

5        PRESIDING COMMISSIONER SHELTON:   -- uh, you can

6    get copies for your file, okay.   Always make sure you

7    have on hand all those originals.   All right, sir,

8    this is the portion of the hearing that we go into

9    with asking questions.   And we are not discussing the

10    offense, but I want you to tell me what you feel, and

11    how you feel about not only the person that was killed

12    in your offense, but all the other victims involved in

13    the robberies.   Tell me what, what's been going on in

14    your head and heart and all that with that?

15        INMATE DAWSON:   I'm very sad about that.   As I

16    said I was out of my character by putting a loaded

17    weapon in my hand, going in somebody's place of

18    business and scaring their employees.

19        PRESIDING COMMISSIONER SHELTON:   Uh-huh.

20        INMATE DAWSON:   And through the impact

21    programming, it gives me - it gave me a insight on

22    fear that I caused some people (indiscernible) taking

23    money and running.

24        PRESIDING COMMISSIONER SHELTON:   What kind of

25    insight did it give you?

26        INMATE DAWSON:   The feeling of what happened, of

27    this - the never ending feeling that I have.   It's

·48

1   something I have to live with for the rest of my life.

2   I know I'm not directly responsible for the murder of

3   Mr. Dwight cousin and security guard.  But I'm

4   indirectly responsible because I participated in a

5   robbery which I shouldn't have.  If there was some

6   kind of way I could tell family how sorry I am, I

7   would, without affecting them, of bringing back

8   anymore pain.  If it was some way that I could, I

9   would give up a limb if it would bring him back

10  because he shouldn't have lost his life.  I shouldn't

11  have participated in no robbery in the first place.

12  As I said my father taught me better than that.  It's,

13  it's - I was just ignorant in going along with

14  something so stupid when I didn't have to.  I always

15  stayed focused.  I always had a job.  This was

16  embarrassing.  I embarrassed my people, my family, my

17  friends.  And this, this is just something I just have

18  to live with for the rest of my life.  And I wish

19  there was some kind of way I could turn back the hands

20  of time, I would do things differently.  I would have

21  kept myself in the Army.

22          PRESIDING COMMISSIONER SHELTON:  You know, if we

23  all had that 20-20 hindsight, huh?  Were you under

24  the influence of drugs or alcohol at the time of the

25  commitment offense?

26          INMATE DAWSON:  No.

27          PRESIDING COMMISSIONER SHELTON:  No.  Because I

49

1    know we talked about the fact that you did have an

2    alcohol and drug problem. Okay. I'm going to go to

3    Commissioner Sellwood and see if you have any

4    questions, because I can't think of anymore. We've

5    been asking questions all along.

6            DEPUTY COMMISSIONER SELLWOOD: Actually, I do.

7    I've got some questions for you, sir. You came out of

8    Compton, is that right?

9            INMATE DAWSON: Yes, sir.

10           DEPUTY COMMISSIONER SELLWOOD: Okay. And you

11   came out of Compton in the early - late 60s, early

12   70s, basically, when you were a teenager that period

13   of time period?

14           INMATE DAWSON: Yes, sir.

15           DEPUTY COMMISSIONER SELLWOOD: Okay. Compton in

16   that time period was not merely as rough as it has

17   been in recent years, but it was still a — I mean it

18   was still a pretty nice residential area then, but it

19   has rough components in Compton.

20           INMATE DAWSON: Yes, but where my, where my

21   parents stay at is very nice.

22           DEPUTY COMMISSIONER SELLWOOD: It was a nice

23   area.

24           INMATE DAWSON: Uh-huh, it was a nice --

25           DEPUTY COMMISSIONER SELLWOOD: Yeah, it, it had

26   its various components and --

27           INMATE DAWSON: Yes, sir.

1        DEPUTY COMMISSIONER SELLWOOD:  But, I, I, I

2   listened to you, and I watch you, and you talk with

3   great earnest - earnestness, if I can say that, with

4   great sincerity about I wasn't raised that way; I'm

5   embarrassed to be here.  Uh, you clearly have lots of

6   feelings about your father passing while you're in

7   jail as a lifer for such a horrendous crime.  So,

8   you've got this reference point that you talk about

9   easily about your upbringing, and the people around

10  you, but you did have a prior criminal history before

11  the life term, is that right?

12        INMATE DAWSON:  Minor.

13        DEPUTY COMMISSIONER SELLWOOD:  Okay, minor but

14  you did.  So, what was going on with that?  Were you

15  just a rebellious kid, all those other things, what

16  was that about?

17        INMATE DAWSON:  It was just bad judgment, sir.

18        DEPUTY COMMISSIONER SELLWOOD:  You don't have

19  the lean forward, just - okay, all right.  I mean who

20  were you doing stuff with?  I don't mean the names.  I

21  mean like the kids, the bad kids on the side?  Were

22  you choosing bad friends, what was going on?

23        INMATE DAWSON:  Some bad friends, but we were -

24  I wasn't, I wasn't involved in any gang activities.

25        DEPUTY COMMISSIONER SELLWOOD:  Okay.

26        INMATE DAWSON:  I was just going out and

27  partying too much with some of my friends that had a

1    little (indiscernible).  I was just out of my

2    character.

3        DEPUTY COMMISSIONER SELLWOOD:  Okay.  And you

4    talk about your character as the guy who goes home and

5    mows the lawn because dad wasn't able to do that

6    anymore.

7        INMATE DAWSON:  Yes, sir.  I get up every

8    morning and go to work.

9        DEPUTY COMMISSIONER SELLWOOD:  And you go to

10   work.  And you talk about that as if that's your

11   character.  And you say I was out of character.  But

12   you were out character more than once.

13       INMATE DAWSON:  Yes, sir.

14       DEPUTY COMMISSIONER SELLWOOD:  It wasn't the

15   life crime.  There were these other things.

16       INMATE DAWSON:  Yes, sir.

17       DEPUTY COMMISSIONER SELLWOOD:  Did you view that

18   at the time as being out of character for you?

19       INMATE DAWSON:  Yes, sir.

20       DEPUTY COMMISSIONER SELLWOOD:  So, even at the

21   time you were cognizant that --

22       INMATE DAWSON:  I shouldn't have been --

23       DEPUTY COMMISSIONER SELLWOOD:  -- I shouldn't be

24   doing that stuff?

25       INMATE DAWSON:  Yes, sir.

26       DEPUTY COMMISSIONER SELLWOOD:  Okay.  And you

27   talk about accepting Jesus Christ into your life.

1        INMATE DAWSON:  Yes, sir, because that was, that

2    would be because of the guys that I'm meeting.

3        DEPUTY COMMISSIONER SELLWOOD:  And you said

4    something that I understood --

5        INMATE DAWSON:  It energizes.

6        DEPUTY COMMISSIONER SELLWOOD:  I understand.

7    You said that I do understand but I want to ask you

8    about it.  As a person listening to you, you talk

9    about accepting Jesus Christ, and you said the words,

10   "And that cured my defects", and you talked about

11   those defects.  One could be - one could question you,

12   "Oh, so now you're the perfect guy because Jesus

13   Christ is in your life.  You don't have to think about

14   it anymore.  It's all just Jesus and you're cured".  I

15   mean one could be cynical when listening to you say

16   that.

17       INMATE DAWSON:  I understand that, sir, no one's

18   perfect.

19       DEPUTY COMMISSIONER SELLWOOD:  Okay.

20       INMATE DAWSON:  It's an ongoing thing.

21       DEPUTY COMMISSIONER SELLWOOD:  So, what is it

22   about --

23       INMATE DAWSON:  Every day - every day judgment.

24       DEPUTY COMMISSIONER SELLWOOD:  So, let me ask

25   you the question.  Are you still as capable of being

26   out of character and doing those other things even

27   though Jesus Christ is in your life, or has he somehow

1  cured that part?

2      INMATE DAWSON:  I would he cured that part, I'm

3  no longer out of character doing things against the

4  law, of breaking the law.

5      DEPUTY COMMISSIONER SELLWOOD:  So, you've

6  learned how to stay within your character?

7      INMATE DAWSON:  Yes, sir, very much so and

8  within the law.

9      DEPUTY COMMISSIONER SELLWOOD:  And you credit to

10  some extent the power and the strength of Jesus Christ

11  helping you do that?

12      INMATE DAWSON:  And my learning and seeing

13  things within here.

14      DEPUTY COMMISSIONER SELLWOOD:  Okay.  I needed

15  to hear you talk a little bit more about that.  I

16  wanted to make --

17      INMATE DAWSON:  Okay.

18      DEPUTY COMMISSIONER SELLWOOD:  -- sure you

19  weren't just saying, "Oh, okay, I accepted Christ so

20  the world's fine now".

21      INMATE DAWSON:  No, sir, the world is not fine.

22  We got Afghanistan, all right, the world is not fine.

23      DEPUTY COMMISSIONER SELLWOOD:  Okay.  Uh, in the

24  past you've been out of character.  You've talked

25  about it.  If you get paroled and you go out into the

26  community what's apt to happen to you is a lot of

27  pressures, a lot of things that you don't expect.