# EXHIBIT I (PART 3)

54

1    Life is going to come at you quickly and sometimes

2    harshly. What are the anchors that you're going to

3    rely upon, that you're going to turn to, that said,

4    "Oh, man, I didn't expect this. Oh, I didn't get that

5    job. Oh, it didn't pay as much as I thought. Oh,

6    these guys want me to do drugs". Whatever it is what

7    are you going to grab onto and hang onto and say,

8    "Okay, I'm all right here while I figure out these

9    other things". Do you have some anchors that you'll

10   hang onto?

11        INMATE DAWSON: Yes, I do.

12        DEPUTY COMMISSIONER SELLWOOD: What are those?

13        INMATE DAWSON: The Lord Jesus Christ and my

14   parents.

15        DEPUTY COMMISSIONER SELLWOOD: Okay.

16        INMATE DAWSON: And my family.

17        DEPUTY COMMISSIONER SELLWOOD: Okay, and --

18        INMATE DAWSON: And my determination and will to

19   get any type of job available. It may not be what I'm

20   skilled at, but as long as I bring some money home to

21   pay the bills, put some food on the table and maintain

22   the taxes on my mother's house, that's what I'm

23   determined to do, sir.

24        DEPUTY COMMISSIONER SELLWOOD: Getting

25   employment as a convicted felon is sometimes hard.

26        INMATE DAWSON: It's going to be hard, but doors

27   are opening. They got programs for us. And if I

1    present myself --

2         DEPUTY COMMISSIONER SELLWOOD:  Do you have any

3    church affiliation?

4         INMATE DAWSON:  Yes, my, my parents' church.

5         DEPUTY COMMISSIONER SELLWOOD:  And so you can

6    go to that church?

7         INMATE DAWSON:  That's where I'll be going.

8         DEPUTY COMMISSIONER SELLWOOD:  Okay, all right.

9    Thank you, Commissioner.

10        PRESIDING COMMISSIONER SHELTON:  Okay.  Mr.

11   Bushling, any questions?

12        DEPUTY DISTRICT ATTORNEY BUSHLING:  I don't have

13   any questions.

14        PRESIDING COMMISSIONER SHELTON:  Ms. Rutledge.

15        ATTORNEY RUTLEDGE:  I just -

16        PRESIDING COMMISSIONER SHELTON:  Do you have any

17   questions?

18        ATTORNEY RUTLEDGE:  Uh, I do.  Excuse me.  Uh,

19   the parole plans that you - the letter that you got

20   from the church from your pastor?

21        INMATE DAWSON:  Yes.

22        ATTORNEY RUTLEDGE:  Have you had contact with

23   him over the years?

24        INMATE DAWSON:  I call him at least once a

25   month.

26        ATTORNEY RUTLEDGE:  And is he a spiritual - do

27   you - he's your spiritual advisor or what's your

1    relationship?

2            INMATE DAWSON:  We went to school together.

3            ATTORNEY RUTLEDGE:  All right.  And –

4            DEPUTY COMMISSIONER SELLWOOD:  I know it's your

5    time, but let me just understand.  Is that person

6    different from the pastor of the church you would go

7    to that your mom goes to?  You talk about going to

8    mom's church.

9            INMATE DAWSON:  Yes.

10           DEPUTY COMMISSIONER SELLWOOD:  Is he the same

11   guy?

12           INMATE DAWSON:  No.

13           DEPUTY COMMISSIONER SELLWOOD:  Or he's

14   different?

15           INMATE DAWSON:  Different guy.

16           DEPUTY COMMISSIONER SELLWOOD:  Thank you.  Thank

17   you.

18           ATTORNEY RUTLEDGE:  All right.  And, uh, when

19   the commissioners asked you, you know, if you had your

20   choice of work which one would you choose and you said

21   the print shop.  Uh, what other – are there other

22   opportunities do you know if Los Angeles where you

23   could work doing – where you could use your skills

24   that you have at PIA here?

25           INMATE DAWSON:  To my knowledge there are bunch

26   of mattress factories off the 91 Freeway that's not

27   too far from my parents' house.  And, uh, according to

1    the book where I got all my potential earnings,

2    there's - there's options open.  So, I have just to

3    hit the bricks and put in my resumes.  But as I said

4    in the meantime, I will be - I learned how to drive a

5    truck, so it's not like I'm just going out there and

6    doing nothing.

7         ATTORNEY RUTLEDGE:  And, uh, you've worked, uh,

8    at the prison.  Have you worked with a pay number?

9         INMATE DAWSON:  Yes, I always had a pay number.

10        ATTORNEY RUTLEDGE:  And were you expected to

11   work so many hours a day?

12        INMATE DAWSON:  Ten hours a day.

13        ATTORNEY RUTLEDGE:  Ten, okay.  And so you were,

14   uh, held to the standards of a - were you held to the

15   same standards that a boss would hold an employee to?

16        INMATE DAWSON:  Yes.

17        ATTORNEY RUTLEDGE:  All right.

18        INMATE DAWSON:  The production level has to be -

19   they want 85 percent.  At the time right now I'm doing

20   53, that's roughly 600 pieces of work, 600 pieces of

21   (indiscernible)

22        ATTORNEY RUTLEDGE:  And how many years were you

23   - were you - weren't you foreman?

24        INMATE DAWSON:  Yes, at the time I was, uh, in

25   the mattress factory, and for 12 years I was lead man.

26        ATTORNEY RUTLEDGE:  All right.

27        INMATE DAWSON:  I was, uh, I was in charge of 22

58

1    inmates making sure they pick up the (indiscernible),

2    make sure they supply and everything.

3           ATTORNEY RUTLEDGE:  Now, since you got that 115

4    in 2002, have you - do you have visiting privileges?

5           INMATE DAWSON:  Yes.

6           ATTORNEY RUTLEDGE:  And --

7           INMATE DAWSON:  I just had a 30-day loss of

8    privilege.

9           ATTORNEY RUTLEDGE:  All right.  So, have you,

10   uh, been able to, uh, visit with your wife and other

11   people without incident?

12          INMATE DAWSON:  Yes.

13          ATTORNEY RUTLEDGE:  So, right now your visiting

14   is - is it back to normal?

15          INMATE DAWSON:  Yes, that was like a ultimatum

16   to keep my marriage.

17          ATTORNEY RUTLEDGE:  Okay.

18          PRESIDING COMMISSIONER SHELTON:  I'm sure your

19   wife understood.

20          INMATE DAWSON:  Well, she's been mad because I

21   got a 115.

22          PRESIDING COMMISSIONER SHELTON:  Uh-huh.

23          INMATE DAWSON:  She knew what was going to

24   happen with the Board.

25          PRESIDING COMMISSIONER SHELTON:  Yeah.

26          INMATE DAWSON:  Because I told her about it.

27          PRESIDING COMMISSIONER SHELTON:  I'm sure when

1  you talk to her she'll go --

2       INMATE DAWSON:  I try to --

3       PRESIDING COMMISSIONER SHELTON:  -- "so what did

4  they say?"

5       INMATE DAWSON:  -- pride myself on keeping out --

6  keeping away from the 115s, staying out of trouble.

7       DEPUTY COMMISSIONER SELLWOOD:  You've done a

8  fairly good job.

9       ATTORNEY RUTLEDGE:  No further questions for --

10       PRESIDING COMMISSIONER SHELTON:  Okay.

11       ATTORNEY RUTLEDGE:  -- Mr. Dawson.

12       PRESIDING COMMISSIONER SHELTON:  We're going to

13  go into closing statements, sir.  And what that means

14  is that Mr. Bushling will go first, followed by your

15  attorney, and then you will have an opportunity to

16  make a closing statement.  Mr. Bushling.

17       DEPUTY DISTRICT ATTORNEY BUSHLING:  Thank you,

18  I'll be, uh, very brief.  Uh, the D.A.'s Office is

19  opposed, uh, a finding of suitability at the time,

20  this time based on the facts of the crime, or rather

21  crimes I should say.  These were two separate

22  incidents, uh, that occurred over a period of a month,

23  February 29th and January 30th.  In the first incident,

24  uh, the co-defendant actually pulled the trigger -- or

25  rather, uh, cocked the gun, uh, and we got that from

26  the facts that the Board adopted.  So, the inmate knew

27  the danger that was, uh, uh, his conduct subjected

60

1   others to. Uh, so just based on the horrendous of the

2   crimes, the people are opposed. Also, uh, and the

3   Board may disagree with me on this, but I was under

4   the impression listening to the inmate speak of his,

5   uh, remorse, that his remorse was more centered on

6   himself than it was on the victims that were involved.

7   Uh, he, he just tended to dwell what it's done to him,

8   even though he did say (indiscernible) things about

9   the impact it had on the victims. But most of it

10   seemed to be, uh, on what this had done to him. So, I

11   think he needs some more insight at this time, and

12   those are the reasons.

13         PRESIDING COMMISSIONER SHELTON: I would ask a

14   favor of you, Mr. Bushling. We, we had done some

15   research prior to starting this hearing. Could you

16   give us a brief time frame of the fact that - I think

17   originally Mr. Dawson was given, uh, life without

18   parole. And there's - since there was confusion, I

19   want to state on the record that that did get

20   overturned. And I would just - he's going to address

21   that right now.

22         DEPUTY DISTRICT ATTORNEY BUSHLING: Yes, in

23   fact, uh -

24         PRESIDING COMMISSIONER SHELTON: Because it took

25   us a while to do some homework, and I'd like to save

26   any future homework.

27         DEPUTY DISTRICT ATTORNEY BUSHLING: Uh, actually

61

1     looking at the Initial Parole Consideration Hearing,

2     April 2003 Calendar, uh, at the bottom of Section One,

3     of your life crime, uh, there's an explanation laid

4     out here that's pretty good.

5          PRESIDING COMMISSIONER SHELTON:  Good.

6          DEPUTY DISTRICT ATTORNEY BUSHLING:  Uh, if you

7     would you like me to read it I can?

8          PRESIDING COMMISSIONER SHELTON:  Why don't you

9     just to –

10         DEPUTY DISTRICT ATTORNEY BUSHLING:  Okay.

11         PRESIDING COMMISSIONER SHELTON:   -- carry it

12    forward.

13         DEPUTY DISTRICT ATTORNEY BUSHLING: "On April

14              24, 1981, the trial court denied Dawson's

15              motion for a new trial but did strike the

16              special circumstance finding on the murder

17              count in sentencing the 38 years to life, 25

18              to life plus 13 years.  As a result of a

19              remitter from the Second Appellate District

20              Court of Appeals, directing the Los Angeles

21              Superior Court to either impose the life

22              possibility of parole under Count 12, or to

23              strike the special circumstance, it was

24              found to be true by the jury that the trial

25              court acted on December 13th, 1984 to modify

26              the original sentence to impose the term of

27              life without possibility of parole on Count

1        12.  Responding to a second remitter from

2        the Court of Appeals, the Los Angeles County

3        Superior Court acted on November 24, 1986 to

4        strike the special circumstance allegation

5        and re-sentence Dawson to the original term

6        of 25 to life plus 13 years".

7     PRESIDING COMMISSIONER SHELTON:  Thank you very

8  much, I appreciate that.  It's a good summation of

9  what we walked through.  All right, Ms. Rutledge, do

10  you have a closing statement?

11     ATTORNEY RUTLEDGE:  Yes, thank you.  While Mr.

12  Dawson, uh, today has taken responsibility for his

13  behavior in, uh, the commitment offense and the other

14  offenses for which he was convicted, uh, according to

15  the psyche reports, beginning with the most recent one

16  which is 2003, he, uh, the, the psychiatrist writes

17  that he has, uh, uh, he regrets – well, uh, he, he –

18  that the co-defendant was an old friend of his.  And,

19  uh, even though he was in a good life position, uh, he

20  went with them do something that was wrong.  And, he

21  describes the motives he had as greed, uh, stupidity

22  and ignorance.  Uh, and he told the psychologist that

23  he never had any intention of harming anyone, uh, and

24  that he no longer puts most of the blame on his

25  partner for influencing him.  Uh, but says that he

26  takes full responsibility for breaking the law and

27  committing robberies.  He was sentenced to 38 years to

1   life.  At this time he has now served 25 years.  And

2   in those 25 years, he has, uh, make good on his part

3   of the deal that if he wants an opportunity for

4   parole, he's got - he has to, uh, show society and the

5   parole board that, uh, he's suitable to be back on the

6   outside.  He has served the amount of years that are

7   required to meet that at this time.  And he may have

8   had this 115 in 2004, but that's in the many - over

9   two decades that he's been locked up.  He's had two

10  115s, and he explained what happened with the first

11  one, which you - Uh, and also during that time, he's

12  not only - he worked as a foreman for 12 years, in

13  charge other inmates.  Uh, and then here he was very

14  active with the - they had to get - finally get him

15  out of graphics because he had been in there too long,

16  and others would have an opportunity.  Uh, but that's

17  surely what he's most interested in but not allowed to

18  do that at this time.  He, uh, has done other things

19  to show the Board that he's suitable including impact

20  and getting his GED.  And he did complete anger

21  management uh, and has received certificates, uh, in

22  other areas of self-help including.  Uh, and he, and

23  he also has participated in basketball, and just done

24  a lot of things to I think keep his end of the bargain

25  as far as, uh, paying the price for what he did.  I

26  would note, too, that, uh, as the court - the, the

27  reason why he got the 38 to life was the court felt

1    that his role in the offense — and I'm quote — I'm

2    referring to the sentencing transcripts – that the

3    trial judge felt that due to his role in the crime

4    that, uh, life without the possibility of parole was

5    not appropriate. And but he still gave him, uh, you

6    know, an otherwise appropriate sentence he felt was,

7    uh, otherwise appropriate. So, I know that the Board

8    has to consider his individual culpability for the

9    offense, and I think that's been addressed here today.

10    Uh, he does not pose an unreasonable risk to society.

11    Uh, and on top of that he has marketable skills. He

12    has a job offer. He's got family support. He's

13    married to a woman that he's known since high school,

14    uh, continues contact with his family, uh, continues

15    to do well. Uh, and he tells the Board today that it

16    was an aberration for him. And I believe that looking

17    at his record in prison. Uh, and he's take – he takes

18    this process very seriously. He's clearly a man who's

19    not just – he isn't here to, you know, give the Board

20    some kind of line. And he doesn't think of this just

21    as some formality. He takes – he's done everything he

22    can do to show the Board. But I can tell by his

23    emotional state that, uh, he respects the seriousness

24    of this proceeding. So, all those things considered

25    and his age, I would ask that the Board, uh, grant him

26    a parole date today. Thank you.

27          PRESIDING COMMISSIONER SHELTON: Thank you. Mr.

1    Dawson, would you like to make a closing statement?

2    INMATE DAWSON:  Yes, I would.  I would like to,

3    uh, say something pertaining to what the District

4    Attorney said.

5    PRESIDING COMMISSIONER SHELTON:  Actually what

6    you need to keep your comments to is telling us why

7    you think you're suitable for parole.

8    INMATE DAWSON:  I deserve a second chance

9    because, uh, as I said I was out of my character.  I

10   take full responsibility for my actions.  I had no

11   right, no business walking in somebody's place of

12   business with a loaded weapon scaring their employees

13   and taking money.  If there's anyway possible I can

14   apologize to each and every one of those people I

15   scared, I would.  I couldn't hurt nobody like that

16   unless, unless my life was in danger, or if I was

17   defending my country.  This is just something I have

18   to live with for the rest of my life.  Somebody lost

19   their life by my careless, stupid act for going along

20   and committing a robbery.  I wish somewhere - I wish

21   there were - I could change it but I can't.  And I

22   wish I can somehow make up for it.  I learned my

23   lesson.  As I said I have straightened myself out.  I

24   know what I really needed in my life.  I got trades.

25   I got marketable skills where, you know - I'm

26   determined to be a upstanding citizen.  I just pray

27   that this panel will give me a second chance.  I

1    didn't actually shoot nobody but, uh, I'm responsible

2    because I participated in that robbery.  I wish I

3    would have seen what would happen, what was going on

4    but I didn't see it happen.  I didn't know it happened

5    until I got charged with it.  I just myself involved

6    with wrong people, and that's something that will

7    never happen again.  I'm older, wiser, and I'm focused

8    on trying to have an upstanding life.

9          PRESIDING COMMISSIONER SHELTON:  Okay.

10         INMATE DAWSON:  Thank you.

11        DEPUTY COMMISSIONER SELLWOOD:  You're welcome,

12    sir.  Let's recess for deliberations.  It's a few

13    minutes after 3:00 p.m.

14                 R E C E S S

15                   --o0o--

16

17

18

19

20

21

22

23

24

25

26

27

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                      D E C I S I O N

3          DEPUTY COMMISSIONER SELLWOOD:  We are on the

4    record.

5          PRESIDING COMMISSIONER SHELTON:  All right.  We

6    are back in the matter of, uh, the Subsequent Parole

7    Consideration Hearing for Darryl Dawson, D-A-W-S-O-N,

8    CDC Number C-30679.  Everyone has returned to the room

9    that was here during the hearing.  Mr. Dawson, the

10   panel has reviewed all the information received, and

11   we've relied on the following circumstances in

12   concluding that you are not yet suitable for parole.

13   I realize that's not what you want to hear, and we'll

14   go there in a second.  And you would pose an

15   unreasonable risk of danger to society or a threat to

16   public safety if released.  This if your, uh, first

17   subsequent hearing, is it not?

18         INMATE DAWSON:  Yes.

19         PRESIDING COMMISSIONER SHELTON:  Okay.  And you

20   had an initial hearing where you got a three-year

21   denial.

22         INMATE DAWSON:  Yes.

23         PRESIDING COMMISSIONER SHELTON:  I want you to

24   understand this process.  You could have gotten a

25   five-year denial on your initial hearing, so you are

26   doing something right.  You want the numbers to go

27   D. DAWSON C-30679    DECISION PAGE 1  10/04/06

1    down, you don't want them to go up.  So, you got a

2    three last year.  You're getting a two-year denial

3    this year, and that's because you're doing well.  Does

4    that make sense to you?

5         INMATE DAWSON:  Yes.

6         PRESIDING COMMISSIONER SHELTON:  Oh, that was a

7    hard yes, wasn't it?  You have some work to do, sir.

8    And we're going to tell you specifically what we need

9    you to work on, but we think you're moving in right

10   direction.  And we think you are most likely going to

11   earn a parole date some day if you keep doing what

12   you're doing, okay.  First of all, we have to talk

13   about the commitment offense.  Do you remember how

14   many victims there were, sir?

15        INMATE DAWSON:  No.

16        PRESIDING COMMISSIONER SHELTON:  You should,

17   that's part of the problem.  This commitment offense

18   was disastrous.  It was awful, somebody died.

19        INMATE DAWSON:  Yes, I understand that.

20        PRESIDING COMMISSIONER SHELTON:  And you

21   mentioned the name of the person that died, so I'm

22   glad you know that.  You should know how many other

23   victims there were.  You have 12 counts of robbery.

24   You have at least 12 victims.

25        INMATE DAWSON:  Yes, ma'am.

26        PRESIDING COMMISSIONER SHELTON:  And you talked

27   D. DAWSON C-30679    DECISION PAGE 2   10/04/06

1    a little bit with us about how that in the class that

2    you took, which was the impact class, how you learned

3    about victims.  You need to know your victims, at

4    least how many there were.  The offense was carried

5    out in an especially cruel and callous manner,

6    multiple victims were attacked and one was killed.

7    And this was in more than one incident.  There are

8    three separate crimes committed here.  Three separate

9    acts of violence.  The offense was carried out in a

10   dispassionate and calculated manner that showed

11   exceptionally callous disregard for human suffering.

12   And for the loss of life and at least 12 other victims

13   that suffered there was something like 33 hundred

14   dollars.  Did you get any of that money?

15        INMATE DAWSON:  The Sheriff took it back.

16        PRESIDING COMMISSIONER SHELTON:  Were you going

17   to get half?

18        INMATE DAWSON:  Excuse me?

19        PRESIDING COMMISSIONER SHELTON:  Were you going

20   to get half of that?

21        INMATE DAWSON:  Yes.

22        PRESIDING COMMISSIONER SHELTON:  So, you're

23   looking at 16-17 hundred dollars to pay for the loss

24   of human life and not to mention your own.

25        INMATE DAWSON:  Yes.

26        PRESIDING COMMISSIONER SHELTON:  So, you need to

27   D. DAWSON C-30679    DECISION PAGE 3    10/04/06

1    understand that, sir.

2          INMATE DAWSON:   I do.

3          PRESIDING COMMISSIONER SHELTON:   Good.   These

4    conclusions are drawn from the statement of facts that

5    came from the April 2003 Board Report, and we

6    incorporated that already into the record, so I will

7    not repeat it.   With regards to a prior record, uh,

8    Mr. Dawson had no juvenile record which is good.   He

9    has, uh, three, uh, incidents of arrests, uh, as an

10   adult.   And I would say the most serious of the three,

11   uh, were, was the driving under the influence of

12   alcohol.   So, with regards to that it's to your

13   benefit that you do not have a record of violence or

14   assault in your background.   So, you're doing the

15   things that you need to be doing.   With regards to

16   institutional behavior, you've received a total of two

17   115s, the last being in 2002.   You've received one

18   128, the last being in - the only one being in 1985.

19   I will go into your positive attributes here in a

20   minute.   But I do want to indicate that we both feel

21   that you have programmed in a limited manner.   It

22   hasn't been much in the way of self-help, uh, during

23   the course of your time.   You got your, uh, vocation

24   early on, haven't upgraded that in any way.   You got

25   your GED early on and, uh, haven't upgraded that in

26   any way.   You're a good worker, which I'll get into in

27   D. DAWSON C-30679     DECISION PAGE 4     10/04/06

1    a second.  Uh, and our concern, too, is that you need

2    to concentrate on some more self-help programs, which

3    I'll be more specific about, but with regards to

4    substance abuse issues.  Because you by your own

5    admission and the records indicated you had a serious

6    drug and alcohol problem early on.  I don't see

7    anywhere as of late where you've – you need to

8    consistently participate in something like AA or a

9    substance abuse program of your choice.  And again

10   I'll summarize that shortly.  Your psychological

11   evaluation is fairly positive.  Uh, I don't remember

12   hearing, uh, a GAF Score, but we're going to request a

13   new psychiatric evaluation be done prior to your next

14   hearing, so all that information for your next hearing

15   is current.  And so that when you get to your next

16   hearing the Commissioners don't go, "Oh, we need a new

17   psyche eval".  So, that will be brought up to date for

18   you and with you, okay.  Your parole plans are pretty

19   good.  Uh, I would suggest doing a few things, uh, to

20   bring them even better and stronger.  Uh, first of all

21   make sure that your support letters are updated at the

22   time of your next hearing, you know, get new letters.

23   You mentioned something yourself.  I think you need to

24   start working on a resume right now.  You have learned

25   a variety of skills and have developed a variety of

26   talent since you've been in here, put them down on

27   D. DAWSON C-30679    DECISION PAGE 5  10/04/06

72

1   paper as a form of a resume, bring that to your next

2   Board hearing.  As well as when you develop a resume

3   start sending them out.  Your wife said she had lots

4   of contacts, start sending that resume out and seeing

5   what kind of response you get.  I worked with an

6   inmate, I think it was last week, who had three

7   different resumes.  He developed each one around the

8   specific vocation that he had and he sent them out.

9   So, you can start working on that.  The other thing,

10  uh, I would suggest, you might want to find – this had

11  something to do with the question that Commissioner

12  Sellwood asked you, about what your support systems

13  would be if you got out there and the world turned

14  upside down.  You can get a sponsor like AA or NA or

15  something equivalent before you get out of here that

16  would help bridge that gap for you.

17          INMATE DAWSON:  Wouldn't that be in the lines if

18  I still had an ongoing problem with drugs and alcohol?

19          PRESIDING COMMISSIONER SHELTON:  Sir, let me

20  tell you this,  Because it's all in your record, and

21  the fact that you were doing drugs on a daily basis

22  and the seriousness of your offense, I would recommend

23  that that would be in your best interest to pursue

24  that activity for at least as long as you're on parole

25  if not longer.

26          INMATE DAWSON: – Even though it was something

27  D. DAWSON C-30679    DECISION PAGE 6   10/04/06

1    that happened 26 years ago?

2         PRESIDING COMMISSIONER SHELTON:  Yes, sir.

3         INMATE DAWSON: Okay.

4         PRESIDING COMMISSIONER SHELTON:  And the reason

5    the say - let me give you an example.  And this is a

6    true story because it involves my brother.  He stopped

7    drinking for like over 20 years, and about six months

8    ago he started again because he quit going to AA and

9    NA.  The support system is there whether you need it

10   for drinking or whether you need it because you didn't

11   get the job you wanted.   Sponsors is not just dealing

12   with alcoholism or drug addiction, it's also dealing

13   with personal problems.  There are friends that's not

14   as close as a wife or family but kind of be distance,

15   and maybe give you unemotional advice.

16        INMATE DAWSON: I understand.

17        PRESIDING COMMISSIONER SHELTON:  You follow?

18        INMATE DAWSON: Yes, I do.

19        PRESIDING COMMISSIONER SHELTON:  So, it's like

20   having a buddy back there saying, "God, you know, my

21   world's caving in".  They can look, stand back outside

22   the picture and look in at you, be a support system

23   for you no matter the issue.  Does that make sense?

24        INMATE DAWSON:  Yes, ma'am.

25        PRESIDING COMMISSIONER SHELTON:  Okay.  With

26   regards to the 3042 Notices we send out, uh, that's

27   D. DAWSON C-30679    DECISION PAGE 7  10/04/06

—                          —

74

1    why the District Attorney is here from Los Angeles

2    County. And he, uh - those letters get sent out to

3    agencies that might have an interest in your case.

4    And we didn't get any responses other than that. And

5    as you indicate - as you know he indicated he's in

6    opposition to your parole at this time. I do want put

7    on your record the things you've been doing well,

8    because you are so on the right track, okay. You did

9    get your GED. Your disciplinary record's fairly good.

10   Uh, you have, uh, worked in vocation print shop. You

11   got moved out of that, not by your fault just that it

12   was time because you've been there a long time. You

13   have your vocation in graphic arts. You have, uh,

14   work - spent time working in the Cen - with the

15   Central Lunch Box Crew. And now current you are in

16   PIA Textiles. You've recently participated in a Cal-

17   Osha Training. You participated in an impact program

18   which involves 13 two-hour sessions. And I understand

19   it's an intense program. And most of the inmates I

20   talk to really, really like it, and you did that in

21   2004. Uh, so, with that standing I want to, uh,

22   indicate that in a separate decision the hearing panel

23   finds that it's not reasonable to expect that parole

24   would be granted at a hearing during the following two

25   years. And to specifics reasons we have talked about

26   and I will summarize. One, we talked about the

27   D. DAWSON C-30679    DECISION PAGE 8  10/04/06

75

1    summary of the offense and, you know, you indicated on

2    several occasions that you were out of character

3    there.  And the Commissioner also tried to talk with

4    you about what out of character meant, how often were

5    you going to go in and out of character.  Spend a

6    little bit more time dealing with those circumstances

7    so you have - you're more grounded.  Uh, I applaud you

8    your faith in Jesus Christ and those philosophies that

9    you follow.  But I want to see you more well-rounded

10   in terms of the whole real world picture, and that you

11   have as many tools to support yourself as possible.

12   Because it's a different world than when you came in

13   here, and we so much want for your success.

14        INMATE DAWSON:  Yes, I understand.  You got

15   people flying planes into the building and

16   restaurants, it's crazy out there.

17        PRESIDING COMMISSIONER SHELTON:  It is, sir.

18   And there's a part of me I think that thinks you're a

19   tidbit naïve about the rest of the real world.  And I

20   want you to be strong person to deal with those

21   realities.

22        INMATE DAWSON:  I just wish I would have stayed

23   in the Army where I could probably be a leader or a

24   commander, uh, of a combat unit over there, take care

25   of business, but that's the mistake I made by not

26   staying in the Army.

27   D. DAWSON C-30679    DECISION PAGE 9   10/04/06

1          PRESIDING COMMISSIONER SHELTON:  As I was saying

2     we probably need to work on some insight.  And you

3     know, it's, uh, one of the things and based on the

4     statement that you made, I appreciate what you say.

5     And you've talked about defending the country before.

6     You can't always fight all the ills of the world, so

7     you have to find ways to deal with you and taking care

8     of your family.

9          INMATE DAWSON:  Yes.

10          PRESIDING COMMISSIONER SHELTON:  My concern is

11     is that you can't go fight those battles anymore.

12     You've got to take care of you, and that has to be in

13     a peaceful way.

14          INMATE DAWSON:  Exactly.

15          PRESIDING COMMISSIONER SHELTON:  All right.  Uh,

16     with regards to what else we talked about, uh, let's

17     just do a review of what we're wanting for you.  You

18     know, we want you to develop a greater insight into

19     the offense as we talked about.  We want you to

20     participate in as many self-help programs as you can,

21     especially those having to do with substance abuse.  I

22     would also suggest relationship building.  I know that

23     some classes are available or even books on – you

24     know, when you do get back home with your wife there's

25     going to be a different world.  And, you know, she's

26     going to have make room for your toothbrush, so to

27     D. DAWSON C-30679    DECISION PAGE 10    10/04/06

77

1  speak, and there's going to be differences of how you

2  guys might want to do things.  So, there are books

3  that you could read and do book reports and present to

4  your Board next time about what you've learned about

5  developing or strengthening interpersonal

6  relationships, uh, insight, uh, strengthening your

7  resolve to not participate in substance abuse and

8  alcohol, uh, hookup with something here in the

9  institution like AA or NA and something similar, stay

10  with it consistently.  We talked about, uh, you will

11  also have to distance yourself from that 115 that you

12  got.  We're going to request that you get a new

13  psychological evaluation that will be - we've already

14  put the paperwork in for that.  And I would also

15  suggest as part of your parole plans since you do have

16  a lot of skills and talents, something like you did

17  with -- you know you spelled out how much money you

18  might make doing different types of jobs, start

19  playing with developing a resume.

20      INMATE DAWSON:  Referring to the 115, you said

21  distance myself with, that was a non-violent one.  But

22  I know it's a rule violation.  I understand all that.

23      PRESIDING COMMISSIONER SHELTON:  Good, I'm glad

24  you do.  Thank you.  Commissioner, do you have

25  anything to add at this point?

26      DEPUTY COMMISSIONER SELLWOOD:  No, I think

27  D. DAWSON C-30679    DECISION PAGE 11  10/04/06

78

1    you've addressed the thoughts that I had.  Thank you.

2         PRESIDING COMMISSIONER SHELTON:  Okay.  Sir, we

3    wish you all the luck in the world.  You're moving in

4    the right direction.

5         INMATE DAWSON:  Thank you.

6         DEPUTY COMMISSIONER SELLWOOD:  Good luck to you,

7    sir.

8         PRESIDING COMMISSIONER SHELTON:  Good luck to

9    you.  That concludes this hearing at about 3:40 p.m.

10                      --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED TWO YEARS

24   THIS DECISION WILL BE FINAL ON:___FEB 0 2 2007___

25   YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   D. DAWSON C-30679    DECISION PAGE 12   10/04/06

## CERTIFICATE AND DECLARATION

## OF TRANSCRIBER

I, TAMA BRISBANE, the owner of House of
Scribes, have designated TONI ANDERSON, a duly
designated transcriber with House of Scribes residing
in the State of California, to prepare the foregoing
transcript.  With my signature I do hereby declare and
certify, under penalty of perjury, that I have
directed her to transcribe audio video(s) that total
one in number and cover a total of 81 pages.  The
recording was duly recorded at CALIFORNIA DEPARTMENT
OF CORRECTIONS, CORRECTIONAL TRAINING FACILITY,
SOLEDAD, and the foregoing pages constitute a true,
complete and accurate transcription of the
aforementioned tape to the best of her ability.

I hereby certify that House of Scribes and
its designated transcribers are disinterested parties
in the above-captioned matter and have no interest in
the outcome of the proceeding.

Dated January 19, 2007 in Stockton,
California.


_Tama Brisbane_____

Owner, House of Scribes

# EXHIBIT B
## (Psychological Evaluation)

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
APRIL 2003 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MARCH 21, 2003

This is the fourth psychological evaluation for the Board of Prison Terms on inmate Darryl Dawson, CDC# C-30679. This report is the product of a personal interview, conducted on 03/21/03, as well as a review of his Central file and unit health record. This single contact interview was for the express purpose of preparing this report.

The inmate was informed of the nature and the purpose of the interview, and the lack of confidentiality inherent in the present assessment. He was also informed that a report for the Board of Prison Terms would be prepared. He understood this and agreed to participate.

### PSYCHOSOCIAL ASSESSMENT

**I.    IDENTIFYING INFORMATION:**

Inmate Dawson is a 47-year-old, married, African-American male. His stated religious affiliation is Christian (does not attend services, but reads the Bible, and prays at bedtime). No unusual physical characteristics were noted, and he denied the use of any nicknames or aliases.

**II.   DEVELOPMENTAL HISTORY:**

Inmate Dawson was the third of three children, having two older sisters. He was raised by both parents.

He stated there were no prenatal or perinatal concerns or birth defects. He had no abnormalities of developmental milestones. All speech, language and motor development occurred unremarkably. He denied any history of cruelty to animals, enuresis or acts of arson. He stated he had no significant childhood medical history, and denied a childhood history of physical or sexual abuse as either a perpetrator or a victim.

**III.  EDUCATIONAL HISTORY:**

Inmate Dawson dropped out of high school in the 12th grade to "work and run the streets."

**IV.   FAMILY HISTORY:**

Inmate Dawson was born and raised in Los Angeles. His father works for the Uniroyal Tire Company. He died in January 2002. His mother is still living in the same house, and formerly worked as a presser in a linen supply company. He has frequent contact with his mother, and with one of his sisters.

DAWSON         C-30679         CTF-CENTRAL         03/21/03         gmj

DAWSON, DARRYL
CDC NUMBER: C-30679
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

When inmate Dawson was 20 years old, his mother sent him to Texas to get him away from peers who had unacceptable conduct, according to her. The inmate commented upon this, and said that he was associating with "the bad elements in the streets."

## V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Dawson is a heterosexual male. He denied any history of high-risk sexual behavior or sexual aggression, either prior to or since incarceration.

## VI.    MARITAL HISTORY:

Inmate Dawson first married Yvette in the mid-1970s, and they had one son, Terrell, who is now age 28, and a correctional officer at CIM. Since his son is a correctional officer, his contact has been very restricted, but he did talk to him on the phone after his father died.

During his incarceration, he married Dawn from 1990 to 1994, and they had one daughter, Michelle, who is now age ten, with whom he exchanges cards.

Currently, inmate Dawson is married to Janice, in 1995, who was his high school sweetheart.

## VII.    MILITARY HISTORY:

Inmate Dawson was in the National Guard until 1977. He had an honorable discharge, but was frequently AWOL. Asked about this, he said that he had difficulty getting transportation, then agreed that this was a weak excuse.

## VIII.    EMPLOYMENT/INCOME HISTORY:

Inmate Dawson has worked as a gas station attendant, as a security guard, as a waiter, as a janitor, and as a bus boy. The last job he had at the time of his arrest was as a parking lot attendant.

Since his incarceration, he has worked as a clerk at several jobs, then worked in a mattress factory for 12 years. He is currently a press operator in the print shop. He has completed vocational graphics.

## IX.    SUBSTANCE ABUSE HISTORY:

Inmate Dawson smoked marijuana and PCP for several years, until about the age of 20. From the age of 21 on, he used cocaine on and off. He also drank alcohol occasionally. He has been attending Alcoholics Anonymous and Narcotics Anonymous.

DAWSON, DARRYL
CDC NUMBER:  C-30679
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Dawson was a participant in the CCCMS program until 12/20/97.  He was depressed at the time, was evaluated as "not a sociopath," and was prescribed Vistaril for sleep.  The inmate said about this, "I wasn't seeing my people enough. I was stressed out from moving from cell living to dorm living, where it was very noisy, and I couldn't sleep."

Inmate Dawson's only medical problem is hemorrhoids, for which he takes the following medications:  Anusol, another ointment, plus Fibercon.  In 09/90, he had a cyst removed from his left wrist.  He has had no medical or psychiatric hospitalizations, and has had no serious accidents or head injuries.  He has had no history of suicidal ideation or suicide attempts.  He has had no seizures or other neurological conditions.  He has had no history of disabilities or significant impairments.

XI.    PLANS IF GRANTED RELEASE:

Should inmate Dawson be given a parole date, he states that he would live with his wife in Los Angeles County, and would work in the print division of the L. A. Times, or he would work in any major mattress factory.

CLINICAL ASSESSMENT

XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Dawson appears to be his stated age of 47.  He was appropriately dressed and groomed.  He was coherent, cooperative, calm and alert throughout the interview.  His speech was clear and readily understandable.  His flow of thought and affect were within the normal range.  There were no hallucinations or delusions noted.  He was fully oriented.  His intellectual functioning was estimated to be within the average range.  His attention and concentration were adequate for the purposes of this examination.  There was no evidence of a mood or thought disorder.  His insight and judgment appeared to be intact.  He showed good insight into his commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:    Polysubstance Abuse, in institutional remission.
AXIS II:   No Contributory Personality Disorder.
AXIS III:  Chronic hemorrhoids.
AXIS IV:   Incarceration.
AXIS V:    GAF = 80.

DAWSON, DARRYL
CDC NUMBER:  C-30679
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

Should this inmate at this time be given a parole or release date, his prognosis for maintaining his present gains in the community is excellent.

## XIII.  REVIEW OF LIFE CRIME:

Inmate Dawson described the circumstances surrounding his commitment offense. He stated that his life was very comfortable at the time, and he had no real need for extra money. He was living with his mother and one of his girlfriends. He had a job as a parking lot attendant, with promise of a promotion coming very soon. He regrets that he did not sign up to enlist in the Army after his National Guard period, and he regrets not marrying his present wife sooner.

Inmate Dawson told of returning to Los Angeles, and meeting an old friend of his (his partner, Kenneth Jordan), who had just been released from prison for armed robbery, and who asked him if he had ever had thoughts of committing a robbery. He said he went along with it out of "curiosity." "My biggest mistake was going along with something when it was wrong." He said that what he did was "from greed, stupidity, and ignorance."

Inmate Dawson explained that he and his partner robbed three places during a two day period: a market, a Jack 'N the Box, and another market. He said his partner told him all he needed to do was show the cashier that he had a weapon, and to take the money. He denies ever pointing his loaded revolver directly at anyone or threatening to shoot unless they gave the money. He explained that, in one store, he did not hear any shots because it was very crowded, and there was music playing. His partner was outside the store, around the corner, and shot the security guard, who was trying to make a phone call at a pay phone. He said he heard later that a security guard was shot to death by his partner.

Inmate Dawson said he never had any intention of harming anyone, and said, "I couldn't see killing anybody, except for my country, or to defend my life---that's how I was raised." The inmate no longer puts most of the blame on his partner for "influencing me too much, or putting to much peer pressure" on him, but said, "I take full responsibility for breaking the law and committing robberies."

## XIV.  ASSESSMENT OF DANGEROUSNESS:

A. This inmate has received only two CDC-115 violations during his entire incarceration of 23 years: one in 10/82 for a physical altercation with a cellmate, and on 01/12/02 for sexual behavior in violation of the rules with a female visitor. Therefore, it is felt that he would pose a less than average risk for violence when compared to this Level II inmate population.

B. If released to the community, his violence potential is estimated to be no higher than the average citizen in the community. This is based on the following considerations:

DAWSON          C-30679          CTF-CENTRAL          03/21/03          gmj

DAWSON, DARRYL
CDC NUMBER: C-30679
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

The lack of arrests for violent behavior prior to his conviction, and his lack of
violent behavior since his incarceration (excepting the physical altercation
with a cellmate many years ago). Although he was not the shooter in the
particular crime for which he was convicted, he was using a loaded weapon to
commit robberies, but he did not actually hurt anyone. He accepts full
responsibility for his actions, and their consequences. And he is to be
commended for improving his understanding by accepting full responsibility,
and no longer trying to shift responsibility (to the influence of his crime
partner), as he has in past psychological evaluations.

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

A.  This inmate is competent and responsible for his behavior. He has the
capacity to abide by institutional standards and has generally done so during
his incarceration period.

B.  This inmate does not have a mental health disorder which would necessitate
treatment, either during his incarceration period or following parole.

C.  As this inmate denies having a problem with alcohol or drug abuse, no
recommendations are made in this area.

*William Gamard, Ph.D*

WILLIAM GAMARD, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

*Burt Zika, Ph.D.*

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

WG/gmj

D:  03/21/03
T:  03/25/03

DAWSON          C-30679          CTF-CENTRAL          03/21/03          gmj

# EXHIBIT C
# (Life Prisoner Evaluation Report)

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

DAWSON, DARRYL                                                C30679

I.      COMMITMENT FACTORS:

   A.      Life Crime: Murder 1st, Armed with a Firearm [187 and 12022(a) PC], Count
           12, and 13 counts of Robbery with Use of Firearm (211 and 12022.5 PC), Los
           Angeles County case number A-357550. Victim: Dwight Cousins, age unknown.
           Received in CDC on 5/22/81. Sentenced to 25 years to Life on the Murder plus
           one year for Being Armed with a Firearm and 12 years on the 12 counts of
           Robbery, for a total term of 25 years to Life plus 13 years. Life term started
           9/30/87. MEPD: 5/31/04.

      1.      Summary of Crime: Darryl Dawson and his crime partner, Kenneth
              Lamart Jordan, participated in three Los Angeles area robberies: a Jack-in-
              the-Box at 4069 Century Boulevard in Inglewood on January 30, 1980
              (two victims), at McCoy's Market at 10905 South Atlantic Boulevard in
              Lynwood on February 29, 1980 (five victims) and at a Boy's Market at
              3670 Crenshaw Boulevard also on February 29, 1980 (six victims).

              At about 10:40 p.m. on January 30, 1980, T. Jackson, the assistant
              manager of the Jack-in-the-Box on Century Boulevard, noticed the cashier
              give something through the drive-up window to a man later identified as
              Dawson. When Jackson complained, Dawson pointed a handgun at him.
              Jackson ducked behind a grill, whereupon a man later identified as Jordan
              told Jackson to come out or there would be shooting. At gunpoint, Jordan
              ordered Jackson to have another employee admit Dawson through the back
              door. Dawson walked Jackson to the front of the restaurant, where Jordan
              ordered Jackson to open the safe. As Jackson reached for his wallet to
              obtain the safe combination, Jordan cocked the handgun that he was
              aiming at Jackson. Jackson explained his purpose and was allowed to
              remove his wallet, which Dawson took and removed the combination for
              Jackson. Dawson retained the wallet. In addition to the wallet, Dawson
              and Jordan took all the coins from the safe, money from the cash register,
              and the wallet from the cashier. The reported loss was about $170.

              At about 8:00 p.m. on February 29, 1980, a man later identified as Jordan
              entered McCoy's Market in Lynwood, approached a checker from behind
              and ordered him to remain at his checkstand, to remove the cash from the
              register and place it in a paper bag. The checker complied and then turned
              around to see that Jordan was holding a gun. A second gunman, later
              identified as Dawson, held a gun pointed to the floor and ordered a second
              checker to empty her register. Dawson directed this checker to also empty
              the till from two closed checkstands. A third, unidentified person was also
              involved in this robbery. The liquor clerk, the snack bar manager and his
              wife were all robbed, as well. Before the three perpetrators left the store,
              Jordan placed a gun in the side of the uniformed but unarmed security

guard and ordered him to the rear of the store. The reported loss was $2,000.

At about 9:00 p.m. on the same date, a box boy at the Boy's Market on Crenshaw Boulevard in Los Angeles observed Jordan enter the store. He immediately came back outside and walked around the corner toward the telephones. Shortly before, the uniformed and armed security guard, Dwight Cousins, had passed the box boy, walking in the same direction. The box boy heard a shot, after which he looked in the direction of the telephones in time to see the security guard falling. Cousins, clutching a telephone receiver as he fell, was heard to cry out, "Oh my God, I've been hit." Jordan, who was holding a gun, told Cousins, "Give me your gun." after which he took the guard's gun. Jordan then entered the store. Cousins bled to death. In the store, two men approached the checker at checkstand 11 and demanded the money from the register. A man later identified as Dawson approached the assistant manager, pointed a gun at him and told him that he would be shot if he did not do as he was told. Dawson then marched the assistant manager to checkstands 6, 5 and 2 in succession (numbers 3 and 4 were closed) where he demanded money from each of the checkers. Jordan approached the checker at checkstand 8 and demanded food stamps and change. He helped the checker to empty the register. Thereafter, Jordan called across the room to Dawson and proceeded to the next checkstand. He then approached the checker at checkstand 6 who informed Jordan that his friend had already been there. As one of the box boys was calling for security, a nearby box girl heard Jordan respond, "I've already killed one person. Do you want to be next?" After Jordan learned that Dawson had been to checkstand 6, he called, "Let's go," and the pair left the store. The reported loss was $1,200.

Dawson and Jordan were arrested at about 11:00 p.m. subsequent to investigation of the McCoy's robbery, after the car they were in was stopped for running a red light. Los Angeles Police Department officers investigating the robbery and murder at the Boy's Market received an anonymous tip regarding the description of the vehicle used in the commission of the offense. They broadcast this information and were contacted by the Los Angeles Sheriff's Department. A subsequent investigation revealed that a vehicle fitting the description was parked at Jordan's residence. Jordan's roommate had a large amount of money when investigated by the officers and revealed that Jordan had called from jail, told him where to find the money and to use it for rent, etc. Dawson and Jordan were seen in custody, interviewed and subsequently placed under arrest on March 10, 1980.

Dawson's crime partner, Kenneth Lamart Jordan, was convicted on 18 or 20 counts of Robbery and 2 counts of Murder 1st and was sentenced to Life Without the Possibility of Parole. On April 24, 1981, the trial court denied Dawson's motion for a new trial but did strike the special circumstances finding on the murder count and sentenced him to 38 years to Life (25-Life plus 13 years). As a result of a remittitur from the Second Appellate District Court of Appeals directing the Los Angeles Superior Court to either impose the Life Without Possibility of Parole under Count 12 or to strike the special circumstance that was found to be true by the jury, the trial court acted on December 3, 1984 to modify the original

sentence to impose the term of Life Without Possibility of Parole on Count 12. Responding to a second remittitur from the Court of Appeals, the Los Angeles County Superior Court acted on November 24, 1986 to strike the special circumstances allegation and resentenced Dawson to the original term of 25 years to Life plus 13 years.

[POR, pp 6-8, 10; Appellate Court Decision (4/25/83) pp 5-6, 13, 15-18]

2.  **Prisoner's Version**:  In an interview for this report, Dawson stated that the following statement represents his version of the issues behind his life crime:

I had no business committing robberies. I had a job and was in the process of moving up into a higher position. I was living with my parents as well as with a girl friend. I knew that Kenneth Jordan was a person who always was in trouble with the law, and during a casual conversation, he asked if I had ever tried doing a robbery, and that all you have to do is show the gun and tell them that this is a robbery and put all the money in the bag. No one was supposed to get hurt. Kenneth Jordan took it upon himself to shoot the security guard, Mr. Cousins.

I did not see what happened, nor did I have any knowledge of what had happened. I would have never went along with committing a crime of robbery if I would have known he was going to harm anyone. If I would have seen what he was about to do, maybe I could have stopped him. He didn't have to shoot the security guard, Mr. Cousins. That was Jordan's judgement, and his only.

Mr. Cousins should have never been harmed; no one should have. I had no business going into someone else's place of business and demanding money from their workers. I had no business breaking the law. I always held a job and didn't have to do these crimes which have put my life in the control of others. I was trying to impress the ladies by always having money and by being able to take them out. But what I've come to realize is that what really impressed everyone who knew me was that I always held down a job and didn't hang out getting in trouble along with the people who stayed in trouble with the law.

My reason for doing these crimes of robbery was stupidity. My motivation was pure ignorance. I have great remorse for my actions and for the families who were affected by my stupidity. No one should have been hurt. Kenneth Jordan acted on his own judgement. I take full responsibility for my actions. I had no business committing crimes of robbery. I am very sorry. This is not in my character.

3.  **Aggravating/Mitigating Circumstances**:

a.  The following factors in aggravation were noted per Title 15 CCR §2283:

   •   The victim, who was shot without warning while he was trying to use a telephone, was particularly vulnerable.

DAWSON, DARRYL          C30679                CTF-Soledad          APR/2003

LIFE PRISONER EVALUATION REPORT                                                4
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

- During the commission of the crime, the prisoner had a clear opportunity to cease but instead continued.

- The manner in which the crime was committed created a potential for serious injury to persons other than the victim of the crime.

- The prisoner was on (summary) probation at the time the crime was committed.

    b.    The following factors in mitigation were noted per Title 15 CCR §2284:

- The prisoner was a passive participant or played a minor role in the commission of the crime.

- The prisoner has a minimal or no history of criminal behavior.

**B.**    <u>Multiple Crime(s)</u>:  None.

## II.    <u>PRECONVICTION FACTORS</u>:

**A.**    <u>Juvenile Record</u>:  None.

**B.**    <u>Adult Convictions and Arrests</u>:  Dawson has a minor criminal history of a total of three contacts with law enforcement before the commitment offense.

He was first arrested on 6/14/74 by Lynwood police for Assault with a Deadly Weapon (245 PC), which was a DA reject due to lack of corpus.

Dawson's second arrest was on 7/16/75 by Los Angeles sheriffs for Possession of Marijuana (11357 H&S), which was also a DA reject due to lack of corpus.

Dawson's last arrest before his commitment offense was on 9/24/79, again by Los Angeles sheriffs, for Driving Under the Influence (23102 VC). On 10/10/79, Dawson pleaded guilty in Compton Municipal Court. Imposition of sentence was suspended, and he was placed on summary probation for one year on condition that he attend driving school and pay a $300 fine. Dawson failed to appear in court on 3/14/80 after receiving an extension on 11/16/79 to pay the fine, and a bench warrant was issued (Dawson had been in Los Angeles County Jail since 2/29/80 on issues related to his commitment offense). On 5/6/80, Dawson pleaded guilty to the violation of probation and was given credit for 10 days served in the county jail. The bench warrant was recalled.
    [CII and POR, p. 5]

**C.**    <u>Personal Factors</u>:  Darryl Leon Dawson was born in Los Angeles on 10/20/55, third of three children to the union of Lauraine (Catley) and Leon Dawson. He told the interviewing officer for his POR that he was raised in a united home with two sisters. At the time of his arrest, Dawson was living with his parents in a three-bedroom house in Compton. He had attended Centennial High School, but dropped out in the twelfth grade. He joined the National Guard in October, 1975.

DAWSON, DARRYL       C30679          CTF-Soledad         APR/2003

He returned from basic training in March, 1976, but failed to attend meetings and was consistently absent without leave. Nevertheless, he was awarded an honorable discharge on 10/24/77. The POR (p. 4) notes that Dawson had been a social drinker since the age of 17; the July 23, 1991 Psychological Evaluation (p. 1) notes also marijuana usage during this period. He acknowledged having a PCP problem while in high school. He was in counseling about his drug usage for a week at Martin Luther King Hospital. In order to get him away from the influence of drugs in the neighborhood, his parents convinced him in 1976 to go to San Antonio, Texas, to live with some relatives. Nevertheless, his drug usage continued. Dawson began using cocaine at the age of 21 and used it up to the time of his commitment offenses. The POR (p. 10) notes the opinion of the investigating Los Angeles Police Officer, who opined that Dawson was definitely involved and was more than a peripheral hanger-on. However, the officer stated that Dawson was not the chief motivator in the planning and commission of the crimes. Codefendant Jordan was apparently supplying Dawson with drugs and used this as an inducement to convince Dawson to participate in the robberies. Dawson had not married by the time of incarceration, but had fathered a boy who was six years old at the time of Dawson's commitment. The file shows no evidence of sexual abuse or of a mental disorder.

III.    POSTCONVICTION FACTORS:

A.    Special Programming/Accommodations: None required.

B.    Custody History:

| | | |
|---|---|---|
| 05/22/81 to 06/17/81 | RCC-CIM |
| 06/18/81 to 07/16/85 | SQ |
| 07/17/85 to 08/25/96 | DVI |
| 08/26/96 to 02/27/97 | CVSP Chuckawalla |
| 02/28/97 to 09/07/97 | CCI |
| 09/08/97 to Present | CTF |

| | | |
|---|---|---|
| 07/02/81 to 09/11/83 | Close B custody |
| 09/12/83 to 02/12/86 | Medium A custody |
| 02/13/86 to 08/17/89 | Close B custody (per guidelines of OP #71) |
| 08/18/89 to Present | Medium A custody |

Dawson was first assigned at San Quentin to A.M. School on 7/2/81. He was in the ABE-II class by 9/8/81 and in the ABE-III class from 1/29/82 until shortly before 11/18/82, when he was dropped non-adversely subsequent to a housing change that precluded participation in the A.M. School. He was assigned as a clerical worker in January, 1983. He earned good ratings, and received the approbation "amazingly efficient" on his CDC 101 chrono dated 7/18/84.

At Deuel Vocational Institution, Dawson was assigned first as a clerk ("exceptional worker" per 12/31/85 CDC 101), then as a general maintenance worker and, on 3/28/86, to the PIA Mattress Factory as a pillow maker. He became a sewing machine operator on 1/1/88 ("excellent worker with exceptional sewing skills" per 10/2/89 CDC 101) and, on 3/15/94, was promoted to Leadman in the Mattress Factory. His final CDC 101 at DVI, dated 7/19/96, stated, "Dawson has had to step up and help up production levels in the factory. He has

LIFE PRISONER EVALUATION REPORT                                              6
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

done a very good job." In addition to his regular work assignment, Dawson
studied for and passed the GED test battery and received his certificate on
5/29/91.

At Chuckawalla Valley State Prison, Dawson was assigned to the Yard
Maintenance Crew from 9/17/96 to 10/2/96. He was then introduced to the
vocational field of graphic arts through assignment to the CVSP Graphic Arts
program from 10/3/96 to 2/27/97.

At the California Correctional Institution, Dawson was assigned to their
vocational print shop program from 3/27/97 through 5/9/97.

At the Correctional Training Facility, Dawson was initially assigned as a dining
hall worker from 9/27/97 to 9/30/97. He was then assigned to the vocational print
program 10/1/97. He was dropped from the program due to course completion on
10/16/01 and reassigned as a Journeyman Graphic Artist on 12/26/01. Per a
memo written on 7/6/00, Dawson has the skills to make an excellent employee in
the printing industry.

C.    **Therapy and Self-Help Activities**: Although Dawson started submitting urine
      samples for toxicological testing as early as 12/26/95, he did not start participating
      in AA Group until 10/5/99 (per 128-B chrono dated 1/13/00) or in NA Group
      until 6/14/01 (per 128-B chronos dated 7/2/01 and 10/1/01). *What about 02/03*

D.    **Disciplinary History**: Dawson's disciplinary history is limited to two Rules
      Violation Reports. The first, dated 10/21/82, is a serious violation from San
      Quentin for involvement in an Altercation (a cell fight). He was found guilty and
      assessed 10 days Disciplinary Detention and 10 days loss of behavior credits. The
      second/last, dated 1/12/02, is an administrative violation from CTF for Sexual
      Behavior (in Visiting Room). He was found guilty and assessed 30 days loss of *7 yr)*
      privileges, counseled, warned and reprimanded.

E.    **Other**: Dawson attended his Documentation Hearing #4 on 8/9/00. The BPT
      Representative made the following evaluations and recommendations:

      re: vocational training,  1997 – Voc Graphic Arts / Offset Print program to date.
         Inmate indicates he's at journeyman stage of program & is assisting instructor
         Mapes in training other inmates (indicates recent letters from Mapes to support
         claims, however, not found in file).
      re: academics,  Received GED per test results document dated 5/29/91 while at
         DVI.
      re: work record,  None this period.
      re: group activities,  Periodic participant of AA (chrono dated 1/13/00).
      re: psychiatric treatment,  None noted.
      re: prison behavior,  Disciplinary free.
      re: other,  Class Score as of 6/22/00 = 0 (has been 0 since 6/16/92); for next
         hearing, inmate is to:
             1)  Remain disciplinary free,
             2)  Complete or get Certificate of Completion in Graphic Arts / Offset
                 Print program,
             3)  Continue participation in AA/NA as available.
             4)  Solicit letters of support from family and/or friends attesting to offers
                 of employment, housing, support.

DAWSON, DARRYL          C30679              CTF-Soledad              APR/2003

LIFE PRISONER EVALUATION REPORT
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR                                                                              7

IV.    **FUTURE PLANS:**

   A.    **Residence:** In an interview for this report, Dawson stated that should he receive parole consideration, he would be able to live with his wife, Janice Dawson, who currently resides at 1000 Harbor Heights Dr. #L, in Harbor City. The telephone number at that address is (310) 257-9203. Both he and his wife would also be able to live with his mother, Lauraine Dawson at 1505 W. 138th Street in Compton. The telephone number at that address is (310) 635-6307. Each of these addresses is within Dawson's county of commitment, Los Angeles.

   B.    **Employment:** Dawson states that he will be able to secure employment using skills that he has acquired in the off-set printing and mattress fabrication trades.

   C.    **Assessment:** Dawson's residence and employment plans appear realistic to this writer. Dawson will not be able to secure any firm offers of employment until he can provide the prospective employer with a parole date, and therefore his lack of specific employment offers does not appear to be a issue subject to his control.

V.    **USINS Status:** Not applicable.

VI.    **SUMMARY:**

   A.    Considering the commitment offense, minor prior record and positive prison adjustment over an extended period of time, this writer believes that the prisoner would probably pose a low degree of threat to the public at this time, if released from prison, should he remain drug and alcohol free.

   B.    Prior to release, the prisoner could benefit from remaining disciplinary free, continuing his participation in AA/NA groups as available and maintaining current job skills.

   C.    This report is based upon an interview with the prisoner on 2/24/03 lasting approximately one hour and a complete review of the central file.

   D.    Prisoner was afforded an opportunity to review his central file, per the Olson Decision, on 2/24/03.

   E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication.

DAWSON, DARRYL          C30679                    CTF-Soledad            APR/2003

LIFE PRISONER EVALATION REP
INITIAL PAROLE CONSIDERATION HEARING
APRIL 2003 CALENDAR

8

_G. Peabody_     3/26/03
G. Peabody          Date
Correctional Counselor I


4- _L.R. Baker - (CCII(A)_ 3/27/03
C. Plymesser        Date
Correctional Counselor II


_C.O. SS_     3-27-03
L. Trexler        Date
Facility Captain


_Levorse,_ C&P.R 3-27-03
D. S. Levorse       Date
Classification and Parole Representative


DAWSON, DARRYL     C30679        CTF       APR/2003

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 2006 CALENDAR

DAWSON, DARRYL                                                C30679

I.    **COMMITMENT FACTORS:**

    A.    <u>Life Crime:</u> Murder 1st PC 187, Armed with firearm PC 12022.5 and 12 counts of Robbery PC 211 with Use of Firearm 12022.5 PC, Los Angeles County case number A-357550. Victim: Dwight Cousins, age unknown. Received in CDC on 5/22/81. Sentence: 25 years to life plus one year. MEPD: 5/31/04.

        1.    <u>Summary of Crime:</u> All relevant documents from the previous hearings including the transcripts have been considered and that information appears valid and the writer has not further information to add.

        2.    <u>Prisoner's Version:</u> Remains the same as stated in the previous hearing.

        3.    <u>Aggravating/Mitigating Circumstances:</u>

            a.    <u>Aggravating Factors:</u> Remains the same as stated in the previous hearing.

            b.    <u>Mitigating Factors:</u> Remains the same as stated in the previous hearing.

    B.    <u>Multiple Crime(s):</u> None.

        1.    <u>Summary of Crime:</u> None.

        2.    <u>Prisoner's Version:</u> None.

II.    **PRECONVICTION FACTORS:**

    A.    <u>Juvenile Record:</u> Remains the same.

    B.    <u>Adult Convictions and Arrests:</u> Remains the same.

    C.    <u>Personal Factors:</u> Remains the same.

COPY TO INMATE ON: March 9, 2006

DAWSON, DARRYL          C30679              CTF-SOLEDAD              APR/2006

LIFE PRISONER EVALUATION REPORT — 2
SUBSEQUENT PAROLE CONSIDERATION HEARING
APRIL 2006 CALENDAR

III.    **POSTCONVICTION FACTORS:**

A.    <u>Special Programming/Accommodations:</u>  None.

B.    <u>Custody History:</u> Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing (10/15/03) Dawson behavior has been positive, in that, he has remained disciplinary free and received exceptional work reports at his assignment as a Lunch Box crew worker.

C.    <u>Therapy and Self-Help Activities:</u>  Dawson attends Alcoholics/Narcotics Anonymous meetings.

D.    <u>Disciplinary History:</u>  Dawson has received two CDC 115's and one CDC 128A. (See disciplinary sheet for details).

E.    <u>Other:</u>  An Initial Parole Hearing was held on 10/15/03. The Board of Prison Terms denied parole for three (3) additional years.
Recommendations:
1.  Remain disciplinary free.
2.  Upgrade vocationally.
3.  Participate in Self-Help.

IV.    **FUTURE PLANS:**

A.    <u>Residence:</u>  In an interview for this report, Dawson stated that he had plans to live with his wife, Janice Dawson, who currently resides at 1000 Harbor Heights Dr. #L, in Harbor City, Ca. The telephone number at that address is (310) 635-6307.

B.    <u>Employment:</u> Dawson stated that he will be able to secure employment using skills that he has acquired in the off-set printing and mattress fabrication trades.

C.    <u>Assessment:</u>  Dawson's resident and employment plans appear realistic to this writer. Dawson will not be able to secure any firm offers of employment until he can provide the prospective employer with a parole date, and therefore his lack of specific employment offers does not appear to be a issue subject to his control.

V.    <u>USINS STATUS:</u> Not applicable.


DAWSON, DARRYL          C30679                    CTF-SOLEDAD              APR/2006

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING                    —                    3
APRIL 2006 CALENDAR

VI.    **SUMMARY:**

A.    Prior to release the prisoner could benefit from: remaining disciplinary free, participating in Alcoholics /Narcotics group as available and maintaining current job skills.

B.    This report is based upon a personal interview, incidental contact in the housing unit a thorough review of the Central File.

C.    Prisoner was afforded an opportunity to examine his Central File. See CDC 128B dated 1/28/06.

D.    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

DAWSON, DARRYL          C30679                    CTF-SOLEDAD          APR/2006

DISCIPLINARY SHEET

**CDC 128A's:**

04/19/85          SQ                    Left Work Assignment without Permission.


**CDC 115's:**

10/21/82          SQ                    Physical altercation with cell mate.

01/12/02          CTF-CENTRAL      Sexual Behavior with his Visitor.


DAWSON, DARRYL          C30679                    CTF-SOLEDAD          APR/2006.

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING                                    4
APRIL 2006 CALENDAR

_B.J. Crowley_                   _2/10/06_
B.J. Crowley, CCI (A)                    Date
Correctional Counselor I


_M Arfa_                        _2-21-06_
M. Arfa,                                Date
Correctional Counselor II


_J.L. Clancy_                   _2/24/06_
J.L. Clancy,                             Date
Facility Captain


_D.S. Levorse, C&PR_  _3-3-06_
D. S. Levorse,                          Date
Classification and Parole Representative


DAWSON, DARRYL          C30679              CTF-SOLEDAD          APR/2006

# EXHIBIT D
# (Previous Decision)

88

1         CALIFORNIA BOARD OF PRISON TERMS

2                 D E C I S I O N

3         DEPUTY COMMISSIONER BLONIEN:   We are back on

4    record.

5         PRESIDING COMMISSIONER WELCH:   Okay.  The

6    Panel reviewed all the information received from

7    the public and relied on the following

8    circumstances in concluding that the prisoner is

9    not suitable for parole and would pose an

10   unreasonable risk of danger to society or a threat

11   to public safety if released from prison.  One,

12   the offense was carried out in an especially cruel

13   -- I should say offenses was carried out in an

14   especially cruel and callous manner.  Multiple

15   victims was involved in separate incidents.  One

16   individual was killed.  The offense was carried

17   out in a manner that demonstrates an exceptionally

18   callous disregard for another human being.  The

19   offense was carried out in a dispassionate and a

20   calculated manner.  The motive for the crime was

21   inexplicable or very trivial.  In fact, during the

22   prisoner's testimony it was hard to find a motive

23   for this -- for these -- for this crime wave based

24   on his testimony.  And what's interesting about

25   this case, the first crime did not deter the

26   prisoner from persisting and committing a series

27   DARRYL DAWSON   C-30679   DECISION PAGE 1    4/15/03

1    of other crimes until finally the victim was

2    killed, Mr. Cousins was killed by one of the

3    prisoner's crimes.  The prisoner had some prior

4    criminal history, not a major criminal record, but

5    he did have some criminal history.  Arrests,

6    certainly he had had some arrests, but not a major

7    criminal history.  It appears that there was an

8    escalating pattern of criminal conduct.  However,

9    under unstable social history, it does not appear

10   that prisoner had an unstable social history.  It

11   appeared that he grew up in an intact home.  It

12   appeared that he was provided with proper guidance

13   and parenting during his formative years.  The

14   prisoner has had some problems programming, but

15   nothing major.  He received two disciplinaries, a

16   cell fight in '82 and sexual behavior in the

17   visiting room.  So, the prisoner really doesn't

18   have a major history of disciplinaries in the

19   institution.  A recent psychiatric report shows

20   that the prisoner is making progress.  Dr. Gamard

21   shows that he's on the right track.  His level of

22   dangerousness both in the community and in the

23   prison is reduced.  The prisoner has some parole

24   plans.  Certainly he has some support plans.  The

25   area that the prisoner is lacking certainly is in

26   the area of job opportunities.  The Hearing Panel

27   DARRYL DAWSON  C-30679   DECISION PAGE 2    4/15/03

—            —

90

1   notes that in response to Penal Code 3042 notices

2   indicating an opposition to a finding of

3   suitability the Deputy District Attorney from Los

4   Angeles spoke in opposition to a finding of

5   suitability.  The Panel makes the following

6   findings:  The prisoner needs to continue and to

7   make a special effort to involve himself in self-

8   help programs or any other of program that may be

9   available to him in the institution that would

10  help him be able to cope with stress in a

11  nondestructive manner.  Until enough progress is

12  made it is the opinion of the Board that the

13  prisoner continues to be unpredictable and a

14  threat to others.  However, I have to say the

15  prisoner has made some positive gains.  Certainly

16  we want to commend the prisoner for his vocation.

17  It's not often that we find a vocational

18  supervisor writes a letter giving the prisoner

19  accolades for his achievements.  Also, the

20  prisoner has only had two disciplinaries, only one

21  that involved violence and that was back in 1982

22  and the other one was for sexual behavior.  But

23  certainly the prisoner's behavior in prison has

24  been relatively good and certainly we want to

25  commend you for that.  And the good job reports,

26  it goes without saying the prisoner gets good job

27  DARRYL DAWSON  C-30679    DECISION PAGE 3   4/15/03

91

1   reports.  However, those positive aspects of his

2   behavior does not outweigh the factors of

3   unsuitability.  Parole is going to be denied for

4   three years.  In a separate decision, the Hearing

5   Panel finds that the prisoner has been convicted

6   of murder and it's not reasonable to expect that

7   parole would be granted to the prisoner during the

8   following three years.  The specific reasons:  One

9   is the crime.  The prisoner was involved on a

10  crime spree, not one crime, but just a series of

11  robberies, and it appears that those robberies --

12  ~~the viciousness of these robberies intensified~~

13  where clerks was being forced to open -- managers

14  and clerks forced to open safes at gunpoint, open

15  registers at gunpoint.  Threats were made to the

16  individuals that's working in these

17  establishments, so it was certainly a very

18  frightful time for the victims that was subjected

19  to this.  Multiple victims were attacked.  What I

20  mean by attacked was involved.  One person was

21  killed, Mr. Cousins, the security guard.  The

22  offense was carried out certainly in a coldhearted

23  and an uncaring manner both towards the victims

24  and for the community that you were a part of.

25  The offense was carried out in a calculated

26  manner.  In order to carry out a series of

27  DARRYL DAWSON  C-30679  DECISION PAGE 4   4/15/03

92

1    offenses like that they certainly had to be

2    calculated.  There certainly had to be some

3    planning and there certainly had to be some

4    thought.  It's not just afterthought as the

5    prisoner would have the Board to believe that he

6    really didn't need to participate in his offenses.

7    However, he had a job, but it just so happened he

8    got hooked up with bad company, meaning his crime

9    partner.  The offense was carried out in a manner

10   that demonstrates an exceptionally callous

11   disregard for the public order and for the

12   ~~suffering of another human being.  And the motive~~

13   was certainly inexplicable.  The prisoner has not

14   completed the necessary programming which is

15   essential to his adjustment and needs additional

16   time to gain such programming.  He needs to

17   continue to participate in self-help and

18   vocational and those kinds of programs.

19   Therefore, a longer period of observation and

20   evaluation of the prisoner is required before the

21   Board shall find that the prisoner is suitable for

22   parole.  The Panel recommends that you become and

23   remain disciplinary-free, that you continue your

24   effort in education and vocation, that you

25   intensify your effort in self-help.  I really feel

26   that part of the decision, at least on the part of

27   DARRYL DAWSON   C-30679   DECISION PAGE 5   4/15/03

93

1    this Commissioner, is that your insight into the

2    crime is -- in the opinion of the Board is very,

3    very lacking, the reasons why you would involve

4    yourself in a series of crimes like this.

5    Certainly, the District Attorney hit on the fact

6    that in your testimony you allege that you did not

7    need the money, that you had a job, that you were

8    working.  Certainly, the Board feels that you

9    should have some type of insight into why you

10   committed these crimes.  And the other thing that

11   is -- that is of concern and we think -- we feel

12   that it would take you at least three years to

13   gain this insight, there seemed to be a common

14   thread in your testimony and I mentioned this to

15   your earlier.  It's almost they made me do that.

16   The booze was found in the car because my cousin

17   left an open container and I was stopped; however,

18   you were the one drunk in the car when the police

19   arrested you.  My crime partner carried the crime

20   too far and Mr. Cousins was killed; however, you

21   were involved in a whole series of -- a whole

22   series of robberies prior to the fatal incident.

23   So, I think if you try to get some insight into

24   the crime and you try to get some insight into

25   your behavior, and the way you do that is get

26   involved in meaningful kinds of self-help

27   DARRYL DAWSON  C-30679  DECISION PAGE 6  4/15/03

94

1  programs, the kinds of programs that help you deal

2  with anger management, the ones that help you deal

3  with self-control, self-actualization, to

4  understand yourself and the dynamics of your

5  community and the dynamics of -- as they relate to

6  other people, how you interact with other people.

7  And I think if you get involved in those kinds of

8  programs I think you'll be on the right track

9  because certainly the work that you've put in the

10 vocational programs has been outstanding and we

11 want you to continue in that area.  But -- I'm

12 sorry.

13              [Thereupon, the tape was

14              changed off the record.]

15     PRESIDING COMMISSIONER WELCH:  And he needs

16 to continue to involve himself in those kinds of

17 programs.

18     DEPUTY COMMISSIONER BLONIEN:  Okay, we are

19 back on record.

20     PRESIDING COMMISSIONER WELCH:  And we're

21 aware that you did take Anger Management, but we

22 certainly encourage you to continue in those kinds

23 of programs.  And that's all I have to say.

24 Commissioner, do you have any comments?

25     DEPUTY COMMISSIONER BLONIEN:  Yeah, I did.

26 You have a very strong family, a strong mother, a

27 DARRYL DAWSON  C-30679  DECISION PAGE 7  4/15/03

95

1    strong wife, who are very supportive of you.  And

2    I know you were disappointed when you heard the

3    three years.  But in terms of self-help, if you

4    don't like group self-help there's a way that you

5    could do your own directed self-help.  And when

6    you go back into the world after being

7    incarcerated for a long time and you're going into

8    a family supportive group that's very strong,

9    sometimes it's more difficult for you because

10   you're absolute I am, I say it is therefore it is,

11   I'm not going to be doing drugs because I just

12   don't do that anymore, that doesn't always hold up

13   as well.  And through self-help that you could

14   direct yourself through books and different

15   avenues available here at the institution I think

16   you would strengthen yourself and be more ready

17   for that kind of relationship with a very strong

18   family.  So, I wish you well and I think you're

19   well on the road to doing well.

20        PRESIDING COMMISSIONER WELCH:  Okay, that

21   concludes the decision at approximately 2:30.

22   Good luck to you, sir.

23             --oOo--

24

25   PAROLE DENIED THREE YEARS

26   FINAL DATE OF DECISION    JUL 1 4 2003

27   DARRYL DAWSON  C-30679.  DECISION PAGE 8   4/15/03

96

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 95, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of DARRYL DAWSON, CDC No. C-30679, on APRIL 15, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated April 23, 2003, at Sacramento County, California.

Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**